**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| PATRICIA BURKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:16cv1256 (LO/JFA) |
| | ) | |
| JAMES MATTIS, Secretary, United States Department of Defense, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

DANA J. BOENTE
United States Attorney

ANDREW S. HAN
Assistant United States Attorney
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:     (703) 299-3970
Fax:     (703) 299-3983
Email:  andrew.han@usdoj.gov
*Counsel for Defendant*

## INTRODUCTION

On or about August 6, 2013, despite knowing that telework was not authorized for childcare and that all alternative work schedules had been canceled agency-wide for budget reasons, Plaintiff Patricia Burke contacted the EEO office of her employer, the Defense Security Service ("DSS"), to claim discrimination for being taken off of her alternate work schedule. Since then, Plaintiff has reported any and all perceived affronts by her supervisors to the EEO office. From being left off an email, to having her workstation be moved *closer* to her team, Plaintiff has collected the "ordinary tribulations of the workplace," *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), and asserts a single claim of retaliatory hostile work environment under Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973. But this claim is devoid of any merit.

First, to the extent that Plaintiff can show that the putative harassment occurred as she alleges, she cannot prove that her working environment, viewed as a whole, would not have happened but-for her EEO activity. Several incidents, such as changes to her work schedule and "exclusion" from meetings, *preceded* her contact with the EEO office, thereby negating any inference of causation. Others, such as a lower performance review, involved a supervisor who was unaware of Plaintiff's EEO activity at the relevant time. For many incidents, Plaintiff lacks evidence beyond her own conclusory opinions that her EEO activity was the but-for cause of the alleged harassment.

And second, the totality of the circumstances that Plaintiff complains of is not "severe or pervasive" so as to sustain a retaliatory hostile work environment claim. To sustain such a claim, conduct must be both subjectively *and* objectively hostile or abusive. However, irrespective of Plaintiff's subjective perception of the putative harassing conduct in this case (e.g., overhearing a handful of negative comments), such conduct is a far cry from being objectively hostile or abusive.

Accordingly, because Plaintiff complains of nothing more than the "ordinary tribulations of the workplace," Defendant's motion for summary judgment should be granted.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

## I.     GENERAL BACKGROUND OF PLAINTIFF'S EMPLOYMENT WITH DSS

1.     DSS is a 900-person agency within the Department of Defense ("DoD"). The Counterintelligence Directorate ("CI") of DSS is tasked with identifying and addressing hostile attempts to penetrate cleared industry (e.g., Lockheed Martin, etc.). DEX 11, at 24:1-25:4, 74:11-12.

2.     In January 2011, Plaintiff was hired as a GS-12 Field Support Analyst at DSS headquarters, which at the time was located in Alexandria. Later that year in July, DSS headquarters (including Plaintiff) moved to its current location in Quantico. Plaintiff's position was within the Operations Division of CI. Her first-level supervisor was Nelson Bishop, and her second-level supervisor was David Bauer. DEX 7, at 16:7-11; DEX 26; DEX 27.

3.     Shortly after Plaintiff started at DSS, her previous employer attempted to re-hire her. To persuade Plaintiff to stay, Bauer offered Plaintiff the opportunity to attend the DoD Counterintelligence Agent Course ("DCAC"), which would potentially increase the opportunities for Plaintiff's career growth at DSS by exposing her to more substantive aspects of the CI mission. Plaintiff attended the DCAC training in fall 2011. DEX 7, at 252:19-253:1; DEX 14, at 20.

4.     Plaintiff became a GS-13 in January 2012. DEX 28.

5.     During summer 2012, the Operations Division was understaffed. Because Plaintiff completed the DCAC training, she had the necessary background to be detailed as an Intelligence Operations Specialist (also known as a "Desk Officer") within the Operations Division. Plaintiff continued to serve in a Desk Officer capacity, at least in part, until around the time she went on maternity leave in March 2013. DEX 7, at 116:11-14; DEX 14, at 20.

6.     In May 2012, during Plaintiff's detail, CI underwent a reorganization whereby a branch of the Operations Division was elevated to its own separate division within CI called the Policy, Plans, & Programs Division ("P3"). Bishop was also elevated to be the Assistant Director of

P3. Plaintiff's billet remained with the Operations Division, so she continued to report to Bauer until he stepped down from the position of Assistant Director of Operations in 2013. DEX 8, at 19:12-20:12; DEX 14, at 3.

7.      On February 22, 2013, Plaintiff completed training to allow her to request telework, which is a discretionary privilege. According to the training, telework is expressly prohibited from being used for childcare purposes. DEX 7, at 39:14-40:3; DEX 31; DEX 32; DEX 34.

8.      Plaintiff had her first child in March 2013 and took approximately four weeks of maternity leave. Just prior to taking maternity leave, she began a "4/10" work schedule,[1] which effectively gave her every Wednesday off without taking leave. Plaintiff also used telework in order to care for her child. DEX 7, at 10:12-13, 28:16-29:10, 32:17-33:25; DEX 38.

## II.    FACTS RELATED TO PLAINTIFF'S SPECIFIC ALLEGATIONS

### A.    <u>Work Schedule</u>

9.      On May 15, 2013, the Director of DSS, Stanley Sims, issued a memorandum ("Sims Memo") to the entire agency notifying employees that they would have to be furloughed for a brief period of time in response to the federal budget sequestration (i.e., congressionally mandated budget cuts) that began in March 2013. Director Sims also canceled all alternative work schedules during the furlough period, absent extraordinary circumstances, to ensure that the furloughs were imposed fairly and correctly. DEX 19.

10.     On July 29, 2013, Franklin Malafarina took over as the Assistant Director of Operations from Bauer, who lateraled over to a different position in DSS. Malafarina had previously

---

[1] There are two basic types of alternative work schedules. One type permits varying the start and end times of a workday. Another type permits working more than 8 hours/day so that one or two days off in a pay period (i.e., two weeks) can be taken without using leave. For example, on a 4/10 schedule, an employee works 10 hours/day, 4 days/week. Another example is a "Maxiflex" schedule, which essentially combines the two types of alternative work schedules. Whether to permit alternative work schedules was in the discretion of DSS management. DEX 33.

been the Chief of CI for the Southern Region based in Texas. In his new role, Malafarina oversaw approximately 110 employees. DEX 10, at 14:1-15, 106:15-16; DEX 14, at 2; DEX 16, at 2.

11.     At a CI leadership meeting during Malafarina's first week, the Director of CI William Stephens asked whether every division was in compliance with the Sims Memo. Because Malafarina was new to his position, he had to check with Bauer after the meeting to see if the Operations Division was in compliance. Bauer advised that everyone was in compliance except for Plaintiff, who was still on an alternative work schedule and/or telework. Malafarina conveyed this information to Stephens and the Deputy Director of CI Mark Allen. DEX 10, at 54:21-56:18.

12.     Soon thereafter, on or about August 1, 2013, Allen met with Plaintiff to inform her that her alternative work schedule/telework giving her every Wednesday off was canceled. Plaintiff went to Malafarina to discuss the cancelation of her alternative work schedule and telework. Malafarina explained to her that telework could not be used for childcare and that he did not have the authority to permit otherwise. DEX 10, at 64:14-65:6, 77:20-78:10, 81:10-82:12, 84:18-85:22.

13.     Claiming gender discrimination, Plaintiff contacted the EEO office on or about August 6, 2013, to complain about the cancelation of her alternative work schedule. DEX 3.

14.     On August 30, 2013, Carolyn Lyle, the then-Director of the EEO Office, Michelle Labov (née Benitez), an EEO Specialist, Malafarina, and Plaintiff met to discuss Plaintiff's concerns. At that point in time, Malafarina had never actually received any formal request from Plaintiff for an alternative work schedule. DEX 10, at 196:15-197:1, 258:20-259:5.

15.     On September 3, 2013, Plaintiff submitted a formal request for a 4/10 schedule to Malafarina. Malafarina consulted with Elizabeth Blackmon of the Human Capital Management Office (i.e., DSS's human resources department) and CI leadership concerning Plaintiff's request. On Friday, September 6, 2013, Malafarina approved Plaintiff's request for two pay periods and with modifications to the start and end times of each workday that she had sought. The temporary

approval was intended to allow Plaintiff time to address her childcare needs with the ultimate goal of having her return to a regular 5/8 schedule. DEX 10, at 330:21-331:16; DEX 41; DEX 42.

16.     After that weekend, on Monday, September 9, 2013, Carl Taylor began his tenure at the DSS headquarters as the Deputy Assistant Director of Operations under Malafarina and as the first-level supervisor of Plaintiff. Taylor had previously been the Chief of CI for the Northern Region based in Massachusetts. DEX 12, at 11:14-12:3; DEX 18, at 2.

17.     In the morning of Taylor's first day, Plaintiff contacted him concerning her work schedule. She stated that she would adhere to the temporary schedule approved by Malafarina, but she could not adhere to the revised daily start and end times that he had imposed. After consulting with Malafarina, Taylor agreed to allow Plaintiff to adjust her daily start and end times for the four-week period as she had requested. At the same time, Taylor requested that Plaintiff send him an email when she arrived and when she departed each day during the four-week period. Because no other employees at the time were on an alternative work schedule, and because no supervisor was present at Plaintiff's requested arrival time, this sign in/out requirement provided an internal control for Taylor's timekeeping responsibilities. DEX 18, at 24; DEX 43; DEX 44; DEX 45.

18.     On September 11, 2013, separate from any alternative work schedule, Taylor signed a telework agreement allowing Plaintiff also to have situational telework privileges. DEX 30.

19.     By this time, the furlough period had ended. On September 13, 2013, Stephens issued a memorandum permitting CI employees to submit formal requests to begin, or return to, alternative work schedules, which Plaintiff did. On September 30, 2013, Taylor approved an alternative work schedule for Plaintiff, which required her to be present in the office every workday but permitted a flexible starting time. DEX 47; DEX 48.

20.     By December 2013, Malafarina and Taylor had been in their new positions long enough to be comfortable with permitting employees on their team to request a Maxiflex schedule,

which Plaintiff again did. Taylor approved her request on December 24, 2013, with the same

instruction that he gave to his entire team: that she advise him ahead of each pay period if she

intended to "flex" her schedule during that pay period. DEX 12, at 67:1-68:5, 213:2-214:9; DEX 53.

21.     On February 10 and February 14, 2014, Taylor reminded those Operations Division

personnel on a Maxiflex schedule, including Plaintiff, of his instruction that they advise him ahead of

time of any intended schedule "flex." On February 20, 2014, due in part to Plaintiff's failure to

follow this instruction, Taylor canceled her Maxiflex schedule. DEX 20; DEX 56; DEX 57.

22.     Plaintiff continues to have situational telework privileges today. She resumed a

Maxiflex schedule as of at least 2015, which she is also still on today. DEX 7, at 18:10-19, 20:5-21:2.

**B.     Attendance at Staff Meetings**

23.     Depending on the subject of a particular staff meeting in the Operations Division or

in CI generally, not all personnel were required to attend. Due to the classified nature of CI's work,

personnel would be invited to meetings on a need-to-know basis. DEX 12, at 137:1-138:5.

24.     When Taylor held a meeting, it was his practice to begin at the stated start time and

to not wait for anyone who was late or absent. DEX 12, at 136:13-25.

**C.     Position Description**

25.     Plaintiff's position description as a Field Support Analyst included among the major

responsibilities: "other duties as assigned." DEX 25.

26.     The Operations Division had no personnel below a GS-13 level, except for one

contractor who provided executive-assistant support for six or seven CI divisions. DEX 10, at

267:8-268:9.

27.     In October 2014, CI underwent another reorganization. Over the next several

months, position descriptions for fourteen (14) employees and contractors, including Plaintiff, were

rewritten to clarify what their roles and responsibilities would be following the reorganization. The

position descriptions were merged and generalized to facilitate moving employees across projects, workflows, and branches. DEX 17, at 3.

28.     Despite this reorganization, Plaintiff attested that "[her] position description was essentially left the same" and that "[n]othing happened with regard to [her] position description." DEX 13, at 2-3.

### D.     Workstation Location

29.     Employees in CI, including the Operations Division, were all located in a Sensitive Compartmented Information Facility ("SCIF"). Lower-level employees sat in cubicles grouped in rows of six along the edges of the SCIF. Managers sat mostly in semi-enclosed offices grouped in the center of the floor. DEX 7, at 164:18-23; DEX 11, at 149:8-17; DEX 24.

30.     At the end of 2012, Bauer approved Plaintiff's request to move her cubicle to be across from the cubicle of Jessica Horvath, an employee in P3. DEX 14, at 10.

31.     In November 2013, Plaintiff's cubicle was moved two rows over to be closer to the rest of the Operations Division. The other five cubicles in the cubicle row were occupied by Desk Officers with the Operations Division. This move also put Plaintiff closer to Taylor's office. DEX 7, at 167:24-168:1, 170:15-21, 171:18-23; DEX 24 (moving from "PB2" to "PB3", and noting "CT").

### E.     Request for a Duty Station Relocation

32.     On January 30, 2014, Plaintiff sent a request to Taylor that her duty station be moved from Quantico to either of DSS's offices in Alexandria or Fort Meade in order to ease her daily commute. DEX 18, at 25-27; DEX 55.

33.     On February 4, 2014, after consulting with the Office of General Counsel and human resources, Taylor denied this request because Operations Division personnel needed to be available in-person at Quantico and because, as a general policy, DSS does not grant duty station transfers for any employee without applying for an announced vacancy. DEX 18, at 25-27; DEX 55.

34. No Field Support Analyst or Desk Officer positions were stationed in either Alexandria or Fort Meade. DEX 12, at 280:21-281:7.

**F.     Performance Review for 2013**

35. Bauer provided Plaintiff's 2013 performance review because he had supervised her during the majority of the performance period (October 1 through September 30). He rated her as overall a "3," i.e., "Successful" under DSS's rating scale, because in his opinion as her supervisor, her work was consistent with DSS's standards that equated to that overall rating. DEX 14, at 5-10.

36. Bauer was unaware that she had filed an EEO complaint at the time that he rated her. DEX 14, at 9.

**G.     Use of the Mother's Room**

37. Plaintiff gave birth to her second child in August 2014. She nursed both of her children for approximately one year each after giving birth. DEX 7, at 145:9-14, 289:21-24.

38. Plaintiff never used any leave time in order to express milk. DEX 7, at 153:9-12.

**H.     The June 25, 2015, Meeting**

39. On June 25, 2015, Michael Buckley, a supervisor within CI (but not in Plaintiff's direct supervisory chain) overheard Plaintiff having a discussion with Bishop concerning a personnel action involving another employee. His office was adjacent to Bishop's and, because incomplete walls composed the internal SCIF offices, he heard the conversation between Plaintiff and Bishop. DEX 9, at 90:7-16, 95:10-18, 96:3-21; DEX 15, at 2-4.

40. Buckley believed that the conversation between Plaintiff and Bishop was inappropriate because, among other things, the personnel action was confidential, and Plaintiff's understanding of the situation was incorrect. Buckley was also upset because he believed that Bishop, as a GS-15, should not have permitted Plaintiff to speak about the personnel action in the manner that she did. DEX 9, at 96:22-98:15.

41.     To address the matter, Buckley called Plaintiff, Bishop, Allen, Malafarina, and Taylor into a conference room ("the June 2015 meeting"). While seated around the conference table, Buckley criticized Plaintiff for her inappropriate behavior. He did not discipline her. DEX 7, at 192:10-12; DEX 9, at 90:15-92:2, 93:18-95:7, 99:16-100:15.

42.     Burke left the June 2015 meeting, after which Buckley continued the meeting and criticized Bishop for how he had conducted himself with a subordinate. DEX 9, at 109:18-110:5.

## III.    PLAINTIFF'S CURRENT POSITION AT DSS

43.     Due in part to the October 2014 reorganization of CI, it was determined that Plaintiff's position could be moved to P3 without taking away from the ability of the Operations Division to fulfill its mission. DEX 10, at 210:3-18, 211:15-212:22.

44.     In November 2015, Plaintiff was officially realigned to P3 as a Program Analyst. Bishop became her supervisor again and remained as such until his retirement from DSS in April 2017. DEX 7, at 23:16-24:7; DEX 29.

## IV.    PROCEDURAL HISTORY

45.     On or about August 6, 2013, Plaintiff contacted the EEO office regarding the cancelation of her alternative work schedule and telework arrangement. DEX 3.

46.     On September 10, 2013, Plaintiff filed her first formal EEO complaint. Plaintiff amended her formal EEO complaint several times to include additional claims based on sex discrimination, disability discrimination, retaliation, and hostile work environment. DEX 4, DEX 5.

47.     Since she first contacted the EEO office, Plaintiff has forwarded dozens upon dozens of emails to the EEO office nearly every day, sometimes with comment and sometimes not, to ostensibly report any and all actions taken by her supervisors. DEX 39 (collecting examples).

48.     On October 14, 2014, Plaintiff requested a Final Agency Decision ("FAD"). On July 6, 2016, after a series of delays, a FAD was issued. The FAD found no sex discrimination, disability

discrimination, or discrete-act retaliation on the part of DSS; however, it did conclude that Plaintiff

was subjected to a retaliatory hostile work environment in one paragraph of legal analysis. Despite

this finding, the FAD did not set forth any remedy for Plaintiff. DEX 6.

49.     On October 3, 2016, Plaintiff sought *de novo* review of the FAD by filing a complaint

in this Court, setting forth four claims against DSS: sex discrimination, sexual harassment, disability

discrimination, and retaliatory hostile work environment. (Dkt. No. 1.)

50.     Following the close of discovery on July 7, 2017, with Defendant's consent, Plaintiff

amended her complaint to dismiss her sex discrimination, sexual harassment, and disability

discrimination claims. Only her retaliatory hostile work environment claim remains. (Dkt. No. 28.)

**ARGUMENT**

Plaintiff's Amended Complaint sets forth a single cause of action for a retaliatory hostile

work environment, *see* Am. Compl. ¶¶ 29-34, but this claim is untenable. "[R]etaliatory harassment

which creates a hostile work environment can constitute an adverse employment action[2] for the

purposes of establishing a claim under the antidiscrimination laws. . . . However, this does not mean

that the federal antidiscrimination laws are intended to be a general civility code for the American

workplace." *Stephens v. Gutierrez*, 2010 WL 1005189, at *9 (E.D. Va. Mar. 15, 2010). To establish a

retaliatory hostile work environment claim, a plaintiff must demonstrate that the alleged conduct: "1)

was unwelcome; 2) resulted because of her . . . prior protected activity; 3) was 'sufficiently severe or

---

[2] In general, absent any direct evidence, a plaintiff claiming retaliation must rely on the burden-shifting framework set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802-05 (1973), to avoid summary judgment. The plaintiff must first demonstrate a prima facie case of retaliation by showing that (1) she engaged in protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted adverse action. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). If the plaintiff is successful, then the defendant must respond by articulating a legitimate, non-retaliatory reason for the alleged adverse employment action(s). *Id.* If the defendant does so, the plaintiff must prove that the given reason is really a pretext for retaliation in order to avert summary judgment. *Id.*

pervasive' to alter the conditions of her employment; and 4) was imputable to her employer." *Pueschel v. Peters*, 577 F.3d 558, 564-65 (4th Cir. 2009). "While the first element is subjective, the rest of the test is made up of objective components based on a reasonable person standard." *Id.* at 565.

In this case, Plaintiff's claim falters at the second and third elements of a retaliatory hostile work environment claim. Each element will be discussed in turn.

## I.    PLAINTIFF'S PROTECTED ACTIVITY WAS NOT THE BUT-FOR CAUSE OF ANY PUTATIVE HARASSMENT

Plaintiff cannot show that her collective working environment—viewed, by necessity, as a whole—was caused by her engagement in protected activity. To prove the second element of a retaliatory hostile work environment, a plaintiff must show that "'but for' the employee's . . . protected activity, he or she would not have been the victim of the discrimination." *Pueschel*, 577 F.3d at 565; *see also Barker v. Comput. Sci. Corp.*, 2015 WL 1442864, at *7 (E.D. Va. Mar. 27, 2015) ("[P]laintiffs bringing retaliation claims under Title VII must demonstrate that the desire to retaliate was the but-for cause of the adverse action, rather than a motivating factor."), *aff'd*, 612 F. App'x 698 (4th Cir. 2015). "Protected activity" includes an employee's participation in a proceeding related to allegations of workplace discrimination, such as making an informal complaint with the EEO office. *See Balazs v. Liebenthal*, 32 F.3d 151, 156 (4th Cir. 1994) (citing 42 U.S.C. § 2000e-3(a)).

Compared to other forms of harassment based on physical characteristics like sex or race, "it is harder to show that harassment was in retaliation for a victim's protected activity." *See Berghauer v. Mabus*, 934 F. Supp. 2d 55, 83 (D.D.C. 2013). Nonetheless, "only the actions that have a causal link to protected activity may be considered part of a hostile work environment claim." *Id.* Proving retaliatory animus is difficult in part because "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *See Burlington Northern*, 548 U.S. at 68; *see also Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 904 (4th Cir. 2017) (rejecting the notion that "all

employees who have reported any Title VII violation must be granted permanent immunity from any adverse action taken by an employer for any reason in the future").

Critically, whether a plaintiff's protected activity is the but-for cause of an adverse action or alleged harassment requires that the protected activity *precede* the employer's action at issue. *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 651 (4th Cir. 2002). As a corollary to this rule, "the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish [causation]" because "by definition, an employer cannot take action because of a factor of which it is unaware." *See Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998). Thus, "when an employer contemplates the action *before* learning of the protected activity," there can be no inference of retaliatory causation. *See Braxton v. Cook Med. Inc.*, 2013 WL 4033654, at *7 (E.D. Va. July 31, 2013) (emphasis added) (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)).

In this case, it is undisputed that the vast majority of the incidents that Plaintiff complains of commenced *before* she ever approached the EEO office or *before* her supervisors became aware of her EEO activity. For example, Plaintiff alleges that she was excluded from meetings in retaliation for her protected activity. During the EEO process, Plaintiff identified only five staff meetings from which she was allegedly excluded by Malafarina or Taylor: August 6, August 13, September 5, September 9, and October 10, 2013. DEX 5. However, assuming that all of these meetings occurred, Malafarina did not learn that Plaintiff had contacted the EEO office until on or about August 23, 2013, when Labov met with him to discuss Plaintiff's allegations, DEX 10, at 47:19-21, 51:11-52:7, and Taylor did not learn that Plaintiff had contacted the EEO office until Malafarina told him about it in preparation for his move to DSS headquarters, DEX 12, at 33:23-34:15. As such, Plaintiff's protected activity was not the but-for cause of any putative exclusion.

Furthermore, Malafarina could not have excluded Plaintiff from any meetings on August 13 because he was not even at work that day, DEX 16, at 13, and Taylor could not have excluded her

from any meetings prior to September 9 because he did not start at DSS headquarters until then, DEX 18, at 2. Plaintiff was also included on calendar invites for meetings on September 5 and October 10. DEX 35; DEX 36.[3] In other words, separate from the question of causation, the indisputable record completely undermines Plaintiff's allegations at the threshold.

It also bears noting that the September 9, 2013, meeting was an introductory, ad hoc meeting that Taylor held *on his first day* at DSS headquarters. Regardless of why Plaintiff did not attend,[4] Taylor followed-up with her after the meeting to ensure that she knew what was discussed, which is plainly inconsistent with any retaliatory intent. DEX 46. Indeed, although Plaintiff has alleged that she was "excluded" from meetings, she does not claim that she ever affirmatively attempted to attend a meeting but was precluded from doing so by Malafarina, Taylor, or anyone else. DEX 7, at 227:7-228:5. At best, Plaintiff's allegations amount to little more than a few instances in which she most likely forgot to attend or could not attend for other reasons (as the calendar invites suggest, DEX 35; DEX 36), was inadvertently not notified of the meeting, or was simply not needed.[5] Her protected activity was hardly the but-for cause of her absence from those meetings.

By way of other examples that preceded Plaintiff's protected activity, first, it is undisputed that Plaintiff's alternative work schedule issues (DEX 2 (Interrog. 8, Nos. 1-2, 7-10, 13)) started with the cancelation of her 4/10 schedule on August 1, 2013, *before* she ever contacted the EEO office (DEX 4).[6] Second, Plaintiff concedes that she performed "administrative tasks" ostensibly below her

---

[3] In fact, Plaintiff was one of several recipients of an email sent a few days earlier from Malafarina indicating that a meeting on September 5 was scheduled. DEX 40.

[4] For instance, Taylor testified during his deposition that it was his practice to begin meetings on time and not to wait for or go get latecomers. DEX 12, at 136:13-25.

[5] The Operations Division regularly dealt with classified information, access to which is limited both by one's clearance level and by one's "need-to-know." Consequently, it was not uncommon for meetings to occur where only some individuals in the Operations Division were required to attend. DEX 12, at 137:1-138:5.

[6] And even later, Malafarina consulted with DSS's human resources staff in order to determine

pay grade (DEX 2 (Interrog. 8, Nos. 14, 17)) as part of her job *before* she ever contacted the EEO office (DEX 7, at 188:17-189:5). Third, when Bauer completed her performance evaluation for 2013 and gave her an overall rating of "3" (DEX 2 (Interrog. 8, No. 11)), he was *not aware* that Plaintiff had contacted the EEO office (DEX 14, at 9). And fourth, Plaintiff concedes that several of the comments that she deemed derogatory towards her (DEX 1 (Interrog. 5, Nos. 1-2)) occurred well *before* she ever engaged in any protected activity (DEX 7, at 53:23-54:23). Consequently, it cannot be said that Plaintiff's protected activity was the but-for cause of the conflict regarding her work schedule, her assigned duties, her 2013 performance evaluation, or perceived negative comments.

With respect to the so-called "administrative tasks," Taylor agrees that he occasionally gave such tasks to Plaintiff—but he gave such tasks to other members of the Operations Division as well. DEX 12, at 162:24-163:21. As Malafarina points out, there was no one in the division who was below a GS-13 grade level, i.e., Plaintiff's grade level, who could be assigned primary responsibility for such work. DEX 10, at 270:12-21. Although there was a contractor assigned to give executive-assistant support to the Operations Division, she served six or seven divisions within CI. DEX 10, at 267:8-268:9. Thus, *everyone* in the Operations Division, including Taylor (a GS-14) and Malafarina (a GS-15) themselves, had to pitch in and complete tasks that one might subjectively consider less-than-desirable. DEX 12, at 161:25-163:21. To that end, Taylor acknowledges that he tasked Plaintiff with helping to reduce a backlog of writing information intelligence reports because, having attended the DCAC training, she had the necessary background to contribute to the report writing. DEX 12, at 249:19-251:1. All of these assignments fell within Plaintiff's position description because it—like many position descriptions—included "other duties as assigned." DEX 12, at 251:8-10; DEX 25.

---

whether Plaintiff's needs with respect to an alternate work schedule could be met, which weighs against any inference of a retaliatory motive. *See Wells*, 336 F. App'x at 388 (reliance "on the advice of the Office of Human Resources and the Office of General Counsel" in denying leave requests cut against finding objectively hostile harassment).

On a separate but equally compelling note, for certain allegations, Plaintiff relies on nothing more than her own conclusory and naked opinion that her protected activity was the but-for cause. For example, with respect to her basis for claiming that Malafarina and Taylor retaliated against her by ignoring her on two occasions (DEX 2 (Interrog. 8, Nos. 5-6)), Plaintiff has testified only that "[she] wasn't previously ignored" and "there was no other reason to ignore [her]," DEX 7, at 178:2-5, 183:11-15. Likewise, when asked why the June 2015 meeting was retaliatory, Plaintiff has testified only that "these types of meetings were not common." DEX 7, at 208:14-19. Plaintiff has not pointed to any actual evidence to show that these alleged incidents were, in fact, *caused* by her EEO activity. DEX 7, at 178:12-17, 183:17-20, 209:1-9. This sort of unadorned testimony by Plaintiff is wholly inadequate to satisfy her burden to establish causation and avert summary judgment. *See DiQuollo v. Prosperity Mortg. Corp.*, 984 F. Supp. 2d 563, 570 (E.D. Va. 2013) ("[U]ncorroborated, self-serving testimony of a plaintiff is not sufficient to create a material dispute of fact sufficient to defeat summary judgment."); *cf. King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.").

Lastly, it should be noted that a few of Plaintiff's claims—specifically, her objection to her 2013 performance rating, and the denial of her request in January 2014 to relocate to a different city to ease her daily commute (DEX 2 (Interrog. 8, Nos. 11, 24); DEX 21; DEX 55)—are typically considered to be discrete-act claims analyzed under *McDonnell Douglas* and not incorporated into a hostile work environment claim. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002); *see also White v. City of Annapolis, Md.*, 2015 WL 5009853, at *9 (D. Md. Aug. 21, 2015) ("[T]he Fourth Circuit has spoken disapprovingly of evaluating a claim of hostile work environment based on allegations of discrete acts of discrimination or retaliation."), *aff'd*, 639 F. App'x 209 (4th Cir. 2016). But even if Plaintiff could force these allegations into her sole hostile work environment claim, she could not demonstrate that—in actuality—DSS's legitimate reasons for these actions were pretext

15

for retaliatory animus. With respect to her 2013 performance review, in Bauer's opinion as Plaintiff's supervisor, her work that year was fully consistent with the standards associated with an overall rating of "3"/"Successful." DEX 14, at 5-10; DEX 21.[7] And with respect to her relocation request, Operations Division personnel needed to be available in-person at Quantico, and, as a general policy, DSS does not grant duty station transfers for any employee without applying for an announced vacancy. DEX 18, at 25-27.[8] Absent any evidence of pretext, it cannot be concluded that either Plaintiff's 2013 performance review or the denial of her relocation request were the but-for result of retaliatory animus. *See Foster*, 787 F.3d at 250.

Accordingly, Plaintiff's allegation of some widespread and ill-defined plot by several DSS employees to retaliate against her for her EEO activity is simply at odds with the incontrovertible record. Given the timeline of events, and lacking any evidence that her supervisors had basic awareness of her EEO activity at the time they took certain actions, Plaintiff cannot prove that the alleged harassment would not have occurred but-for that EEO activity. Her claim must be rejected.

## II.     THE PUTATIVE HARASSMENT WAS NOT "SEVERE OR PERVASIVE"

The main deficiency in Plaintiff's retaliatory hostile work environment claim is in the third element: the record is inadequate to show that the conduct at issue—even when viewed as a whole—was sufficiently severe or pervasive to avoid summary judgment. "[H]arassment is considered sufficiently severe or pervasive to alter the terms or conditions of the employment if a workplace is 'permeated with discriminatory intimidation, ridicule, and insult.'" *Pueschel*, 577 F.3d at 565 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).[9] It must be "severe or pervasive

---

[7] Relatedly, Plaintiff asserts that prior to 2015, her "evaluations were blank" (DEX 2 (Interrog. 8, No. 25)), but this is demonstrably untrue. She was certainly reviewed in 2013, as well as in 2014 and 2015. DEX 22; DEX 23. In fact, the only blank parts of her evaluations are her *own* self reports.

[8] In fact, there were *no* Field Support Analysts and *no* Desk Officers who were stationed in the office locations to which Plaintiff sought to relocate. DEX 12, at 280:21-281:7.

[9] The "standard for severe and pervasive harassment is the same in the retaliation context as in the

enough to create a subjectively *and objectively* hostile or abusive work environment." *Wells v. Gates*, 336 F. App'x 378, 388 (4th Cir. 2009) (emphasis added). In considering whether conduct is objectively severe or pervasive, this Court should look to, among other things, "the frequency of the . . . [retaliatory] conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (alterations in original). As such, "even numerous instances of misconduct will not establish retaliatory harassment when each instance of misconduct is minor." *Hinton v. Va. Union Univ.*, 185 F. Supp. 3d 807, 840 (E.D. Va. 2016).

A plaintiff "must clear a high bar in order to satisfy the severe or pervasive test." *See EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). As the Fourth Circuit has admonished:

> Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life. Thus, complaints premised on nothing more than rude treatment by coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor, are not actionable under Title VII.

*Id.* at 315-16 (internal citations omitted); *see also Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 191 (4th Cir. 2004) ("[P]laintiff's] hostile work environment claim fails because it is based on professional frustrations . . . ."); *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (rejecting the plaintiff's allegations as "merely . . . a story of a workplace dispute"); *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997) ("Title VII does not guarantee a happy workplace . . . ."). In short, "[t]he harassment must be extreme." *Wells*, 336 F. App'x at 388.

Where, as here, the sum total of a plaintiff's allegations amounts to nothing more than a "routine difference of opinion and personality conflict with one's supervisor," *see Sunbelt Rentals, Inc.*,

---

sexual harassment and racial discrimination contexts." *Akers v. Alvey*, 338 F.3d 491, 498 (6th Cir. 2003). In other words, cases addressing whether alleged harassment constitutes "severe or pervasive" conduct are instructive regardless of the basis of the hostile work environment claim.

521 F.3d at 315, both the Fourth Circuit and courts within this district have not hesitated to enter summary judgment for the employer on retaliatory hostile work environment claims. *See, e.g., Artis v. U.S. Foods Serv.*, 2015 WL 1514021, at *8 (D. Md. Apr. 2, 2015), *aff'd*, 632 F. App'x 160 (4th Cir. 2016); *Maupin v. Howard Cnty. Bd. of Educ.*, 2010 WL 9460565, at *4-10 (D. Md. July 15, 2010) (letters of reprimand, "unsatisfactory" review, "'letters of concern' falsely accusing [the plaintiff] of wrongdoing," failing to discipline coworker who made "disparaging comments" about plaintiff and her lawsuit, ordering plaintiff not to communicate with the EEOC, spreading rumors, and requiring medical documentation before approving sick leave), *aff'd sub nom. Maupin v. Howard Cnty. Pub. Sch. Sys.*, 420 F. App'x 227 (4th Cir. 2011); *Pueschel*, 577 F.3d at 564-65 ("isolated personnel decisions"); *Wells*, 336 F. App'x at 3 (denying sick leave, and refusing to rescind a letter of instruction); *Von Gunten v. Maryland*, 243 F.3d 858, 870 (4th Cir. 2001), *overruled on other grounds by Burlington N.*, 548 U.S. at 75 ("imposition of generally applicable departmental policies, good faith responses to [a] request to be moved away from [a supervisor]," and "non-actionable office unpleasantries"); *Tomasello v. Fairfax Cnty., Va.*, 2016 WL 165708, at *18-19, 25 (E.D. Va. Jan. 13, 2016) (supervisor "tried to make [plaintiff's] job difficult" and "did not wish to have a picture taken with her," and lowered performance review); *Thomas v. Potter*, 2006 WL 2850623, at *5 (E.D. Va. Oct. 3, 2006) (employee "was criticized for his work performance," and subject to "rude conduct").[10]

---

[10] Many other courts have similarly not hesitated to grant summary judgment for the defendant-employer on a retaliatory hostile work environment claim. *See, e.g., Akers*, 338 F.3d at 498; *Ning Shen v. McDonald*, 2017 WL 2485230, at *8 (S.D.W. Va. June 8, 2017); *Nnadozie v. Genesis Healthcare Corp.*, 2017 WL 412522, at *8 (D. Md. Jan. 31, 2017) (appeal filed); *Merrill v. McCarthy*, 184 F. Supp. 3d 221, 249 (E.D.N.C. 2016); *Cornelius v. McHugh*, 2015 WL 4076982, at *6 (D.S.C. May 15, 2015), *report & recommendation adopted in part, rejected in part*, 2015 WL 4068844 (D.S.C. July 1, 2015); *Fordyce v. Prince George's Cnty. Md.*, 43 F. Supp. 3d 537, 552 (D. Md. 2014); *Kearns v. Northrop Grumman Sys. Corp.*, 2014 WL 2170781, at *16 (D. Md. May 23, 2014); *Kinsey v. W.S. Badcock Corp.*, 2008 WL 2048207, at *12-13 (E.D. Tenn. May 12, 2008); *Martin v. Merck & Co.*, 446 F. Supp. 2d 615, 640 (W.D. Va. 2006); *see also Bergbauer*, 934 F. Supp. 2d at 89-91 (collecting numerous cases, and noting that courts "routinely decide Title VII hostile work environment claims on motions for summary judgment").

Indeed, this Court in *Stephens* granted summary judgment for the employer under remarkably similar circumstances as those here. *See* 2010 WL 1005189, at *9-10 (O'Grady, J.). In *Stephens*, the plaintiff complained that he was "not contacted directly by his supervisors for a period of time," "not given new work assignments," "threatened with being placed on absent without leave status" for time taken to work on his EEO claim, "rated 'Commendable,' rather than 'Outstanding' for FY 2005," and "shun[ned] without any prospect of proper interpersonal interaction or professional opportunity." *See id.* at *10. On top of this, the plaintiff alleged that he was "not assigned job-related travel," denied "official 'EEO time'" to complete EEO activities, and "not notified in advance of any performance deficiencies." *Id.* Yet, even with these additional allegations supporting the plaintiff's retaliatory hostile work environment claim, this Court granted summary judgment for the employer. *Id.* ("This conduct . . . is not of the type or the severity necessary to create a hostile workplace."). The same result should thus obtain in this case, as almost all of Plaintiff's allegations—that she was ignored by her supervisors, did not receive desirable work assignments, was threatened with having to use leave for using the mother's room, received a "Successful" instead of an "Excellent" performance rating for 2013, and was isolated from her coworkers—reduce to the same essential conduct that this Court rejected in *Stephens* as not objectively hostile or retaliatory.

To the extent Plaintiff's allegations are different than those at issue in *Stephens*, they still come nowhere close to the "extreme" sort of "physically threatening or humiliating" conduct necessary to satisfy the "severe or pervasive" requirement of a retaliatory hostile work environment. *See Wells*, 336 F. App'x at 388. Although this Court should "examine all of the circumstances to determine whether the work environment was objectively hostile," *see id.*, it is nevertheless illuminating to consider Plaintiff's allegations by category,[11] as discussed next.

---

[11] Plaintiff alleges that she was denied a reasonable accommodation for her "stress and anxiety arising out of the ongoing harassment, discrimination, and reprisal." Am. Compl. ¶ 22. Although this was ostensibly alleged as retaliation and not just discrimination under the Rehabilitation Act, *see id.* ¶

A.     **Plaintiff's Work Schedule**

The record shows that any cancelations or modifications to Plaintiff's work schedule (DEX 2 (Interrog. 8, Nos. 1-2, 7-10, 13)) were not objectively hostile or abusive. Quite the opposite: despite an agency-wide moratorium on alternative work schedules, Plaintiff's supervisors attempted to balance Plaintiff's requested schedule with DSS's mission-related needs. On May 15, 2013, the Sims Memo was issued to the entire agency, notifying employees of upcoming furloughs as a result of the then-ongoing federal government budget sequestration. DEX 19. Plaintiff received the Sims Memo the same day. DEX 37. To ensure fair and accurate implementation of the furloughs, all alternative work schedules were canceled effective June 30, 2013. DEX 19. Thus, when Plaintiff's supervisors became aware that she was still on an alternative work schedule after the effective date of the Sims Memo on August 1, 2013, it was objectively reasonable for them to cancel it to comply with the agency-wide directive. *See Wells*, 336 F. App'x at 388 (application of "generally applicable regulations . . . did not reflect an objectively hostile atmosphere").

Despite this agency-wide policy, and despite the fact that Plaintiff had been on notice *for over two months* that all alternative work schedules were to be canceled, Malafarina still consulted with Blackmon to address Plaintiff's needs. DEX 41. He ultimately allowed Plaintiff to have four additional weeks of her 4/10 schedule to resolve her childcare situation, with the end-goal of moving her to a 5 days/week schedule. DEX 10, at 330:21-331:16; DEX 42. Indeed, Malafarina had to comply with the Sims Memo, and he believed in his new role as the head of the Operations Division that Plaintiff's Field Support Analyst position required that she be present in the office every workday to support DSS's nationwide CI operations. DEX 10, at 114:19-115:19.

---

23, Plaintiff did not include this allegation in her list of retaliatory actions in response to Defendant's interrogatories. DEX 2 (Interrog. 8). Thus, Defendant has not considered it to be part of Plaintiff's retaliatory hostile work environment claim.

During this four-week period of Plaintiff's temporarily extended 4/10 schedule, the furloughs ended early; therefore, DSS was able to gradually lift the restrictions on alternative work schedules. DEX 10, at 331:20-332:13; DEX 12, at 202:2-9; DEX 47. On September 30, 2013, Taylor (who by then had started at DSS headquarters) approved an alternative work schedule for Plaintiff. DEX 48. He also executed a new situational telework agreement for her. DEX 30. Later, in December 2013 after several months in his new position, Taylor felt comfortable offering the Maxiflex schedule to his team. DEX 12, at 67:1-68:5. Plaintiff immediately requested a Maxiflex schedule, and Taylor approved her request right away with the instruction that he be notified in advance of any intended "flexing" to her schedule—an instruction he gave to *all* of his subordinates for whom he approved a Maxiflex schedule. DEX 12, at 213:2-214:9; DEX 53.

When Plaintiff and other subordinates did not follow this instruction, however, Taylor reminded his entire team *twice* of his instruction that he be notified in advance of any intended schedule "flexing." DEX 56; DEX 57. Yet despite these general reminders, Plaintiff still failed to follow Taylor's instruction. DEX 12, at 107:12-109:1. Accordingly, for this and other reasons, Taylor exercised his prerogative as Plaintiff's supervisor to revoke her Maxiflex schedule on February 20, 2014. DEX 20. Even then, Plaintiff admits that this schedule change was not permanent. DEX 7, at 156:22-157:4. To be sure, as of at least 2015 (if not earlier), she returned to a Maxiflex schedule, which she still uses today. DEX 7, at 20:5-21:2, 24:19-25:1.

Given this history, it cannot be said that Malafarina's or Taylor's decisions concerning Plaintiff's work schedule were objectively hostile or abusive. Other courts within this circuit have agreed that the sort of scheduling modifications imposed by Malafarina and Taylor (e.g., working 5 days/week in the office) were not severe or pervasive harassment. *See, e.g.*, *White*, 2015 WL 5009853, at *17 ("two to three" changes to a work schedule is not objectively hostile), *aff'd*, 639 F. App'x 209; *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 601 (D. Md. 2011) ("tour of duty change" and other conduct

"hardly constitute harassment at all"), *aff'd*, 465 F. App'x 274 (4th Cir. 2012); *cf. Alexander v. Marriott Int'l, Inc.*, 2011 WL 1231029, at *8 (D. Md. Mar. 29, 2011) ("Revocation of a special privilege to work from home cannot constitute an injury for purposes of stating a retaliation claim.").

> **B.      Plaintiff's Alleged Exclusion from Meetings and Emails**

As discussed above, during the EEO process, Plaintiff identified five meetings from which she was allegedly excluded because she filed an EEO complaint. DEX 5. In her interrogatory responses in this litigation, Plaintiff identified for the first time two more meetings on November 20 and November 25, 2013, from which she was supposedly excluded. DEX 2 (Interrog. 12). Plaintiff also alleges that she was excluded from a team email on November 8, 2013. DEX 2 (Interrog. 8, No. 3). But even if Plaintiff could prove that she was excluded from all seven of these meetings and this one team email, this falls well-short of the level of severity or pervasiveness needed to sustain a hostile work environment claim. *See Pueschel*, 577 F.3d at 566 ("isolated personnel decisions" are not sufficiently severe or pervasive to support a claim). Indeed, the severity or pervasiveness of Plaintiff's putative exclusion from meetings and email is undermined by the fact that Plaintiff, tellingly, stops short of claiming that she was excluded from *all* Operations Division or CI meetings or emails. DEX 7, at 228:6-24, 229:12-18. Absent any evidence that Plaintiff's work performance was otherwise affected by her putative exclusion from these meetings or this one email, there is nothing objectively hostile about such exclusion to support her retaliatory hostile work environment claim. *See Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 80 (D.D.C. 2007) (collecting cases, and holding that being "bypassed" in communications, being excluded from a conference, and not being advised of certain meetings "do not constitute severe and pervasive ridicule, harassment, or intimidation"); *cf. Alexander*, 2011 WL 1231029, at *9 ("[m]ere exclusion from meetings" is not retaliation).

What is more, although it appears that Plaintiff was in fact excluded from one email concerning a tasking list for the Desk Officers of the Operations Division on November 8, 2013,

DEX 49, what Plaintiff fails to disclose is that Taylor still sent her a task list (as the only Field

Support Analyst in the Operations Division) under separate email cover, DEX 50. She also fails to

mention that she was included on an email with the rest of the Operations Division *that very same day*.

DEX 51. In other words, Plaintiff objects to nothing more than Malafarina's and Taylor's "standard,

managerial acts" (and low-level acts at that) of determining to whom and how information should be

disseminated—conduct that Title VII is not intended to address. *See Fordyce*, 43 F. Supp. 3d at 553;

*see also DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) ("[T]his Court does not sit as a kind

of super-personnel department weighing the prudence of employment decisions . . . .").

### C.   Plaintiff's Work Assignments

Plaintiff alleges that on September 26, 2013, she was assigned so-called "administrative

tasks" such as "scheduling meetings, taking meeting minutes etc." and that on January 29, 2015, she

was assigned to write "information intelligence reports" which is a "major duty" of a different job

series than hers, all in retaliation for her engagement in protected activity. DEX 2 (Interrog. 8, Nos.

14, 17). Tellingly, however, Plaintiff admits that she was not given *solely* work that she would

consider to be "administrative tasks," and she further admits that she performed work that was

commensurate with her grade-level and position description:

> Q: I see. Whereas for the administrative task issue, what is the issue there?
> A: I was given administrative tasks by Mr. Taylor as far as scheduling meetings,
> taking his meeting minutes, those type of things.
> Q: Was that the only type of work that Mr. Taylor assigned to you?
> A: I'm sure he gave me some other work to do. I can't recall. I mean, I'm sure
> something metric-wise, occasionally he would give me some things. I can't recall.
> Q: And you wouldn't describe those as administrative type work?
> A: No. But -- no.
> Q: Were those appropriate to your level?
> A: Sure. I mean, I don't -- like I can't think of specifics of what he would give me.

DEX 7, at 232:21-233:12.

Plaintiff's quibble with receiving some work assignments that she did not care for is simply

not the stuff of hostile work environment claims. *See, e.g.*, *White*, 2015 WL 5009853, at *17

("degrading assignments" are not objectively hostile), *aff'd*, 639 F. App'x 209; *Thorn*, 766 F. Supp. 2d at 601 ("shifting job responsibilities, even when tied to the other acts [the plaintiff] alleges" are not "an objectively material adverse action"), *aff'd*, 465 F. App'x 274. Even if Plaintiff reframed her allegations to assert that she did not receive *enough* desirable work in retaliation for her EEO activity, her claim would fare no better. *See Stephens*, 2010 WL 1005189, at *10 ("not [being] given new work assignments" was not objectively hostile); *see also Ning Shen*, 2017 WL 2485230, at *8 ("a lighter work load," among other things, "d[id] not rise to the level of sufficiently severe and pervasive").[12]

### D.    Plaintiff's Workstation

On or about November 19, 2013, Plaintiff's workstation was moved, which she alleges was retaliatory. DEX 2 (Interrog. 8, No. 4). Even if this were true, however, this move is not the sort of harassment and abuse that courts have recognized as *objectively* hostile. Plaintiff concedes that employees' workstations in the SCIF were moved on a regular basis, so there was nothing inherently unusual about her move; in fact, Plaintiff had moved her workstation at least once before at the end of 2012. DEX 7, at 168:13-23, 177:3-13. This time, in November 2013, she moved to a cubicle that was only two rows over from her original cubicle. DEX 7, at 167:24-168:1, 170:15-21; DEX 24 (moving from "PB2" to "PB3"). Crucially, it is undisputed that Plaintiff was moved into the cubicle row *where the rest of the Operations Division* sat. DEX 7, at 175:15-176:21. This cubicle row was also physically closer to Taylor's office. DEX 7, at 171:18-23; DEX 24 (noting "CT").

Under these circumstances, where Plaintiff's workstation change did not significantly disrupt her work conditions or ability to perform—but, in fact, *integrated* her with the rest of her division—

---

[12] Plaintiff also alleges that on April 29, 2015, Taylor "revised [her] position description without [her] prior knowledge." DEX 2 (Interrog. 8, No. 26). But even when she first raised this issue during the EEO process, Plaintiff conceded that this allegation was frivolous. DEX 13, at 2-3 (attesting that "my position description was essentially left the same" and "[n]othing happened with regard to my position description on that date"). Thus, this incident was neither objectively *nor subjectively* hostile.

courts have rejected any suggestion of objectively hostile harassment. *See, e.g.*, *Hemphill v. UPS, Inc.*, 975 F. Supp. 2d 548, 565 (D.S.C. 2013) ("[D]ecisions such as the location of Plaintiff's desk . . . are properly classified as business decisions that do not evidence harassing conduct."); *Hoffman v. Balt. Police Dep't*, 379 F. Supp. 2d 778, 791 (D. Md. 2005) (allegations including being "forced to relocate [one's] office numerous times without justification . . . fall short of stating a hostile environment").

### E.   Allegations of Plaintiff Being Monitored and Reprimanded

Several of Plaintiff's allegations can be categorized as grievances concerning the scrutiny of one's work. For example, Plaintiff alleges that on September 9, 2013, she was required to "send emails signing in and out when [she] report[ed] for duty and when [she was] departing." DEX 2 (Interrog. 8, No. 12). Taylor (who had just started at headquarters that same day) did request that Plaintiff provide him with this information, but he did so only for the temporary four-week period that she was on a 4/10 schedule. DEX 12, at 279:21-280:18. Because she was the only employee on an alternative work schedule when everyone was supposed to be following the Sims Memo, and because Plaintiff sought and was approved to have a daily start time before any supervisors were in the office, Taylor requested that Plaintiff send him an email at the beginning and end of each workday to facilitate his timekeeping as her supervisor. DEX 12, at 85:6-86:5; DEX 18, at 24; DEX 45. When the four-week period was over, Taylor no longer requested these emails from Plaintiff, and Plaintiff concedes that this "sign in/out" requirement was only temporary. DEX 7, at 124:21-23. As such, it cannot be said that this sign in/out requirement was objectively hostile. *See, e.g.*, *Mensah v. Mich. Dep't of Corr.*, 621 F. App'x 332, 334 (6th Cir. 2015) (no hostile work environment where, among other things, plaintiff had to notify his supervisor "when he arrived to work in the morning and when he left," was "denied a request for annual leave," was "not allowed to work flex time," and received a written reprimand); *Hemphill*, 975 F. Supp. 2d at 565 ("whether Plaintiff was required to notify her superiors of her arrival and departure times" did "not evidence harassing conduct").

In another example, Plaintiff alleges that Taylor created a policy whereby she was required to use leave to use the mother's room and express milk for her children. DEX 2 (Interrog. 8, No. 15). However, Plaintiff concedes that she never actually had to use leave when doing so. DEX 7, at 153:9-12. At most, therefore, Plaintiff's claim is based on the hypothetical threat of having to use leave to express milk, but an unfulfilled threat is not objectively hostile or abusive so as to sustain a hostile work environment claim. *Cf. Berghauer*, 934 F. Supp. 2d at 87 (absent evidence that an employer ever acted on a threat to affect the plaintiff's performance review, hostile work environment claim was not actionable). Otherwise, this allegation amounts to little more than the mere *possibility* of additional scrutiny, which falls well within the prerogative of a supervisor. *See, e.g.*, *Rattigan*, 503 F. Supp. 2d at 81 (rejecting hostile work environment claim because "[c]lose supervision or monitoring by an employer is not uncommon (nor should it be discouraged)").

And in a third example, Plaintiff takes issue with the June 2015 meeting "where [she] was reprimanded and chastised for 'spreading rumors.'" DEX 2 (Interrog. 8, No. 27). Significantly, she does not allege that she suffered any actual or tangible consequence as a result of this meeting, like a suspension, lowered performance appraisal, or even a written reprimand. DEX 7, at 192:10-12. Nor was she publicly embarrassed in front of her peers, as she acknowledges that this meeting was conducted behind closed doors with only her supervisors present. DEX 7, at 190:4-191:25. Plaintiff also acknowledges that although Buckley raised his voice, he did not yell, he was seated the entire time across a table, and she does not recall him ever making any physical gestures toward her. DEX 7, at 191:14-193:9. She admits that none of the other individuals in the meeting raised their voice, to the extent that they spoke at all. DEX 7, at 194:25-195:6. While Plaintiff may have been upset by the meeting, there was nothing *objectively* abusive about it that would suggest severe or pervasive harassment. *See, e.g.*, *Buchhagen v. ICF Int'l, Inc.*, 545 F. App'x 217 (4th Cir. 2013) (rejecting allegations of "'mockingly' yelling at [the plaintiff] in one meeting; yelling and pounding her hands on her desk

during another meeting; 'repeatedly harp[ing]' on a mistake . . . ; making 'snide comments' . . . ; and unfairly scrutinizing and criticizing [the plaintiff's] use of leave" as failing to state a hostile work environment claim); *Thomas*, 2006 WL 2850623, at *5 (complaints that the plaintiff "was criticized for his work performance, received warnings for failing to report to work, and was subject to rude conduct . . . do not rise to the level of severe or pervasive harassment").

      **F.**    **Allegations of Plaintiff Being Ignored**

      Plaintiff identifies two—and only two—dates on which Taylor or Malafarina supposedly neglected to speak to her despite speaking to Operations Division personnel who were seated around her. DEX 2 (Interrog. 8, Nos. 5-6). Even if these allegations are true, these two incidents on November 20, 2013, and January 31, 2014, are beyond inadequate to establish any sort of severe or pervasive harassment, or objective hostility or abuse. *See Pueschel*, 577 F.3d at 566. Plaintiff admits that these two incidents were isolated and that neither Taylor nor Malafarina actually stopped communicating with her afterwards. DEX 7, at 178:18-22 ("Q: Did Mr. Taylor ever talk to you again after November 20th, 2013? A: I'm sure he would've had to talk to me. We worked together. I mean, he was my supervisor, so we had to have some kind of conversation."), 181:12-15 ("Q: Did Mr. Malafarina ever talk to you again after November 20th, 2013? A: Our conversations were limited. We talk more now. But they were very limited and brief.").[13] Plaintiff also admits that her communications with Taylor after November 20, 2013, were personable and not limited to work:

> Q: Did you and Mr. Taylor ever talk about non-work-related items?
> A: Possibly my family. What time frame are you speaking of?
> Q: You know, after November 20th, 2013.
> A: I mean we could have. I have no idea what -- what we possibly could have talked about. I mean, if I needed off, you know, I might have told him if my kids were sick or my husband had surgery, I might have told him and we could have talked, I mean, about different things.

---

[13] In fact, on both days, Taylor and Malafarina still emailed with Plaintiff. DEX 52; DEX 54.

DEX 7, at 180:9-19.

But even if these two incidents were not isolated occurrences, this Court has previously held that being "shun[ned] without any prospect of proper interpersonal interaction or professional opportunity . . . is not of the type or the severity necessary to create a hostile workplace." *See Stephens*, 2010 WL 1005189, at *10 (O'Grady, J.); *see also Martin*, 446 F. Supp. 2d at 639 (finding "being avoided and ignored by fellow employees" to be "undoubtedly uncomfortable" but "within the category of petty slights and minor annoyances"). As the Fourth Circuit has repeatedly held, "[e]ven if [the employer] harbored some personal dislike of [the plaintiff] that made [her] job more difficult or stressful, an employer is not required to like his employees." *See, e.g.*, *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000); *see also Combs-Burge v. Rumsfeld*, 170 F. App'x 856, 862 (4th Cir. 2006) (allegations that the employer was "more friendly to white employees" than to the African-American plaintiff cannot sustain a hostile work environment claim).[14]

### G.      Allegations of Derogatory Comments

Plaintiff sets forth a plethora of comments that, in her opinion, contributed to a retaliatory hostile work environment or reflected retaliatory animus. But, again, these comments generally amount to, at best, mere "personality conflicts," which will not suffice to maintain a harassment claim. *See Ziskie v. Mineta*, 547 F.3d 220, 227 (4th Cir. 2008). To begin, many of these comments were allegedly connected to the putative harassment described above and therefore fail to show an objective hostile environment for the reasons previously stated (e.g., DEX 1 (Interrog. 5, Nos. 3-6)).

---

[14] Along these same lines, Plaintiff suggests that DSS management sought to isolate her from Horvath. DEX 2 (Interrog. 5, No. 2). However, even if true, this is not severe or pervasive harassment. *See Bush v. Hagel*, 2014 WL 345650, at *9 (E.D. Va. Jan. 30, 2014) (rejecting the plaintiff's claims that "he was isolated and excluded from work correspondence" as "simply insufficient evidence of adequately pervasive or severe conduct"), *aff'd sub nom. Bush v. Carter*, 597 F. App'x 178 (4th Cir. 2015); *Akers*, 338 F.3d at 499 ("ignoring [the plaintiff]" and "encouraging her coworkers to do the same" did not constitute a retaliatory hostile work environment).

As to other comments, first, Plaintiff describes several of the comments as essentially gossip. DEX 1 (Interrog. 5, No. 26). However, "office gossip . . . do[es] not rise to the level of sufficiently severe and pervasive" hostility. *See Ning Shen*, 2017 WL 2485230, at *8; *see also Rattigan*, 503 F. Supp. 2d at 80 (rejecting "claims that [the plaintiff] was the subject of a 'general rumor'" as not severe).

Second, for many of the comments that Plaintiff may have perceived to be a slight against her, she was not actually the real subject or target of the comments. DEX 1 (Interrog. 5, Nos. 7, 12, 14-15, 18, 30, 32-33); DEX 2 (Interrog. 5, No. 2).[15] Without more, the mere fact that Plaintiff had a pending EEO complaint when these comments were allegedly made does not automatically render those comments to be retaliatory in nature. *See Hartsell*, 123 F.3d at 772 ("An insulting or demeaning remark does not create a federal cause of action for . . . harassment merely because the 'victim' of the remark happens to belong to a class protected by Title VII.").

Third, many of the comments that Plaintiff takes issue with are plainly not derogatory from an objective standpoint. DEX 1 (Interrog. 5, Nos. 8-11, 17, 19-22, 24, 27-29, 31); DEX 2 (Interrog. 5, Nos. 1, 3; Interrog. 8, Nos. 16, 18-21, 23). For example, allegedly, Taylor stated: "[e]veryone has a boss they need to answer to.," and Malafarina stated: "Please trust me I met with Nelson [Bishop] about you working for him. Unfortunately when you are on Mr. Stephens's bad side it is hard to get off of it." DEX 1 (Interrog. 5, Nos. 8, 21). At best, these comments constitute "petty slights and minor annoyances" that are not actionable under Title VII, even under a theory or retaliatory hostile work environment. *See Thorn*, 766 F. Supp. 2d at 600, *aff'd*, 465 F. App'x 274.

Fourth, what remains is a scattering of isolated comments, which, although maybe crass, have no discernible nexus to Plaintiff's EEO activity. DEX 1 (Interrog. 5, Nos. 23 , 25 (""Ms.

---

[15] For example, Plaintiff concedes that she only assumed that Malafarina's alleged comment about dealing with "sensitivity issues" (DEX 1 (Interrog. 5, No. 7)), which she was not even present for to hear first-hand, was about her. DEX 7, at 63:14-64:24.

Princess Kitty' would not intimidate [Malafarina]"), 34 (alleging that Buckley asked her on one occasion "why [she] had a permanent Bitch face")); DEX 2 (Interrog. 5, No. 4 (alleging that Malafarina commented that Plaintiff was an "overpaid GS-13 and 'just a catty woman'"; "impossible to work with"; and "'will not dictate to [him]]' what [he is] going to do and not do")).[16] Moreover, Plaintiff admits that *none* of the putative comments by Malafarina were said in her presence, DEX 7, at 85:2-13, 88:24-90:12, which necessarily diminishes their impact. *See Martin*, 446 F. Supp. 2d at 629 ("[S]econd-hand harassment, although relevant, [is] less objectionable than harassment directed at the plaintiff." (quoting *Jennings v. Univ. of N.C.*, 444 F.3d 255, 272 (4th Cir. 2006)). Even when viewed collectively, these sorts of comments are not severe or pervasive enough to justify a hostile work environment claim. As the Fourth Circuit has noted, "[w]ere such things the stuff of lawsuits, we would be litigating past sundown in ever so many circumstances." *Ziskie*, 547 F.3d at 228.

* * *

All told, Plaintiff's allegations describe "professional frustrations," *Honor*, 383 F.3d at 191, "a story of a workplace dispute," *Bass*, 324 F.3d at 765, and something less than a "happy workplace," *Hartsell*, 123 F.3d at 773, but not an objectively hostile and abusive situation. Each of the types of actions by Plaintiff's managers that she complains of do not constitute severe or pervasive harassment, and wrapping them up together does not make the whole greater than the sum of its parts. *See Hinton*, 185 F. Supp. 3d at 840. As this Court and others have done when presented with analogous (and often more egregious) circumstances, summary judgment should be entered here.

## CONCLUSION

For the foregoing reasons, Defendant' Motion for Summary Judgment should be granted.

---

[16] For example, when asked why Buckley's putative comment was retaliatory, Plaintiff testified only that "[b]ecause it's not a comment that you would say to somebody" and admitted that she could not say for sure that the comment was related to her EEO complaint. DEX 7, at 224:6-225:5.

Dated:  August 17, 2017

Respectfully submitted,

DANA J. BOENTE
UNITED STATES ATTORNEY

By: _____/s/_____
ANDREW S. HAN
Assistant United States Attorney
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:    (703) 299-3970
Fax:    (703) 299-3983
Email:  andrew.han@usdoj.gov
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2017, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which will send a notification of electronic filing (NEF) to the

following counsel of record:

Jacob M. Small
J. Madison PLC
1750 Tysons Boulevard
Suite 1500
McLean, Virginia 22102
T: (703) 910-5062
F: (703) 910-5107
E: jmsmall@jmadisonplc.com

                                _____/s/_____
                                Andrew S. Han
                                Assistant United States Attorney
                                Office of the United States Attorney
                                Justin W. Williams U.S. Attorney's Building
                                2100 Jamieson Avenue
                                Alexandria, Virginia 22314
                                Tel:     (703) 299-3970
                                Fax:     (703) 299-3983
                                Email:  andrew.han@usdoj.gov