## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### *Alexandria Division*

PATRICIA BURKE,

     *Plaintiff,*

V.

                            1:16-cv-1256 LO/JFA

JAMES MATTIS, THE SECRETARY OF DEFENSE

     *Defendant.*

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Patricia Burke ("Ms. Burke") hereby opposes Defendant James Mattis's Motion for Summary Judgment, and submits this memorandum of law in opposition thereto.

## INTRODUCTION

Defendant Defense Security Service ("DSS" or "Agency")'s Motion for Summary Judgment should be denied. Plaintiff Patricia Burke complained of gender discrimination in employment to the Agency's Equal Employment Opportunity Office ("EEO") on August 13, 2013. This case is about what DSS did in response.

Ms. Burke has been an employee of DSS's Counterintelligence Directorate ("CI") since January 2011. In late 2013, DSS cancelled Ms. Burke's Telework arrangement. Ms. Burke had been using Telework because her childcare schedule required that she be at home on Wednesdays, and her supervisor David Bauer had suggested that she accomplish this with Telework.

When DSS cancelled Ms. Burke's Telework, Ms. Burke understood that male DSS employees were afforded schedule accommodations for family reasons. Ms. Burke saw this disparate treatment as gender discrimination and made a EEO complaint. Her complaint was amended

several times *inter alia* to included claims of retaliation. Today, only those retaliation claims are before the Court.

From the beginning, Ms. Burke's superiors responded aggressively and defensively. During the initial interview between the EEO office and one of Ms. Burke's direct supervisors Franklin Malafarina, Mr. Malafarina went on a tirade about being the boss.

Early in EEO's investigation of Ms. Burke's complaint, CI Director William Stevens said—while discussing Ms. Burke's case in a meeting with senior CI management—that when he was in the Air Force, a tactic they used against trouble makers was to isolate them and take away their job functions and their feelings of self-importance. In the years that followed Ms. Burke's initial complaint, that is exactly what CI leadership did to Ms. Burke.

The evidence in this case establishes that DSS CI management isolated Ms. Burke by blatantly ignoring her in front of peers, moving her workspace away from a friend, and excluding her from meetings and office communications. Then they took her work away, leaving her with nothing to do except the menial tasks they gave her instead. They also forced her (only her) to sign in and out every day. Her male supervisor Carl Taylor even instructed her to inform him every time she went to the mother's room to express breast milk for her infant child. And, in an email about Ms. Burke's EEO claim, another supervisor, Franklin Malafarina, petitioned to have Ms. Burke investigated for timecard fraud, knowing full well that she had done no such thing.

Before she complained of gender discrimination, Ms. Burke's supervisors were in agreement that she was an "excellent" and "superb" employee. Following her complaint, however, Ms. Burke's performance review plummeted, her male supervisors called her sexist names, including "catty women" and "princess kitty." And one, Michael Buckley, even told her that she had a "bitch face."

CI management did not stop with years of isolating and insulting Ms. Burke. During EEO's investigation, CI management attempted to torpedo her claims by attacking both of EEO's two employees' careers. Mr. Malafarina attempted to get Ms. Burke's EEO Counselor, Michelle Labov [formerly Michelle Benitez], fired. And after Mr. Stephens complained to the Agency's Chief of Staff, the Agency placed concerns in the EEO Director's own performance review. These attempts were partially successful, as Ms. Labov elected to mostly withdraw from any involvement in Ms. Burke's case out of fear. Despite these difficulties, after a years-long investigation, the Agency issued a sixty-page Final Agency Decision ("FAD") that culminates with a finding that Ms. Burke was subjected to a hostile work environment in retaliation for making protected EEO complaints.

For these reasons and more, a reasonable jury could find that Ms. Burke was discriminated against for filing an EEO complaint and therefore, the Defendant's Motion for Summary Judgment should be denied.

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE

Plaintiff either admits or declines to challenge all but the following paragraphs in Defendant's Statement of Undisputed Material Facts:

7.      The evidence cited by Defendant does not support the statement "According to the training, telework is expressly prohibited from being used for childcare purposes." Additionally, DEX 32 is inadmissible hearsay.

8.      This paragraph is incorrect and addressed by part b. of Plaintiff's Statement of Disputed Facts

3

11.     Bauer responded to Mr. Malafarina's inquiry regarding whether anyone was non-compliant with the Simms Memo by saying "no." Ms. Burke was only on Telework and the Simms Memo did not address Telework. PEX 25 pp. 2-3; Malafarina Dep. 54:18-56:18.

17.     Plaintiff denies the statement "[b]ecause no other employees at the time were on an alternative work schedule, and because no supervisor was present at Plaintiff's requested arrival time, this sign in/out requirement provided an internal control for Taylor's timekeeping responsibilities" But admits that Mr. Taylor testified consistent with that statement.

20.     Plaintiff denies the asserted reasons for the scheduling changes that Malafarina and Taylor approved.

21.     Plaintiff complied with Mr. Taylor's instructions regarding her Maxiflex Schedule. Taylor Dep. 228:10-23; 217:20-221:24.

24.     Mr. Taylor testified only that, ". . . I wasn't you know, going to disrupt the meeting and, you know, wait for people to show up." Taylor Dep. 136:13-15.

26.     Witness Carla Cobbs testified regarding at least four individuals who performed administrative assistant functions for CI. Cobbs Dep. 62:13-64:18.

28.     The statements attributed to Ms. Burke in this paragraph actually refer to a 2015 reorganization.

31.     Plaintiff denies that "to be closer to the rest of the operations division" was the reason she was moved. Carl Taylor told Ms. Burke she was moved for filing a complaint. P. Burke Dep. 73:01-20.

33.     Plaintiff denies that "as a general policy, DSS does not grant duty station transfers for any employee without applying for an announced vacancy. Jessica Horvath gave a sworn

4

declaration listing multiple male employees permitted to change their duty locations. *See* PEX 37 pp. 5-6.

34.     Plaintiff only admits that Taylor testified consistent with this statement.

35.     Plaintiff admits that Mr. Bauer signed a declaration consistent with this statement. But Jessica Horvath stated in her signed declaration that she overheard a conversation wherein Jennifer Gabeler, Mr. Bauer's significant other, admitted that Mr. Bauer was not completely honest in his sworn declaration. PEX 37 p. 23.

36.     Plaintiff admits that Mr. Bauer signed a declaration consistent with this statement. But Jessica Horvath stated in her signed declaration that she overheard a conversation wherein Jennifer Gabeler, Mr. Bauer's significant other, admitted that Mr. Bauer was not completely honest in his sworn declaration. PEX 37 p. 23

40.     Regarding the statement "Plaintiff's understanding of the situation was incorrect," Plaintiff denies this. It was, in fact, Mr. Buckley with the entirely incorrect understanding of the conversation. PEX 2.

48.     Plaintiff denies that the FAD only provided one paragraph of legal analysis regarding the retaliatory hostile work environment. The FAD speaks for itself.

Plaintiff sets forward the following for its Statement of Material Facts in Dispute:

**a.     In 2011, Patricia Burke Joined DSS as a Field Support Analyst, Performed Well, and was Promoted in Short Order.**

1.     On January 3, 2011 Plaintiff Patricia Burke first joined DSS as a "Field Support Analyst" and paid as a GS-12. P. Burke Dep. 13:11-12, 15:20-24. She initially worked for first-level supervisor, Nelson Bishop, and second-level supervisor, David Bauer. P. Burke Dep. 16:07-11. Until the initiation of her complaint in August of 2013, Ms. Burke was liked by her colleagues, Bishop Dep. 16:18-04, and was considered to be "excellent" and a "top 10 percent"

5

employee by Mr. Bishop. Bishop Dep. 17:02-14. And Mr. Bauer, her second-level supervisor, described her as a "superb" employee in January 2013. PEX 29. Her 2011 and 2013 performance reviews also reflect that she was a competent employee, meeting DSS's expectations. PEX 55; PEX 56. She was promoted to the GS-13 position within a year of her hire. P. Burke Dep. 18:03-09.

### b.    Ms. Burke Received Permission to Work Modified Schedules.

2.    Ms. Burke gave birth to her first child, HB, in Spring of 2013. P. Burke Dep. 31:24-32:09. On January 2, 2013, prior to HB's birth, Mr. Bauer approved Ms. Burke's Work Schedule Request,  permitting her to work a "4/10" alternative work schedule ("AWS")[1]. PEX 28. At DSS, AWS are regulated by DSS Regulation No. 11-610. DEX 33. Under this schedule, Ms. Burke worked from 6:30am to 5:00pm on Mondays, Tuesdays, Thursdays, and Fridays, but had Wednesdays off. PEX 28. Mr. Bauer approved Ms. Burke's pre-birth AWS because it was, in his judgment "in the best interest of the DSS mission and the employee." PEX 13 p. 16. The schedule, Mr. Bauer said, permitted Ms. Burke to attend regular doctor's visits while giving the agency a 40-hour workweek. PEX 13 p. 6.

3.    After HB's birth, in April, Ms. Burke's AWS came to an end. PEX 13 p. 6. Mr. Bauer offered to Ms. Burke the opportunity to return to an 8-hour per day schedule, with Ms. Burke using Telework on Wednesdays. P. Burke Dep. 31:19-32:16.

4.    Ms. Burke also spoke with Mr. Stephens about the arrangement, and received his approval. P. Burke Dep. 31:06-12. Both Mr. Stephens and Mr. Bauer understood when agreeing

---

[1] AWS is largely synonymous with a compressed work schedule ("CWS"), and any differences are not important to the analysis of this case. Therefore, the term AWS will be used throughout this brief and all references to CWS will be changed to AWS for clarity's sake.

to Ms. Burke's Wednesday Telework that the reason Ms. Burke needed Wednesdays off was because she had no childcare arranged on Wednesdays. P. Burke Dep. 31:08-10. And after Ms. Burke began performing Telework on Wednesdays, she would send pictures of her child to Mr. Bauer during the workday on Wednesdays. P. Burke Dep. 32:25-33:25. In addition to Mr. Bauer and Mr. Stephens, Assistant Director of CI Mark Allen knew that Ms. Burke was on a telework arrangement. PEX 13 p. 17.

> **c.   In or Around August 2013, DSS Revoked Ms. Burke's Telework Arrangement.**

5.      On May 15, 2013, in anticipation of necessary employee furloughs, DSS Director Stanley Simms issued a memorandum (the "Simms Memo"). DEX 19. In it, Mr. Simms directs Agency personnel to cancel AWS during pay periods that include furloughs, "To ensure furlough days consist of 8 hours for all employees." DEX 19 p. 1. Notably absent from the Simms Memo was any reference to telework, which is not AWS. DEX 34.

6.      On July 29, 2013, Mr. Malafarina assumed the role of Assistant Director of Operations within CI, replacing David Bauer as Ms. Burke's supervisor. PEX 25 at 2-3. According to Mr. Malafarina, during his first week he attended a meeting where Mr. Stephens asked if anyone had any employees on AWS. Malafarina Dep. 54:18-56:18. Mr. Malafarina was not sure. Malafarina Dep. 56:5-6. So Malafarina approached his predecessor, Dave Bauer, and said, "Dave, just to make sure, we don't have anybody who's in violation of the furlough rules, correct?" Malafarina Dep. 56:6-8. Mr. Bauer said "no." Malafarina Dep. 56:9. Mr. Malafarina testified next that Mr. Bauer told him that Ms. Burke was "on a – I can't remember if it was compressed or alternate work schedule and she was teleworking every Wednesday." Malafarina Dep. 56:10-12.

7.     Mr. Malafarina testified in his deposition that he then let Mr. Stephens and Deputy Director Mark Allen know that Ms. Burke was in violation of the Simms Memo. Malafarina Dep. 56:15-18. On August 1, 2013, Mr. Allen revoked Ms. Burke's Wednesday Telework arrangement. P. Burke Dep. 38:24-39:9.

8.     As described above, Ms. Burke was, at that time, on Telework and not CWS. If Mr. Malafarina has subsequently forgotten that the Simms Memo did not impact Telework or that Ms. Burke was not on CWS, he was clear on this point on May 2, 2014, when he gave a sworn declaration, testifying, "No one was allowed to have [A]WS during the furlough period. . . . Complaint's [*sic*] issue was a telework issue not a [A]WS issue.*"* PEX 25 pp. 15, 29.  As Ms. Burke's former supervisor Mr. Bauer stated in his sworn declaration, "Telework is at [*sic*] leadership decision and new leadership decided telework was not appropriate." PEX 13, p. 17. In his deposition, Mr. Malafarina couched the August 1, 2013 Telework revocation as an effort to comply with the Simms Memo. Malafarina Dep. 54:18-56:18. But in his 2014 declaration, Mr. Malafarina gave a different answer: "No employee can use telework as a substitute for dependent care and child care is a subset of dependent care." PEX 25 p. 19.

**d.     Ms. Burke Applies for, and CI Leadership Denies, Multiple and Various Schedule Modifications.**

9.     By revoking her Telework, Mr. Malafarina required Ms. Burke to be in the office on Wednesdays, despite Ms. Burke's inability to find child care for HB on Wednesdays. Over the next two months, Ms. Burke applied for five schedule accommodations to address her child care concerns. PEX 47 p. 2. DSS denied four of those. The one that the Agency granted was a situational Telework arrangement that permitted Ms. Burke to take situational telework. DEX 30. For another request, Mr. Malafarina modified the request on September 6, 2013, permitting Ms. Burke to observe a 4/10 schedule for two weeks only "to allow Plaintiff time to address her

8

childcare needs with the ultimate goal of having her return to a regular 5/8 schedule" Def. Brief p. 4-5. While the Agency denied her requests, it permitted men various scheduling accommodations for similar reasons. *See, e.g,* PEX 37 pp. 5-6, 16-17, 20.

### e.   Ms. Burke Seeks the EEO Office's Protection for Gender Discrimination, Sparking a Multi-Agency Investigation.

10.     Ms. Burke complained of gender discrimination to the DSS EEO office on August 13, 2013. DEX 3. Ms. Lyle met with Ms. Burke in the summer of 2013. Lyle Dep. 21:10-15. In this meeting Ms. Burke complained of an unfair schedule denial and job duties that were not professionally oriented as described in her position description. Lyle Dep. 21:18-22:06. In Ms. Lyle's initial meeting with Ms. Burke, Lyle documented Burke's complaints, explained the federal EEO process and asked Ms. Burke if she would like to proceed with the EEO process, and Ms. Burke said yes. Lyle Dep. 22:20-23:09. Ms. Lyle then emailed Michelle Labov to establish and confirm Labov's role as the EEO Counselor. Lyle Dep. 24:02-07.

11.     Ms. Labov then met in person with Mr. Malafarina on August 23, 2013 to discuss Ms. Burke's complaints. Labov Dep. 26:09-20; PEX 5. The meeting was atypical in that it took four hours when this type of meeting usually takes 15 or 20 minutes. Labov Dep. 26:21-25. Ms. Labov found Mr. Malafarina to be aggressive and angry, as well as visibly and audibly upset with the situation and with Ms. Burke. Labov Dep. 27:03-25, 32:14-33:01. He went off on tangents, including one where he talked about being the boss, how he had never had an employee tell him what to do before, stating, "It's not my fault she had a kid." Labov Dep. 29:25-30-01. Mr. Malafarina left Ms. Labov with the impression that he believed the whole situation was ridiculous and there were other ways to handle things. Labov Dep. 33:08-34-03. He even described how, in his first meeting with Ms. Burke, he formed the opinion that Ms. Burke was act-

ing "catty." PEX 5 p. 2-3. Ms. Benitez left the meeting feeling uncomfortable with Mr. Malafarina. Labov Dep. 34:07-25.

###### f.   Agency Management Attempts to Influence the EEO Office's Handling of Ms. Burke's Case.

12.     On Monday, August 26, 2013, Ms. Benitez returned to work to find Ms. Lyle frantic and upset after hearing from Rebecca Allen (DSS Chief of Staff) that Mr. Malafarina had complained that Ms. Labov had been accusatory at the initial meeting and that she had "manhandled" him and he was demanding her termination. Labov Dep. 42:06-43:07, 42:19-21. Ms. Labov and Ms. Lyle held a meeting to discuss this event and Ms. Lyle then told Ms. Labov that the complaint had been moved to the director of the entire agency, Mr. Simms. Labov Dep. 46:10-47:05. According to Ms. Lyle, the agency began to "pushback," Lyle Dep. 140:07-141:08, with what Ms. Lyle described as an unusual request to have all requests routed through Deputy Director Mark Allen. Lyle Dep. 134:05-14.

13.     At the request of Ms. Labov, Labov Dep. 39:17-40:11, Ms. Lyle set up an alternate dispute resolution process meeting with Ms. Burke and Mr. Malafarina.  Lyle Dep. 32:01-10. Ms. Labov wished to remove herself from interacting one on one with Mr. Malafarina, and didn't want to be part of the case because she was uncomfortable. Labov Dep. 47:20-48:02. Also in attendance at the alternate resolution process meeting were Ms. Lyle, Ms. Labov, and Ms. Elizabeth Blackmon. Lyle Dep. 33:22-34:04, 37:03-09.   The focus of the meeting was Ms. Burke's schedule, the effect this schedule had on her leave balance, loss of pay that resulted from the abrupt new schedule requirements, and a compressed work schedule to resolve these issues. Labov Dep. 40:22-41:14; Lyle Dep. 42:14-43:02. Mr. Malafarina was quick to anger and again made the statement, "It's not my fault [Ms. Burke] had a kid."  Labov Dep. 40:22-41:09, 49:18-50:07, 179:15-180:01. He ended the meeting with a promise to respond to a DSS-280 AWS re-

10

quest from Ms. Burke by September 6, 2013. Lyle Dep. 42:14-43:02. But the contact Ms. Lyle received from Ms. Allen on August 26th, and the demeaner of Mr. Malafarina in the meeting of August 30th were noted by Ms. Lyle to be indications that there was going to be difficulty working with Counterintelligence ("CI") with regards to Ms. Burke's complaint. Lyle 145:08-146-04.

14.     The "pushback" continued as it was difficult for Ms. Lyle to get documents from CI. Scheduling interviews with CI staff was difficult and there were continued complaints about the EEO office to Ms. Allen. Lyle Dep. 61:08-62:01. Ms. Labov recalls Ms. Lyle confiding to her about feeling pressure from the front office with respect to Ms. Burke's case more often than once a week. Labov Dep. 163:02-14. Ms. Lyle even received feedback on her performance review that was described to her in context with Ms. Burke's complaint and specifically, with Mr. Stephens. Lyle Dep. 100:03-19.

### g.     After Her EEO Complaint, Ms. Burke Was The Only Person Mr. Taylor Required to Sign In And Out.

15.     During the temporary two-week AWS that Mr. Malafarina gave Ms. Burke on September 6, 2013, Mr. Taylor imposed upon Ms. Burke a requirement that she sign in and sign out every day. PEX 9 p. 24. Ms. Burke was the only person he imposed this requirement upon. PEX 9 p. 24. The only other person that Mr. Taylor ever subjected to a sign-in and sign-out requirement was someone who was caught being dishonest with his time reporting. Taylor Dep. 86:07-87:01.

### h.     Ms. Burke Files a Formal EEO Complaint

16.     On September 10, 2013, Ms. Burke escalated her protected activity, filing a formal EEO complaint. DEX 4. From that point on, and through multiple amendments for retaliation, EEO cooperated with the Department of Defense, Investigations and Resolutions Division

("IRD")'s investigator Matthew Wendel, who investigated Ms. Burke's allegations, Lyle Dep. 17:04-15.

17.     Mr. Wendell and his successor Tonya Pollard conducted an investigation that lasted years, interviewing witnesses, gathering documents, and collecting sworn statements. On May 29, 2014, Mr. Wendel produced a Report of Investigation. PEX 47. On May 27, 2016, a different IRD investigator, Tonya Pollard, produced a Supplemental Report of Investigation handling some amendments. PEX 45.

### i.     Mr. Stephens Explains How to Deal With Troublesome Employees: Take Work Away, Ignore Them, and Lower Their Self-Importance.

18.     On or about November 15, 2013, Mr. Stephens called Mr. Bishop into his office to talk "regarding the Trish Burke situation." PEX 49 p. 14. Mr. Stephens told Mr. Bishop that Ms. Burke had filed an EEO complaint. PEX 49 p. 14. Mr. Stephens then shared that he believed CI's timekeeper and Mr. Bishop's subordinate, Jessica Horvath, had helped Ms. Burke's EEO case by providing Ms. Burke with information. PEX 49 p. 14. He then said he wanted to get to the bottom of the alleged leak and asked Mr. Bishop what Mr. Bishop was going to do about it. PEX 49 p. 15. Mr. Bishop next testified as follows: "Mr. Stephens did not specifically advise me to do this, but he mentioned one tact [sic] he found useful in past situations in the Air Force was that you can ignore people or take away their duties and self-importance and it really bothers them." PEX 49 p. 14. In his deposition, Mr. Bishop testified that he took Mr. Stephens to be making a strong suggestion that Mr. Bishop conduct himself in this manner. Bishop Dep. 115:19-118:12.

19.     In his deposition, Mr. Stephens was presented with video of Mr. Bishop's testimony cited above. Over the course of eleven pages of testimony, Mr. Stephens equivocated on

whether he ever said what Bishop alleged. Stephens Dep. 180:14-191:12. Stephens never denied saying it, instead saying things like "Am I surprised that he's making these comments? Not particularly, no." Stephens Dep. 185:22-186:02. and "No, I would say perceived it incorrectly is what I would say." Stephens Dep. 191:01-04.

**j.    Stephens, Malafarina, and Buckley Made a Show of Ignoring Ms. Burke In Front of Her Colleagues.**

20.    Multiple witnesses testified that, after Ms. Burke's complaints to EEO, various CI Leaders publicly ignored Ms. Burke. Mr. Bishop testified that he observed Mr. Stephens walk past Ms. Burke and others but not say hi to Ms. Burke, and he would hearken back to Stephens's comment about ignoring people. Bishop Dep. 194:16-198:22. Even Ms. Labov, Ms. Burke's EEO counselor, twice observed Mr. Stephens purposefully ignoring Ms. Burke. Labov Dep. 90:14-91:20. Witness Connie Vitiello also testified that she saw Mr. Stephens ignore Ms. Burke on "several" occasions, and she described in detail one such observation which she perceived as an "intentional slight." Vitiello Dep. 62:20-76:03. For her part, Ms. Burke also testified about being ignored by Messrs. Taylor and Malafarina on or about November 15, 2013, just five days after the date Stephens suggested that Bishop engage in ignoring employees. P. Burke Dep. 177:22-178:17. And one member of CI's leadership admitted going out of his way to interact with Ms. Burke less after her complaint. Buckley Dep. 125:17-126:07. Michael Buckley testified that "So part of it is with the complaint, my interaction or willingness to interact, that I had to answer to diminished greatly the need for me to interact with Ms. Burke at all." Buckley Dep. 125:17-21. Jennifer Gabeler, a member of CI senior management, testified that, after *she* made a gender discrimination complaint against Mr. Stephens, he engaged in the same sort of snubbing toward her. Gabeler Dep. 160:03-162:10.

**k.      DSS Isolated Ms. Burke From Her Friend Jessica Horvath.**

21.      Immediately after making the comment described above, Mr. Stephens directed Mr. Bishop to arrange that Ms. Burke's cubicle be moved away from Ms. Horvath, her friend. PEX 49 p. 15; PEX 13 p. 11 ("It is widely known that Ms. Burke and Ms. Horvath are close personal friends and routinely have lunch together."). This was, by Mr. Malafarina's admission, Mr. Malafarina's idea. PEX 25 p. 12. Carl Taylor, Mr. Malafarina's subordinate and According to Ms. Burke, her then-first level supervisor told her in his office that this desk move was because Ms. Burke filed a complaint. P. Burke Dep. 73:01-20.

**l.      DSS Took Away Ms. Burke's Meaningful Work and Replaced It With Menial Tasks.**

22.      After she filed her complaint, DSS Leadership took Ms. Burke's substantive work away, leaving her sitting at her desk alone and bored. Bishop Dep. 100:12-103:01 ("I would go in. She basically had nothing to do. Thery weren't giving her work to do."); Horvath Dep. 186:03-189:03 ("But it wasn't until the EEO case kind of started coming out and until Frank Malafarina and Carl Taylor came on board to the agency as her direct-line supervisors, that she really had nothing to do."); Burke Dep 187:10-188:03 ("Essentially when I filed a complaint, I had no work. I wasn't given anything. I was given menial tasks, administrative tasks, scheduling his meetings, taking meeitng minutes, et cetera. There was no -- no real job."), 265:09-11 ("Like I said previously, I had no work to do. I literally sat there for three years."). The work she was given was menial, administrative work, to the point where Mr. Bishop felt compelled to write Mr. Malafarina. PEX 14.

**m.      Agency Management Excluded Ms. Burke From Meetings.**

23.      Mr. Taylor's first day as Ms. Burke's direct supervisor was on September 9, 2013, after Ms. Burke had engaged in protected activity. PEX 9 p. 2; Taylor Dep. 10:12. On the day of

his arrival, Mr. Malafarina briefed Mr. Taylor on Ms. Burke's case. PEX 66 p. 1. That day, Mr. Taylor conducted a "get to know you" meeting of all the "desk officers." PEX 66 p. 1. Witness Carla Cobbs stated under oath in her declaration that Ms. Burke was not there and that Mr. Taylor did not ask anyone to get Ms. Burke. PEX 10 p. 10.

24.     Ms. Cobbs remembers an additional meeting where Ms. Cobbs noted Ms. Burke's absence and offered to go get Ms. Burke. Cobbs Dep. 118:02-121:15. But Mr. Taylor declined and Ms. Cobbs asked if he was sure. Cobbs Dep. 118:02-121:15. Mr. Taylor again declined, but Ms. Cobbs found the exchange "weird" dismissive in his response. Cobbs Dep. 118:02-121:15).

### n.      After Ms. Burke's Protected Activity, CI Leadership Called Ms. Burke Derogatory Terms And Made Comments About Her EEO Complaint.

25.     At his initial interview with Ms. Labov, Mr. Malafarina related his first meeting with Ms. Burke and described her as "catty." PEX 5 pp. 2-3. In his deposition, Mr. Malafarina admitted that he said this. Malafarina Dep. 176:08-14. When asked what he meant, he testified that "I have worked around whomen who, for whatever reason, don't seem to like other females that they work with and, if given the opportunity, will badmouth other women that they work with." Malafarina Dep. 177:04-09.

26.     During a teleconference on or around September 5, 2013, Mr. Malafarina also referred to inheriting a situation he did not want to deal with. PEX 10 p. 11. According to Ms. Cobbs, Malafarina also referenced "dealing with sensitivity issues since coming on board." PEX 10, Cobbs Dep. 138:10-139:02. The impression that Ms. Cobbs had from Mr. Malafarina's comments was that all in attendance understood Mr. Malafarina to be referring to Ms. Burke. Ms. Cobb testified, "Mr. Malafarina's comments did have a tone of this is what happens when

you go to EEO and Mr. Malafarina will not deal with them anymore." PEX 10 p. 11. Mr. Mal-afarina did not deny (nor admit) making this statement. Malafarina Dep. 191:22-192:07.

27.      On at least two occasions Mr. Malafarina stated that "Miss Princess Kitty" would not intimidate him to Mr. Bauer. PEX 13 p. 13. Mr. Buckley made a statement to Ms. Burke about walking around with a permanent bitch face. P. Burke Dep. 210:25-211:15, Horvath Dep. 100:07-16. Mr. Malafarina also made comments about Ms. Burke being a "princess" and feeling "entitled" as a woman to do as she pleased. PEX 5. Ms. Labov also recalls Mr. Malafarina often calling Ms. Burke a "brat." Labov Dep. 178:08-24.

> **o.  In an Email About Ms. Burke's EEO Case, Mr. Malafarina Peti-tions Stephens to Have Ms. Burke Investigated For Time Card Fraud, Knowing She Had Not Engaged in Fraud.**

28.      Some of CI Leadership's responses to Ms. Burke's claims were potentially more dangerous than simply attacking her career, friendships, and self-importance. On January 31, 2014, Following the DSS EEO mediation session, (six months after he became her supervisor) Mr. Malafarina sent an email to his boss with the subject line "FW: EEO Investigation for DSS Case 13-013." PEX 34 p. 1. The email was a forward of an email notifying Malafarina that he was required by law to answer questions from Mr. Wendel, the IRD investigator. PEX 34.

29.      Mr. Stephens began his email by complaining about the EEO process, writing "[h]ow can an employee file an EEO complaint because their supervisor will not allow them to continue to violate DoD and DSS policy?" PEX 34 p. 1. In a 665 word email that Mr. Malafarina agreed he was "frustrated" when he wrote, Malafarina Dep. 283:14-15, Mr. Malafarina works his way to suggesting that Ms. Burke should be investigated for timecard fraud for telework that she completed prior to his arrival. PEX 34 p. 1.

30.     Mr. Malafarina testified that he thought Ms. Burke had engaged in fraud because he could not find a copy of the approved telework agreement signed by both her and Mr. Bauer, and because she had not specifically designated telework hours on her timecard. Malafarina Dep. 154:12-16. He did this despite *seeing* a telework agreement signed by Mr. Bauer, Ms. Burke's prior supervisor, and being told by Mr. Bauer that he had approved Ms. Burke's Telework. Malafarina Dep. 160:18-22; Malafarina Dep. 163:15-20. He acknowledged that the lack of documentation could be due to any number of innocent reasons. Malafarina Dep. 164:04-12). He then said that in "most cases, in situations like this, my experience has been [the reasons are] sloppy paperwork," Malafarina Dep. 168:14-169:02, and that he saw the signed telework agreement and had the conversation with Ms. Burke's prior supervisor around July 31, 2013, months before he suggested the time card fraud investigation. Malafarina Dep. 169:09-170:04.

### p. Carl Taylor Requires Ms. Burke to Request Leave When She Needed to Use the Mothers Room to Express Breast Milk for Her Child.

31.     On February 20, 2014, Carl Taylor issued a memorandum with the subject line "Work Schedule Request – February 19, 2014." PEX 20. In that memorandum, Mr. Taylor informed Ms. Burke that "you may request, and I will approve, leave for use of the Mothers Room." PEX 20 p. 1.

32.     Witness Carla Cobbs testified regarding how this leave request looked to colleagues in the office. Cobbs Dep. 37:20-38:04. According to Ms. Cobbs, everyone has a whiteboard in their cubicle and Ms. Burke would write times on her board with her initials on them. Cobbs Dep. 32:07-17. Ms. Cobbs asked Ms. Burke what those times were and Ms. Burke said that Carl Taylor told her to write down every time Ms. Burke left her desk to breastfeed or use the bathroom. Cobb Dep. 34:01-21.

17

### q. Michael Buckley Overhears a Conversation and Berates Ms. Burke in Front of Management.

33.     On the morning of June 25, 2015, Ms. Burke and Mr. Nelson were in his office talking about a colleague's request for a detail to a different directorate than CI. PEX 50 p. 2; Bishop Deposition 127:16-130:11. The employee in question had told Ms. Burke this herself. PEX 50 p. 3. Michael Buckley heard part of the conversation through the wall, including a part where Ms. Burke said she was going to file a complaint if the employee in question were treated advantageously to her. Buckley Dep. 90:07-10; 95:10-21. Mr. Buckley called an impromptu meeting about the conversation including Ms. Burke, Mr. Bishop, Carl Taylor, Frank Malafarina, and Mark Allen. Bishop Dep. 130:20-133:18. The tone of the meeting was confrontational and Mr. Buckley was volatile. Bishop Dep. 134:09-16.  It was a group of supervisors ganging up on Ms. Burke. Bishop Dep. 136:01-04. When it was revealed that the promoted employee was the source of the information, Ms. Burke was excused from the meeting. Bishop Dep. 134:20-135:07. But Ms. Burke was already visibly upset, apparently on the verge of tears for being berated for something that she did not do. Bishop Dep. 135:08-19. It was so upsetting to Ms. Burke that it took her "30-plus minutes" to calm down afterwards. Horvath Dep. 142:17-21. Once Ms. Burke left, the group turned their attention to Mr. Bishop, telling him that he should not talk to Ms. Burke because he is only prolonging her EEO case. Bishop Dep. 137:09-18.

### r.     The Government Investigation of Ms. Burke's Allegations Concludes, and the Agency Finds that Management Retaliated Against Ms. Burke for Her Complaints by Creating a Hostile Work Environment.

On July 5, 2016, DSS issued a 60-page FAD in Ms. Burke's case. It concludes that the Agency did, in fact, retaliate against Ms. Burke for engaging in protected activity. FAD pp. 56-57.

**ARGUMENT**

Summary judgment may only be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The court must view the facts in the light most favorable to the nonmoving party and grant that party all reasonable inferences from those facts. *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013).

An employer is prohibited from discriminating against an employee that has opposed an unlawful employment practice, "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" alleging sex discrimination. 42 U.S.C. § 2000e-3(a). This discrimination may be proved two different ways. *Foster v. University of Maryland-Eastern Shore*, 787 F.3d 243, 249 (4th Cir. 2015). The first way is through direct and indirect evidence of retaliatory animus ("mixed-motive framework[3]"). *Id*. And the second way is through the "pretext framework" of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Foster*, 787 F.3d at 249.

Regardless of the framework, the Plaintiff must first make out a prima facie case. *See Foster* at 250. And to do so she must show that (1) she engaged in protected activity, (2) her employer took an adverse employment action against her, and (3) a causal relationship exists between the adverse employment action and the protected activity. *Guessous v. Fairview Property Investments, LLC*, 828 F. 3d 208, 217 (4th Cir. 2016). Where the two frameworks differ is how

---

[3] While this is the name generally used in the case law, it was rendered somewhat of a misnomer by University of Texas Southwestern Medical Center v. Nassar, when the Supreme Court limited motivating factor causation to status based discrimination and made "but-for" causation the standard in retaliation cases. __ U.S. __, 133 S. Ct. 2517, 2522-23, 2528 (2013).

they deal with causation. *See Foster* at 251. The pretext framework has a "less onerous" causation burden at this stage than the mixed-motive framework. *Id*.

**I.     MS. BURKE ENGAGED IN PROTECTED ACTIVITY WHEN SHE COMPLAINED TO EEO AND FILED HER FORMAL COMPLAINT.**

An employee engages in protected activity when she opposes or files a charge of sex discrimination. *See Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006).[4] Ms. Burke filed both informal and formal complaints of sex discrimination with the DSS EEO office beginning in August of 2013. Burke Dep. 25:04-26:07.

**II.    DSS CI SUBJECT MS. BURKE TO AN ADVERSE EMPLOYMENT ACTION WHEN IT ENGAGED IN A PATTERN OF HARASSMENT.**

The adverse action prong is satisfied when an employee shows that the employer's actions "would have been materially adverse to a reasonable employee." *Burlington Northern and Santa Fe Ry. Co.*, at 57. "[T]hat means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id*. The anti-retaliation statute seeks to prevent an employer from interfering with enforcement of Title VII. *Id*. at 57, 68. Acts of retaliation must be viewed in the light of all the attendant circumstances. *Id*. At 68-69.  "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or acts performed." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81-82 (1998). In other words, the court must consider the retaliation under the totality of the circumstances. *See Burlington Northern and Santa Fe. Ry. Co.* At 69.

---

[4] The defendant concedes that Ms. Burke engaged in protected activity in its Memorandum of Law in Support of Defendant's Motion for Summary Judgment on page 11 lines 4-6.

One form of adverse employment action is the hostile work environment. *Morris v. Old-ham County Fiscal Court*, 201 F.3d. 784, 791 (6th Cir. 2000). "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice." *Guessous* at 221. There are two categories of hostile work environments, one that culminates in a tangible employment action and another where there is no tangible employment action. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 143-44 (2004). In the former situation, the employer is held strictly liable, but in the latter the employer has an affirmative defense available. *Id*. at 143.

A retaliatory hostile work environment claim consists of four elements, "that the alleged conduct: 1) was unwelcome; 2) resulted because of her . . . prior protected activity; 3) was 'sufficiently severe or pervasive' to alter the conditions of her employment; and 4) was imputable to her employer." *Pueschel v. Peters*, 577 F.3d 558, 564-65 (4th Cir. 2009) (ellipsis not in original). The first element is subjective, while the remaining three elements are based on an objectively reasonable person standard. *Id*. At 565. The second element's causation standard requires proof of but-for causation. *Id*.

### 1. Ms. Burke Did Not Welcome the Years of Harassment By Her Superiors.

This element is proven by the multiple complaints and amendments Ms. Burke filed and bolstered by evidence of Ms. Burke crying at work. Horvath Dep. 138:20-140:07; 160:06-22. Further, Defendants do not appear to contest this element. Def's Brief p. 11.

### 2. DSS Engaged in the Harassment Because Ms. Burke Sought EEO's Assistance Protecting Her Federal Civil Rights

While the desire to retaliate must be the but-for cause of the harassment, it need not be the sole cause. *Guessous v. Fairview Property Investments, LLC*, 828 F.3d 208, 217 (2016) (cit-

ing *Burrage v. United States*, 134 S. Ct. 881, 888 (2014).  Causation may be established by mere temporal proximity. *See Guessous*, 828 F.3d at 218.

In this case there is strong causation evidence. The statement by Mr. Stevens suggesting that the way to deal with troublemakers is to isolate them, take away their job functions and their feelings of self importance demonstrates the plan behind DSS's treatment of Ms. Burke following her EEO complaint. *See* ¶ 18 in Statement of Material Facts In Dispute ("SMFD"), above. Additionally, when Mr. Malafarina initiates the retaliatory hostile work environment by getting upset during his initial interview with Ms. Labov, SMFD ¶ 11, and trying to get her terminated on the next business day, *see* SMFD ¶ 12, the temporal proximity of these actions and the knowledge of the complaint establish a strong causal connection between the two. Because causation is the same as the third element of the prima facie case and is legally complicated, it will be dealt with in greater detail below in Part III of this Brief.

### 3.  DSS's Years of Harassing Ms. Burke Caused a Severe and Pervasive Hostile Work Environment.

Harassment is considered severe or pervasive when it creates "an environment that a reasonable person would find hostile or abusive." *Harris* at 21. This determination requires the court to look at all of the attendant circumstances. *Id*. at 23. This requires consideration of "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. While unfulfilled threats are not actionable on their own, they are actionable to the degree they contribute to a hostile work environment. *Ellerth*, 524 U.S. at 754.

Evidence of how others in the plaintiff's protected class were treated in the same workplace is probative evidence of a hostile work environment, regardless of whether the plaintiff was aware of the treatment. *Ziskie v. Mineta*, 547 F.3d 220, 225 (2008). The evidence serves the

purpose of showing that the treatment was pervasive and also that the treatment was due to the plaintiff's membership in a protected class. *Id*. 26t 225-26.

The Defendant's brief identifies seven categories of acts contributing to a hostile work environment. Def's Brief 20, 22, 23, 24, 25, 27, 28. But it ignores two others that it segregates and calls discrete acts: the 2013 performance rating and the denial of Ms. Burke's relocation request. Def's Brief 15.

The hostile work environment was initiated by Mr. Malafarina when he got angry during his initial interview with Ms. Labov when he learned of the allegations. SMFD ¶ 11 It was furthered when he went to the Director of CI in an attempt to get Ms. Labov's employment terminated. SMFD, ¶ 12 These actions began the show of hostility toward anyone cooperating with the EEO process and furthered Ms. Burke's isolation and the isolation of anyone associated with her.

The hostile work environment continued as DSS isolated Ms. Burke, took her job functions away and attacked her self worth. Her supervisors ignored her while greeting those around her. Vitiello Dep. 83:21-85:10. There were years when she was given no work to do. She was excluded from emails and meetings. Vitiello Dep. 83:21-85:10. She was denied AWS and Telework. She was called names by her supervisors, and Mr. Buckley went so far as to say that she had a "bitchy face." Horvath Dep. 100:14-16). Her desk was physically moved away from her friend Ms. Horvath in order to further isolate her. She was forced to sign in and out and was the only person required to do so. Malafarina accused her of time card fraud. Mr. Taylor made her report every time she used the mother's room to express milk for her infant child.

DSS even retaliated against those who cooperated with the EEO investigation. Mr. Malafarina attempted to get Ms. Labov terminated. And Ms. Horvath and Mr. Bishop were isolated because management perceived that they supported Ms. Burke's EEO complaint.

When viewing all of these facts together along with the circumstances under which they occurred demonstrate the severity and pervasiveness of the hostile work environment. The fact that this behavior played out over the course of years shows the pervasiveness of the hostile work environment.

The facts in this case relative to severity and pervasiveness of a hostile work environment are similar to the facts considered by the Fourth Circuit Court of Appeals in *Spriggs v. Diamond Auto Glass*, 242 F.3d 179 (4th Cir. 2001). In *Spriggs*, the plaintiff-employee was subjected to "continuous daily" comments about members of the plaintiff's protected class. *Id.*at 184-85. The supervisor used derogatory terms for members of that class and compared the plaintiff's appearance to that of an animal. *Id*. At 85. The court found that this behavior was sufficiently severe and pervasive to deny the defendant's motion for summary judgment. *Id*. 186.

Similarly, Ms. Burke was subjected to being ignored and denied work on a daily basis for a prolonged period of time. The supervisors used derogatory terms for her such as Princess, Princess Kitty, brat, and catty woman. *See* Horvath Dep. 260:02-17; P. Burke Dep. 90:13-16; Gabeler Dep. 138:16-139:02; Labov Dep. 178:08-24; P. Burke Dep. 85:02-16. Mr. Buckley told Ms. Burke that she had a bitch face, thus comparing her appearance to that a female dog. Horvath Dep. 100:14-16. This comparison is analogous to the facts in *Spriggs* where the supervisor compared the employee's appearance to that of an animal.

**4. The Harassment is Imputable to DSS Because It Was Performed By Management.**

The fourth element requires a showing that "the employer 'knew or should have known about the harassment and failed to take effective action to stop it.;" *Foster* at 255. In this case, the harassment came from members of management and other members of management were aware of the conduct. Bishop Dep. 122:08-17, 124:11-136:07). Additionally, the imputation element is not contested in the Defendant's Brief. (Def's Brief p. 11, lines 4-5).

**III.   CAUSATION**

**1. Mixed-Motive Framework**

The causation prong of the mixed-motive framework requires an employee to have direct or circumstantial evidence of discrimination. *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 317 (4th Cir. 2005). The protected activity must be the "but-for" cause of the adverse employment action. *Nassar*, 133 S. Ct. 2517, 2528 (2013). That means that the wrongful action would not have occurred in the absence of the protected activity, but it does not require the protected activity to be the sole motivation. *Guessous*, 828 F.3d at 217 (citing *Nassar*, 133 S. Ct. at 2533 and *Burrage v. United States*, 134 S. Ct. 881, 888 (2014)). There can be other contributing motivations, so long as the protected activity was the but-for cause of the retaliation. *Id*.

The employer "must act out of 'the desire to retaliate' in order to incur liability" but employer need not act maliciously. *Villa v. Cavamezze Grill, LLC*, 858 F.3d 896, 901 (2017) (quoting *Forman v. Small*, 271 F.3d 285, 299 (D.C. Cir. 2001)). The employer's *subjective* motivations are what is important for liability purposes. *Villa* at 901.

In this case, Mr. Stephens laid out his retaliatory plan to Nelson Bishop. Bishop Dep. 115:22-117:01. He said that a good tactic to use was to isolate people and take away their job functions and their feeling of self-importance. Bishop Dep. 107:05-14. Mr. Bishop understood

25

that Mr. Stephens was making a strong suggestion that he was to act that way. Bishop Dep. 116:17-21.

Later, after the meeting on June 25, 2015 when Mr. Buckley berated Ms. Burke when her overheard her discussing amending her complaint, this tactic reemerged. Bishop Dep. 137:11-138:03). Mr. Buckley and Mr. Malafarina told Mr. Bishop that his conversations with Ms. Burke prolonged her EEO case. Bishop. Dep. 137:11-138:03. Additionally, when Mr. Malafarina requested to investigate Ms. Burke for timecard fraud, he did so in an email with subject "EEO Investigation for DSS Case 13-013." PEX 34. And Mr. Taylor told Ms. Burke that her desk was moved because of her EEO complaint. P. Burke Dep. 73:05-16. Further, Mr. Buckley admitted to changing how he interacted with Ms. Burke subsequent to her EEO complaint. Buckley Dep. 125:17-126:07.

The fact that the Director of CI lays out a general scheme of how to deal with troublemakers, and then his subordinates conform their behavior to that statement of intent, is strong evidence that the EEO complaint triggered the harassing conduct.

## 2. Pretext Framework

There is sufficient direct and indirect evidence to prove a retaliatory animus under the mixed-motive framework, but Ms. Burke could also meet her burden under the pretext framework. The pretext framework has a shifting burden that requires the plaintiff to make out an initial prima facie showing that: (1) she engaged in protected activity, (2) her employer took an adverse employment action against her, and (3) a causal relationship existed between the adverse employment action and the protected activity. *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004) (citing *King v. Rumsfeld*, 328 F.3d 145, 150-51 (4th Cir. 2003), *cert. denied*, 540 U.S. 1073 (2003)). Once the plaintiff makes a prima facie showing of discrimination, the burden shifts

to the defendant to demonstrate a legitimate, non-retaliatory explanation for the adverse action. *Price* at 212. If the defendant can make this showing, then the burden shifts back to the plaintiff to show that the purported reasons are pretextual. *Id*. Pretext can be proved by showing that the "explanation is 'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently probative of" discrimination. *Mereish v. Walker*, 359 F. 3d 330 (4th Cir. 2004). And causation may be established by the mere temporal proximity of the protected activity and the adverse action. *See Guessous*, 828 F.3d at 218.

i.   *Prima Facie showing*

There are three elements to that prima facie showing: "(i) 'that [she] engaged in protected activity,' (ii) 'that [her employer] took adverse action against [her],' and (iii) 'that a causal relationship existed between the protected activity and the adverse employment activity."

Ms. Burke made an EEO complaint and DSS created a retaliatory hostile work environment as discussed above in Roman Numerals I and II. In addition to the causation evidence discussed above in the mixed-motive framework, the temporal proximity of the initiation of the hostile work environment and managements knowledge of the complaint, serve as strong evidence of causation.

During the initial meeting between Mr. Malafarina and Ms. Labov where management first learned of the EEO complaint, Mr. Malafarina went on a tirade. Frank Malafarina's immediate anger about the EEO complaint manifested itself during the initial interview with Ms. Labov on August 23, 2013. PEX 5. By the following workday, there had already been movement to have Ms. Labov dismissed. These two incidents commence the hostile work environment, but they are not the only circumstantial evidence supporting causation. In the email where Mr. Malafarina asks for Ms. Burke to be investigated for timecard fraud, he talks about the EEO com-

plaint and process. Also, during the conversation among management following the June 25, 2015 berating of Ms. Burke, Mr. Buckley and Mr. Malafarina told Mr. Bishop that his conversations with Ms. Burke only serve to prolong her EEO claims.

    *ii.    Non-retaliatory justification*

The non-retaliatory justification put forward has been that the actions constituting a hostile work environment are the result of personality conflicts between Ms. Burke and her supervisors.

    *iii.    But the evidence shows that the non-retaliatory justification is a pretext for discrimination*

Pretext may be proven by showing the proffered reason is unworthy of credence on its face or by putting forth circumstantial evidence of discrimination. *Mereish v. Walker*, 359 F.3d 330, 336 (2004). And "[t]o the extent that the evidence supporting a plaintiff's prima facie case also undermines the employer's non-retaliatory justification, that evidence may be called upon by the trier of fact in determining whether or not the proffered justification is pretextual." *Guessous v. Fairview Property Investments, LLC*, 828 F.3d. 208, 220 (2016). Where the facts show a history of discomfort, distrust and disparaging treatment by the employer to members of a protected class, a reasonable jury is entitled to find that the discriminatory animus motivated the action. *Guessous* at 221.

While the personality conflicts justification is not so incredible on its fact that it is unworthy of credence, it is a weak justification for the panoply of hostile work environment behaviors that Ms. Burke endured. The fact that these personality conflicts appeared only after she made her EEO complaint serve to further reduce the credibility of this explanation. Therefore the slight credibility of this justification is easily rebutted by the volume and strength of the causation evidence presented above.

**CONCLUSION**

Ms. Burke made an EEO complaint in August of 2013 and was subjected to a hostile work environment that began immediately upon management learning of the complaint. The actions constituting the hostile work environment took many forms including such childish behavior as name calling and ignoring her. The more serious of the actions is the taking away of work and the lowered job performance evaluation. These actions are more serious because they go directly to Ms. Burke's job.

Additionally, the DSS EEO Office made a final agency decision that DSS *had* retaliated against Ms. Burke for engaging in protected activity. FAD p. 56-57. That decision is admissible in evidence as an admission by a party opponent (by an authorized agent) and as a public record. Fed. R. Evid. 801(d)(2); Fed. R. Evid. 803(8). For summary judgment purposes the facts stated in that final agency decision are established, along with all reasonable inferences that are favorable to Ms. Burke. Thus, DSS admits that it retaliated against Ms. Burke for making a formal complaint to the EEO office.

For the foregoing reasons, the Court should deny DSS's Motion for Summary Judgment.

/s/
_____

Jacob M. Small (VSB # 84460)
Attorney for Patricia Burke
J. Madison PLC
1750 Tysons Blvd.
Suite 1500
McLean, Virginia 22102
P (703) 910-5062
F (703) 910-5107
jmsmall@jmadisonplc.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2017, I electronically filed the foregoing Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment with the Clerk of the Court using the CM/ECF system, which will automatically send notification of such filing to the following attorney of record:

Andrew S. Han
The United States Attorney's Office
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3970
andrew.han@usdoj.gov

*Counsel for the Secretary of Defense*

/s/
_____
Jacob M. Small (VSB # 84460)
Attorney for Patricia Burke
J. Madison PLC
1750 Tysons Blvd.
Suite 1500
McLean, Virginia 22102
P (703) 910-5062
F (703) 910-5107
jmsmall@jmadisonplc.com