**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| PATRICIA BURKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:16cv1256 (LO/JFA) |
| | ) | |
| JAMES MATTIS, Secretary, United States | ) | |
| Department of Defense, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

<u>**REPLY MEMORANDUM OF LAW IN SUPPORT OF**</u>
<u>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

DANA J. BOENTE
United States Attorney

ANDREW S. HAN
Assistant United States Attorney
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:    (703) 299-3970
Fax:    (703) 299-3983
Email:  andrew.han@usdoj.gov
*Counsel for Defendant*

## INTRODUCTION

In support of her sole claim in this case—a retaliatory hostile work environment claim—Plaintiff has completely failed to meet her burden to set forth competent evidence to avert summary judgment. She does not even attempt to controvert the majority of Defendant's undisputed material facts, relying instead on conclusory averments and unreasonable interpretations of the record. She does not dispute that her protected activity was not the but-for cause of most of the putative harassment at issue—i.e., alleged exclusion from meetings, work schedule issues, "administrative tasks," the 2013 performance evaluation, and many of the perceived negative comments. And she does not grapple with a *single* legal authority cited by Defendant demonstrating that her retaliatory harassment claim is untenable as a matter of law—including *Stephens v. Gutierrez*, 2010 WL 1005189 (E.D. Va. Mar. 15, 2010) (O'Grady, J), in which this Court found that remarkably similar circumstances as those alleged here did not reflect a "severe or pervasive" hostile work environment.

Rather, Plaintiff lays out a speculative and vague conspiracy in which Frank Malafarina's "anger" upon learning that she filed an EEO complaint against him led to all of the alleged harassment. Or that William Stephens's putative comments to Nelson Bishop during a discussion about Jessica Horvath—and not about Plaintiff or Plaintiff's EEO complaint—establishes that all of the alleged harassment was the result of her protected activity. Critically, Plaintiff does not set forth any evidence to connect these random incidents about others to any of the events that compose *her* alleged harassment. To avoid summary judgment, Plaintiff cannot simply rest on her own conclusory theories of causation, but that is exactly what she has done in her opposition brief.

Plaintiff is thus left *only* with her assumption that because the EEO office of the Defense Security Service ("DSS") issued a final agency decision ("FAD") finding in favor of Plaintiff on her retaliatory hostile work environment claim, summary judgment is automatically improper and this Court *must* convene a full federal jury trial regardless of its analysis of the undisputed factual record

and its application of that record to the governing legal standards. But Plaintiff fails to cite even one authority in support of this overbroad proposition. Indeed, a FAD is not binding in federal court in a Title VII action and cannot create a genuine dispute of material fact on liability to defeat summary judgment. Otherwise, the *de novo* standard of review under Title VII would be meaningless.

Because Plaintiff fails to establish that her EEO activity was the but-for cause of the putative harassment, or that the putative harassment (to the extent she adduces any supporting evidence) was severe or pervasive, her retaliatory hostile work environment claim cannot be sustained.

### REPLY TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE

Plaintiff expressly declines to controvert most of the facts in Defendant's Statement of Undisputed Material Facts ("SUMF"), Opp'n 3; thus, this Court can, and should, assume that all such uncontroverted facts identified by Defendant are admitted. *See* Loc. Civ. P. 56(B).

To the extent that Plaintiff responds to Defendant's SUMF, she divides her Statement of Material Facts in Dispute ("Statement of Facts") in two sections, one that responds directly to Defendant's SUMF, Opp'n 3-5, and one that sets forth additional facts, *id.* at 5-18. Defendant replies to certain of these facts next, following Plaintiff's grouping:

### *Reply to Plaintiff's Direct Response to Defendant's SUMF (Opp'n 3-5)*

7.     Plaintiff does not identify any evidence to dispute that telework is expressly prohibited from being used for childcare purposes. Indeed, the terms of the standard telework agreement form state: "20. The employee acknowledges that telework is not a substitute for dependent care." DEX 30. Moreover, the DSS telework policy specifically incorporates Department of Defense ("DoD") Instruction 1035.01, "Telework Policy" (Apr. 4, 2012), which states: "Employees may not use telework as a substitute for dependent care (e.g., child or elder care)." DEX 34.[1] Lastly, contrary to Plaintiff's assertion, DEX 32 is a module from the telework training

---

[1] DoD Instruction 1035.01 can be found at https://www.hsdl.org/?view&did=705846. *See United*

concerning childcare and is not hearsay because it is not offered to prove the truth of the matter

asserted; rather, it is offered to prove that Plaintiff was on notice that telework is prohibited from

being used for childcare purposes.

17. Plaintiff does not cite any part of the record to dispute this fact.

20. Plaintiff does not cite any part of the record to dispute this fact.

21. Plaintiff's citation to the record does not controvert the fact that she did not follow

Carl Taylor's instructions regarding Maxiflex scheduling. Taylor instructed his team, including

Plaintiff, to advise him *ahead* of each pay period if they intended to "flex" their schedule during that

pay period. Def.'s SUMF ¶¶ 20-21.

26. Plaintiff's citation to the record does not controvert the fact that the *Operations*

*Division* within the Counterintelligence Directorate ("CI") had no personnel below a GS-13 level,

except for one contractor who provided executive assistant support for six or seven CI divisions.

DEX 10, at 267:8-268:9. Plaintiff's citation only refers to CI as a whole.

28. Plaintiff's erroneously distinguishes between a "2015 reorganization" of CI and the

reorganization of CI that commenced in October 2014. These are the same thing: the reorganization

lasted "several months." Def.'s SUMF ¶ 27. Position descriptions, including Plaintiff's, were

rewritten "[f]rom approximately December 2014 until the spring of 2015." DEX 17, at 3.

31. Plaintiff's citation to the record does not controvert the fact that her cubicle was

moved to be closer to the rest of the Operations Division. During her deposition, although Plaintiff

testified that Taylor told her she was moved because she "filed a complaint," she explicitly declined

to testify that Taylor referred to her *EEO* complaint when doing so. DEX 58, at 73:14-20. In fact, in

November 2013, Plaintiff acknowledged that Taylor told her that her cubicle was being moved "into

---

*States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("This court and numerous others routinely
take judicial notice of information contained on state and federal government websites.").

the CI Ops [Operations Division] area" in part because she "complained" about being left out of meetings and not being part of the team, and *not* because she filed an EEO complaint. DEX 59.

33.     Plaintiff's citation to the record does not controvert the fact that DSS does not grant duty station transfers as a general policy, absent an announced vacancy. Plaintiff's citation lists one relocation request that was denied and three requests that warranted an exception, including for "being a court appointed guardian for [an] elder parent" in Ohio, having a recurrence of cancer that required treatment in North Carolina, and needing "specialized medical care" available only in Massachusetts for a daughter. PEX 37, at 5-6.

34.     Plaintiff does not cite any part of the record to dispute this fact.

35.     Plaintiff's citation to the record does not controvert David Bauer's reasons behind his 2013 performance evaluation of Plaintiff. Jessica Horvath's statement that she overheard Jennifer Gabeler say that Bauer "was not 100% honest on his questionnaire" is also inadmissible hearsay.

36.     Plaintiff's citation to the record does not controvert the fact that Bauer was unaware of her EEO complaint at the time that he rated her. Horvath's statement that she overheard Gabeler say that Bauer "was not 100% honest on his questionnaire" is also inadmissible hearsay.

40.     Plaintiff does not cite any part of the record to dispute this fact.

### Reply to Plaintiff's Additional Statement of Facts (Opp'n 5-18)

4.     Plaintiff's citation to the record does not support that she ever "received [William Stephens's] approval" or that he "understood when agreeing" to her childcare arrangement.

9.     Plaintiff's citation to the Report of Investigation establishes at most that she *alleged* that she applied five times for an alternative work schedule but was denied four times. PEX 47 (Dkt. No. 50-14). In addition, Plaintiff misstates Defendant's brief. On September 6, 2013, Frank Malafarina approved Plaintiff's request for a 4/10 schedule for two *pay periods*, which is four weeks long, not two weeks. Def.'s SUMF ¶¶ 8 n.1, 15; DEX 60, at 333:14-21. And Plaintiff's citation to

Horvath's declaration actually shows that Plaintiff was in fact approved for a 4/10 schedule, Flex hours, and twice for a Maxiflex schedule. PEX 37, at 16-17.

12.     Carolyn Lyle testified that, despite receiving "pushback," the EEO office "got all the documents that we needed" and that the EEO investigator never complained to her about missing any information for his investigation. DEX 61, at 184:1-185:6, 236:4-238:10.

14.     Lyle testified that, despite receiving "pushback," the EEO office "got all the documents that we needed" and that the EEO investigator never complained to her about missing any information for his investigation. DEX 61, at 184:1-185:6, 236:4-238:10.

15.     On September 6, 2013, Malafarina approved Plaintiff's request for a 4/10 schedule for two *pay periods*, which is four weeks long, not two weeks. Def.'s SUMF ¶¶ 8 n.1, 15; DEX 60, at 333:14-21.

18.     The conversation between Nelson Bishop and Stephens concerned Horvath, not Plaintiff or Plaintiff's EEO complaint. DEX 62, at 119:3-7; PEX 49, at 14. Moreover, between May 2012 and November 2015, Bishop was not in Plaintiff's supervisory chain. DEX 62, at 237:11-238:10; PEX 49, at 3.

19.     Plaintiff mischaracterizes the record because Stephens did not "equivocate[]" in denying making the alleged statements. DEX 63, at 186:9-11 ("Q: Did you ever tell Mr. Bishop, when you were in the Air Force, that's what you used to do? A: No.").

20.     Plaintiff relies on Connie Vitiello's testimony regarding her observations. Vitiello was employed by DSS only from March 2015 to October 2016; she belonged to the Cyber Security team within CI; she never met Taylor; and she was located at least four rows away from Plaintiff and the Operations Division. DEX 64, at 7:11-16, 189:17-190:2, 197:11-19, 205:17-206:20. Plaintiff relies on Jennifer Gabeler's testimony for certain comparisons. Gabeler was a GS-15 and the Assistant Director of the Intelligence Division within CI; she has never worked in the Operations Division;

she has never been in Plaintiff's supervisory chain-of-command; and Plaintiff was located *behind* her office in the SCIF. DEX 65, at 29:7-12, 217:5-9, 218:2-5, 218:20-219:9.

21.    During her deposition, Plaintiff declined to testify that Taylor referred to her *EEO* complaint when he explained why her cubicle was being moved. DEX 58, at 73:14-20. In fact, in November 2013, Plaintiff acknowledged that Taylor told her that her cubicle was being moved "into the CI Ops [Operations Division] area" in part because she "complained" about being left out of meetings and not being part of the team, and not because she filed an EEO complaint. DEX 59.

22.    Plaintiff relies on Bishop's and Horvath's testimony regarding her work assignments. However, between May 2012 and November 2015, Bishop was not in Plaintiff's supervisory chain. DEX 62, at 237:11-238:10; PEX 49, at 3. From 2011 to 2014, Horvath was a GS-12 in the P3 division; she never worked in the Operations Division; and she was never in Plaintiff's supervisory chain. DEX 66, at 225:16-226:14, 230:3-13.

29.    Malafarina, not Stephens, wrote the referenced email. PEX 34 (Dkt. No. 50-11). Plaintiff has never actually been investigated for timecard fraud. DEX 60, at 284:12-15.

33.    Horvath resigned from DSS in November 2014. DEX 66, at 15:8-9, 230:14-17. Thus, she did not work at DSS on June 25, 2015.

## ARGUMENT

## I.    PLAINTIFF'S THEORY OF CAUSATION RELIES SOLELY ON SPECULATION AND CONCLUSORY ALLEGATIONS

### A.    Retaliation Requires a Showing of But-For Causation, Not a Mixed-Motive

To prove a retaliatory hostile work environment claim, Plaintiff must establish that her protected activity was the but-for cause of the putative harassment. *See Pueschel v. Peters*, 577 F.3d 558, 565 (4th Cir. 2009). Nevertheless, Plaintiff repeatedly and erroneously refers to the "mixed-motive" framework as a means for establishing causation in her claim. *See, e.g.*, Opp'n 19. But far from merely being "somewhat of a misnomer" as Plaintiff suggests, *id.* at 19 n.3, the Supreme Court

(and the Fourth Circuit) has explicitly rejected the "mixed-motive" framework as having any relevance to the analysis of a retaliation claim. *See Smyth-Riding v. Scis. & Eng'g Servs., LLC*, --- F. App'x ---, 2017 WL 3531416, at *5 n.7 (4th Cir. Aug. 17, 2017) (explaining that the Supreme Court in "*Nassar*[2] rejected the mixed-motive analysis for Title VII retaliation claims, and reiterated that the statutory text for Title VII retaliation claims relies on a but-for causation standard" (citing *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015))). The Supreme Court has made very clear that the but-for standard "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 133 S. Ct. at 2533.

Plaintiff also erroneously asserts that "[c]ausation may be established by mere temporal proximity." Opp'n 22, 27 (citing *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 218 (4th Cir. 2016)). Although temporal proximity alone may suffice to meet the "less onerous burden"[3] of demonstrating causation at the *prima facie* stage of the *McDonnell Douglas* analysis, *see, e.g., Emami v. Bolden*, 241 F. Supp. 3d 673, 681 (E.D. Va. 2017), it is "not sufficient to establish that . . . protected activity was a 'but for' cause" of an adverse action. *See Staley v. Gruenberg*, 575 F. App'x 153, 156 (4th Cir. 2014); *accord Smith v. Strayer Univ. Corp.*, 79 F. Supp. 3d 591, 605 (E.D. Va. 2015). The Fourth Circuit's decision in *Guessous* is not to the contrary. In that case, the Fourth Circuit held that the fact that the decision to terminate the plaintiff was made "only seventy-five minutes" after she engaged in protected activity sufficiently called into question the employer's weak justification that it

---

[2] *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013).

[3] Plaintiff further muddles the analysis by arguing that the *McDonnell Douglas* "pretext framework has a 'less onerous' causation burden at this stage than the mixed-motive framework." Opp'n 20 (citing *Foster*, 787 F.3d at 251). But the Fourth Circuit never held this. The Fourth Circuit only held that "the burden for establishing causation at the prima facie stage [of the *McDonnell Douglas* framework] is 'less onerous'" than establishing causation at the pretext stage of the *McDonnell Douglas* framework. *See Foster*, 787 F.3d at 251. Consistent with the but-for causation standard set forth in *Nassar*, at the pretext stage of the *McDonnell Douglas* framework, a plaintiff must ultimately prove "that retaliation was a but-for cause of a challenged adverse employment action." *See id.* at 252.

terminated the plaintiff because there was not enough work available to keep her busy. *See* 828 F.3d at 218. Thus, under the particular facts of *Guessous*, the temporal proximity undermined the credence of the employer's proffered legitimate, non-retaliatory reason for the termination, but it did not alone establish causation.

The mixed-motive framework has no place in the analysis of causation for retaliatory hostile work environment. The proper standard is but-for causation, which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 133 S. Ct. at 2533. Here, Plaintiff's causation evidence is lacking.

### B.   Plaintiff Fails to Identify Any Evidence that Her Protected Activity Was the But-For Cause of the Alleged Harassment

At the threshold, Plaintiff does not even *address*, let alone contest, Defendant's argument and evidence that her protected activity was not the but-for cause of: (1) her alleged exclusion from meetings, (2) her alternative work schedule issues, (3) her being assigned "administrative tasks," (4) her 2013 performance evaluation, or (5) many of the perceived negative comments she alleges. Def.'s Mem. 12-14. Plaintiff does not dispute that all of these incidents preceded any contact she had with the EEO office or commenced before her supervisors became aware of her engagement in protected activity. Consequently, it cannot be said that Plaintiff's EEO activity was the but-for cause of any of these actions. *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 651 (4th Cir. 2002) (holding that causation is present *only* where "the adverse employment action took place after the filing of the discrimination claim"); *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998) (holding that "by definition, an employer cannot take action because of a factor of which it is unaware"). Plaintiff's concession is fatal to her retaliatory harassment claim because there cannot be a causal connection between protected activity and an employment action where the employment action was "a mere continuation of the treatment [the plaintiff] was receiving before [her] protected activity." *See Fletcher v. Philip Morris USA Inc.*, 2009 WL 2067807, at *10 (E.D. Va. Jul. 14, 2009).

Even if this concession were not enough to warrant summary judgment, Plaintiff is left to focus on a handful of disconnected pieces of evidence in an attempt to establish that her protected activity was the but-for cause of all the alleged incidents composing her retaliatory hostile work environment claim, but none fulfills her significant causation burden:

*First*, Plaintiff points to the testimony of Nelson Bishop, who stated that in November 2013, William Stephens suggested to him that "the way to deal with troublemakers is to isolate them, take away their job functions and their feelings of self[-]importance." Opp'n 22, 25-26. Plaintiff then speculates that this putative conversation "demonstrates the plan behind DSS's treatment of Ms. Burke following her EEO complaint." *See id.* But even assuming that Stephens made these statements,[4] beyond her own speculation, Plaintiff does not point to a single piece of evidence that connects them to the putative harassment on which *her* claim is based.

To begin, this conversation with Stephens that Bishop described concerned Jessica Horvath—not Plaintiff or Plaintiff's EEO complaint. DEX 62, at 119:3-7 ("Q: Did Ms. Burke's EEO complaint come up at all in that conversation? A: I don't know for sure. I don't think so. I think this had to do specifically with Ms. Horvath. Q: Ms. Horvath? Okay. A: Yeah. . . . ."); PEX 49, at 14 (Dkt. No. 50-15).[5] Although Bishop took Stephens's comment as a "strong suggestion," he also testified that Stephens "didn't tell me specifically to do that to [Horvath]" and that Stephens did not even generally say "that's what we do." DEX 62, at 115:22-116:6, 117:19-118:2; PEX 49, at 15. Moreover, between May 2012 and November 2015, Bishop was not in Plaintiff's supervisory chain. DEX 62, at 237:11-238:10; PEX 49, at 3. Still, to be clear, Bishop did not testify that he ever acted on Stephens's "suggestion," that he ever forwarded this "suggestion" on to anyone else (such as Carl

---

[4] Stephens unequivocally denied making these statements to Bishop. DEX 63, at 186:9-11.

[5] Horvath was a GS-12 in the P3 division; she never worked in the Operations Division; and she was never in Plaintiff's supervisory chain. DEX 66, at 225:16-226:14, 230:3-13. She resigned from DSS in November 2014. DEX 66, at 15:8-9, 230:14-17.

Taylor, Frank Malafarina, or Michael Buckley), or that he ever had a conversation like this one again with Stephens. Plaintiff identifies no evidence to the contrary. Thus, it is entirely speculative that this putative conversation had any bearing on Plaintiff's situation whatsoever.[6]

*Second*, Plaintiff points to the June 2015 meeting[7] as an example of when Stephens's "tactic reemerged." Opp'n 26, 28. However, any theoretical nexus between the two incidents is illogical, if for no other reason than that there is no evidence that Buckley was ever aware of the alleged conversation between Stephens and Bishop. Likewise, Stephens himself was not present during the June 2015 meeting. DEX 9, at 95:2-5.

Plaintiff fails to produce any evidence to connect Stephens and Bishop's putative conversation to the June 2015 meeting, which took place *over eighteen months later* and thus "negates any inference that a causal connection exists between the two." *See Pettis v. Nottoway Cty. Sch. Bd.*, 980 F. Supp. 2d 717, 729 (E.D. Va. 2013), *aff'd*, 592 F. App'x 158 (4th Cir. 2014); *cf. Montano v. INOVA Health Care Servs.*, 2008 WL 4905982, at *6 (E.D. Va. Nov. 12, 2008) (noting that "somewhere under three months" is needed to infer causation based on temporal proximity alone). Nor can she. Buckley called the June 2015 meeting because he believed that Plaintiff and Bishop had inappropriately discussed a confidential personnel action, that Plaintiff misunderstood the situation, and that Bishop, as a GS-15, should not have permitted Plaintiff to speak about the personnel action in the manner that she did. DEX 9, at 96:22-98:15. The June 2015 meeting had nothing to do with Buckley overhearing her "discussing amending her complaint," as she asserts (without evidentiary

---

[6] Also, as Defendant explained in his opening brief, Plaintiff has wholly failed to proffer competent evidence that is at all consistent with Stephens's alleged comments about "isolat[ing]" or "tak[ing] away . . . job functions" from individuals. Plaintiff was not excluded from meetings or emails, Def.'s Mem. 22-23; she was not given improper work or had work taken away, *id.* at 23-24; she was not isolated from anyone and was actually moved *closer* to her team, *id.* at 24-25; and she was not ignored as she alleges, *id.* at 27-28. Again, Plaintiff did not controvert any of these undisputed facts.

[7] In the June 2015 meeting, Buckley gathered Plaintiff, Bishop, and most of her chain-of-command to address her inappropriate discussion of a confidential personnel action. Def.'s SUMF ¶¶ 39-42.

support). DEX 9, at 90:7-16, 95:10-18.[8] Without more, Plaintiff is left speculating that the June 2015 meeting would not have occurred but-for her EEO activity.

*Third*, Plaintiff points to an email dated January 31, 2014, from Malafarina to Stephens as evidence that Plaintiff's engagement in protected activity caused the putative harassment. Opp'n 26, 27-28. Contrary to Plaintiff's contention, however, this email demonstrates precisely the *opposite* conclusion: that Plaintiff's telework privilege was revoked because she was using telework as a substitute for childcare in direct violation of "DoD and DSS policy" and not because of her EEO complaint. PEX 34 (Dkt. No. 50-11). In the email, Malafarina writes "[i]t is against DoD and DSS policy to allow an employee to use telework as a substitute for Child Care," and "[t]his has nothing to do with EEO" because he "cannot allow one of [his] employees to knowingly violate the DoD and DSS telework policies." PEX 34. Thus, this email serves only to bolster Defendant's legitimate, non-retaliatory reasons for why Plaintiff's requests for telework and an alternative work schedule were denied.

Plaintiff nevertheless emphasizes Malafarina's statements in this email urging Stephens that Plaintiff should be investigated for timecard fraud. Plaintiff contends that this is evidence of causation; however, Plaintiff again fails to connect the dots. Opp'n 26. Most importantly, as Malafarina himself testified, no such investigation ever actually occurred. DEX 60, at 284:12-15. Indeed, Plaintiff does not argue—let alone proffer corroborating evidence—that she was the subject of any timecard fraud investigation. Nor does Plaintiff contend that she suffered *any* consequences as a result of this email, whether related to her timecards or otherwise. To be sure, there is no evidence that anyone other than Stephens ever received this email, or that Plaintiff was even made aware of the existence of this email until this litigation was filed in federal court.

---

[8] Plaintiff's Statement of Facts itself does not assert that the June 2015 meeting was prompted by Buckley overhearing Plaintiff "discussing amending her complaint." Pl.'s Statement of Facts ¶ 33.

And finally, even if Malafarina (or DSS generally) had pursued an investigation into potential timecard fraud by Plaintiff, that would not necessarily have constituted retaliation (or evinced causation) because an employee's protected activity does not mean that she "must be granted permanent immunity from any adverse action taken by an employer for any reason in the future." *See Villa v. CavaMezze Grill, LLC,* 858 F.3d 896, 904 (4th Cir. 2017).[9] There is nothing about this email that shows that Plaintiff's protected activity caused the putative retaliatory harassment.

**Fourth**, Plaintiff points to her own deposition in which she testified that Taylor told her "that her desk was moved because of her EEO complaint." Opp'n 26. But the record does not factually extend as far as Plaintiff would have it go. At her deposition, Plaintiff explicitly declined to testify that Taylor ever referred to her *EEO* complaint—as opposed to just a generalized complaint—when he explained why her cubicle was being moved. DEX 58, at 73:14-20 (Q: Was it your EEO complaint? A: *I'm assuming.* That's the only complaint I had. Q: Did he actually say because—did he say that he was moving you because you filed an EEO complaint or just complaint? A: Complaint." (emphasis added)). The record elsewhere shows why Plaintiff stopped short of testifying that Taylor told her that her cubicle was moved due to her EEO activity.

Indeed, that was *not* the only "complaint" that Plaintiff had asserted in the workplace. In November 2013, when her cubicle was moved, Plaintiff acknowledged that Taylor told her that her cubicle was being moved "into the CI Ops [Operations Division] area" in part because she had "complained" about being left out of meetings and not being part of the team given where her cubicle was physically located, and *not* because she filed an EEO complaint. DEX 59. Thus, Plaintiff

---

[9] Notably, although Plaintiff quarrels with the basis of Malafarina's suspicions, she stops short of actually denying the truth of his suspicions. In any event, even if it turned out that Plaintiff did not commit timecard fraud, that would not automatically transform a hypothetical investigation into a retaliatory act either. *See DeJarnette v. Corning Inc.,* 133 F.3d 293, 299 (4th Cir. 1998) (holding that "it is not [the court's] province to decide whether the reason" for a particular action by an employer "was wise, fair, or even correct, ultimately, so long as it truly was the reason" for the action).

admits that Taylor was trying to *remedy her concerns* about feeling isolated by integrating her with the Operations Division—i.e., her team. Plaintiff also does not dispute that her workstation was ultimately moved into the same row as the rest of the Operations Division and closer to Taylor's office. Def.'s SUMF ¶ 31. As such, far from proving that Taylor would not have moved her cubicle but-for her EEO activity, Plaintiff's own testimony and concessions undermine any causal link.

*Fifth*, Plaintiff points to the deposition testimony of Buckley as evidence that he "admitted to changing how he interacted with Ms. Burke subsequent to her EEO complaint." Opp'n 26. Indeed, Buckley testified at his deposition as follows:

> Q: Did she change over the years?
> A: So part of it is with the complaint, my interaction or willingness to interact, that I had to answer to diminished greatly the need for me to interact with Ms. Burke at all.
> Q: Tell me about that.
> A: What would you like to know about that?
> Q: Why did your willingness to interact with Ms. Burke change completely after she filed her complaint?
> A: I didn't want anything to be misconstrued. I didn't want anything to be taken the wrong way. She was still not in my chain of command and distance was best.

DEX 67, at 125:17-126:7. As is self-evident, however, the "chang[e]" in Buckley's interactions with Plaintiff had nothing to do with retaliatory animus, as she insinuates. Rather, Buckley's testimony typifies the sort of "'predictable tension' in the workplace following the lodging of discrimination and retaliation charges" that may come about. *See Von Gunten v. Maryland*, 243 F.3d 858, 870 (4th Cir. 2001), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 75 (2006). As the Fourth Circuit recognized, it is completely reasonable that Buckley—whom Plaintiff named as an alleged harasser in her EEO complaint—would shy away as he testified. That Plaintiff appears to have expected otherwise is hardly the stuff of an actionable hostile work environment claim.

*Finally*, Plaintiff points to notes taken by Michelle Labov regarding her initial interview with Malafarina on August 23, 2013, in which she first informed him of Plaintiff's claims that he discriminated against her, as evidence that her protected activity caused the putative harassment.

Opp'n 27.[10] Plaintiff misleadingly characterizes Labov's notes as demonstrating that "Mr. Malafarina went on a tirade" and that "Malafarina's immediate anger about the EEO complaint manifested itself during the initial interview," but Labov's notes do not reflect this tone. PEX 5 (Dkt. No. 50-2). Even if they did, Plaintiff fails to explain how these notes would establish that her protected activity was the but-for cause of any actions that followed. Moreover, as Labov herself explained, Malafarina was indeed upset upon learning about Plaintiff's complaint against him, but his reaction was "typical of anyone who's ever been a part of a complaint." DEX 68, at 28:15-30:23. As with Buckley above, it is entirely "predictable" that "tension in the workplace [will] follow[] the lodging of discrimination and retaliation charges." *Von Gunten*, 243 F.3d at 870. In any event, Labov further testified that by the end of her meeting with Malafarina, she "was able to comfort him and make him feel okay about the process," and "he left that meeting shaking my hand and smiling." DEX 68, at 35:10-36:4.

Plaintiff also insists that "[b]y the following workday, there had already been movement to have Ms. Labov dismissed." Opp'n 27. But she has not explained how such actions directed *at Labov* have any relevance to her own claim. In the end, however, it is undisputed that Labov was never actually terminated from DSS; she left of her own volition in April 2014. DEX 68, at 157:15-23.

***

Thus, on top of failing to address Defendant's legal arguments on causation at all, Plaintiff's proffered evidence in support of her theory of causation falls far short of bearing her significant summary judgment burden. Her retaliatory hostile work environment claim must be rejected.

## II.   AS A MATTER OF LAW, PLAINTIFF FAILS TO SHOW THAT THE PUTATIVE HARASSMENT WAS "SEVERE OR PERVASIVE"

Even if all of the incidents composing Plaintiff's retaliatory hostile work environment took place as she alleged, judgment as a matter of law in favor of Defendant is warranted. Def.'s Mem.

---

[10] Only Labov and Malafarina were present during this meeting. DEX 68, at 28:1-3.

16-30. Remarkably, Plaintiff does not attempt to distinguish *any* of the numerous cases cited by Defendant in which courts across the nation (including this Court, the Fourth Circuit, other jurists within this district, and other district courts within this circuit) have considered a retaliatory hostile work environment claim based on circumstances similar to—and often more egregious than—those alleged here, and have unhesitatingly granted summary judgment. Def.'s Mem. 18-19 & n.10 (discussing more than a dozen cases, including *Stephens*, 2010 WL 1005189 (O'Grady, J.), and *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 89-91 (D.D.C. 2013) (collecting additional cases granting summary judgment for the defendant on hostile work environment claims)). Nor does she meaningfully dispute Defendant's characterization of the factual basis of her claim, Opp'n 23.[11] Plaintiff's silence effectively concedes that there is nothing so unusual about her claim that has not already been rejected by other courts as non-actionable "professional frustrations." *See Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 191 (4th Cir. 2004).

Nonetheless, Plaintiff summarily concludes that the factual basis of her claim satisfies the "severe or pervasive" requirement of a retaliatory hostile work environment. Opp'n 23. But the record itself—even viewed in the light most favorable to Plaintiff—does not support her contentions. For example, she argues that Malafarina "got angry" during his initial interview with Labov and attempted to get Labov fired. *See id.*[12] Yet, as explained above, Labov herself described

---

[11] Plaintiff contends that Defendant "ignores" her 2013 performance rating and the denial of her relocation request in considering her hostile work environment claim, Opp'n 23, but this is clearly untrue. Defendant observed that these actions are better suited for a discrete-act analysis, but also explained why neither action could have contributed to a hostile work environment. Def.'s Mem. 15-16. Again, not only was David Bauer unaware of Plaintiff's EEO activity when he gave her 2013 review (which Plaintiff does not dispute), it was his opinion as her supervisor that her work in 2013 was fully consistent with a rating of "3"/"Successful." DEX 14, at 5-10; DEX 21. And Operations Division personnel needed to be available in-person at Quantico, and, as a general policy, DSS does not grant duty station transfers without an announced vacancy available. DEX 18, at 25-27.

[12] Again, the record shows the opposite: it is undisputed that Labov was never terminated from DSS, and she left the agency of her own volition in April 2014. DEX 68, at 157:15-23.

Malafarina's reaction as "typical of anyone who's ever been a part of a complaint." DEX 68, at 28:15-30:23. Labov further testified that by the end of her meeting with Malafarina, she "was able to comfort him and make him feel okay about the process," and "he left that meeting shaking my hand and smiling." DEX 68, at 35:10-36:4. Regardless, Plaintiff fails to explain how this interaction between Labov and Malafarina—where no one else was present, DEX 68, at 28:1-3—is relevant to whether a retaliatory hostile work environment directed *at Plaintiff* was severe or pervasive. *See Martin v. Merck & Co.*, 446 F. Supp. 2d 615, 629 (W.D. Va. 2006) ("[S]econd-hand harassment, although relevant, [is] less objectionable than harassment directed at the plaintiff.").

Plaintiff also argues that "[h]er supervisors ignored her while greeting those around her," and that she was "excluded from emails and meetings." Opp'n 23. Rather than grapple with Defendant's extensive arguments concerning these contentions, Def.'s Mem. 22-23, 27-28, Plaintiff retreats to the testimony of Connie Vitiello in support, Opp'n 23. However, Vitiello's testimony has, at best, de minimis relevance here. Vitiello was employed by DSS only from March 2015 to October 2016— well after the time that Plaintiff alleges that the incidents of being ignored or excluded took place; she belonged to the Cyber Security team, not the Operations Division; she sat at least four workstation rows away from Plaintiff; and she admits that she never even met Carl Taylor. DEX 64, at 7:11-16, 189:17-190:2, 197:11-19, 205:17-206:20. Consequently, Vitiello's testimony is negligible with respect to demonstrating the severity or pervasiveness of the putative harassment.

Plaintiff cites only a single authority, *Spriggs v. Diamond Auto Glass*, 242 F.3d 179 (4th Cir. 2001), in support of her argument that the putative harassment she experienced was sufficiently severe or pervasive to avert summary judgment. Opp'n 24. However, there is no meaningful similarity between the two cases. In *Spriggs,* an African-American plaintiff claimed that he was subjected to a racial hostile work environment during two terms of employment. During the first term, there was evidence that his white supervisor used "incessant racial slurs, insults, and epithets."

16

242 F.3d at 182. The supervisor made such derogatory comments towards employees (whom he called "n-----s" or "monkeys"), customers, and his own wife (whom he "repeatedly" referred to as a "black bitch" and a "no-good nasty bitch"). *Id.* As the plaintiff described, "[i]t was continuous daily." *Id.* During the second term, the supervisor's prior "routine" returned, but with the addition of "habitually" calling the plaintiff "monkey," "dumb monkey," and "n-----." *Id.* The supervisor also placed a picture of a monkey in a manual that the plaintiff regularly used along with a notation of X's, O's, and the comment "so you'll never forget who you are." *Id.* Perhaps unsurprisingly, the *Spriggs* court held that this evidence of racial hostility was sufficiently severe or pervasive to maintain a claim. *See id.* at 185-86.

Here, Plaintiff strains credulity in her attempt to equate her situation to that in *Spriggs*. She compares the comments "Princess, Princess Kitty, brat, and catty woman" and having a "bitchy face" to the comments made in *Spriggs*. Opp'n 24. But these comments simply do not carry the same level of "pure anathema" or "odious[ness]" that the comments in *Spriggs* carry for African-American individuals. *See* 242 F.3d at 185. Moreover, Plaintiff fails to identify a shred of evidence that any of these putative comments were made in *retaliation* for her protected activity. When asked at her deposition why, for example, the "permanent bitch face" comment was retaliatory, Plaintiff could only speculate that "it's not a comment that you would say to somebody" and that she could not "a hundred percent recall what it was about." DEX 58, at 224:6-225:5. The mere fact that Plaintiff had a pending EEO complaint when these comments were allegedly made does not automatically render those comments to be retaliatory in nature. *See Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 772 ("An insulting or demeaning remark does not create a federal cause of action for . . . harassment merely because the 'victim' of the remark happens to belong to a class protected by Title VII.").

There is also no evidence that these comments were made at all close to the "incessant," "repeated[]," "continuous daily," "routine," or "habitual[]" frequency of the comments in *Spriggs*. *See*

242 F.3d at 182. Indeed, Plaintiff admits that the "permanent bitch face" comment was made only once, and that the "Princess Kitty" comment was conveyed to her at most a couple times. DEX 58, at 91:11-15, 93:8-94:1, 216:16-20. She further admits that none of the putative comments by Malafarina (i.e., "Princess Kitty" or "catty woman") were said in her presence, DEX 7, at 85:2-13, 88:24-90:12,[13] which necessarily diminishes their impact. *See Martin*, 446 F. Supp. 2d at 629.

In sum, even when viewed in the light most favorable to Plaintiff, the totality of the circumstances do not come close to meeting the demanding requirement that harassment be severe or pervasive in order to be actionable—especially given how tenuous the evidentiary foundation is in support of her claim. *See EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (a plaintiff "must clear a high bar in order to satisfy the severe or pervasive test"). Plaintiff points to no case in which a court considering similar facts have concluded otherwise.

## III.   THE FINDINGS AND CONCLUSIONS OF THE FINAL AGENCY DECISION DO NOT PRECLUDE SUMMARY JUDGMENT

Having failed to adduce evidence to create a genuine dispute of material fact on her own, Plaintiff makes one last argument: she contends that the FAD issued by DSS's EEO office finding in favor of her on her retaliatory hostile work environment claim *alone* necessarily precludes summary judgment. Opp'n 29. In other words, Plaintiff contends that anytime a FAD yields a finding adverse to an agency, then summary judgment is *never* warranted, and a district court *must* convene a trial regardless of the factual and legal soundness of the FAD. Plaintiff effectively argues

---

[13] In this regard, much of Plaintiff's supporting evidence is incompetent. Opp'n 24. In particular, Jennifer Gabeler's and Plaintiff's own cited testimony are inadmissible hearsay. Dkt. No. 50-30, at 138:16-139:02 (testifying that Bauer told Gabeler that he heard Malafarina refer to Plaintiff as "Princess" or "Princess Kitty"); Dkt. No. 50-35, at 85:02-16, 90:13-16 (testifying that Bauer and Bishop told Plaintiff that they heard Malafarina refer to her as "Princess Kitty" and "catty woman"). *See Monk v. Potter*, 723 F. Supp. 2d 860, 878 (E.D. Va. 2010) (holding that "inadmissible hearsay in depositions and affidavits may not support or oppose summary judgment motion").

that a FAD completely usurps this Court's obligation to evaluate, *de novo*, the record evidence against extant legal authority. But courts have repeatedly rejected this breathtaking conclusion.

When a federal employee alleging illegal discrimination or retaliation is displeased with the employing agency's administrative adjudication of the claim, the employee can bring suit in federal court and obtain *de novo* review under Title VII. *See Chandler v. Roudebush*, 425 U.S. 840, 845-46 (1976); 42 U.S.C. § 2000e-16(c). The *de novo* standard applies not just to any finding of liability, but also to the agency's proposed remedy, if any. *See Laber v. Harvey*, 438 F.3d 404, 420-21 (4th Cir. 2006) (en banc). Thus, if a plaintiff chooses to bring suit, the case "proceeds as if no earlier proceedings had been completed at all." *Id.* at 421. As such, an agency's FAD is not binding in federal court, and this Court must evaluate the record "without any deference due the agency's conclusion." *Timmons v. White*, 314 F.3d 1229, 1233 (10th Cir. 2003).[14]

To that end, the Fourth Circuit has expressly warned that FADs and their private-sector equivalents (i.e., EEOC decisions) "may be more prejudicial than probative" because the jury would place too much weight on them. *See, e.g., Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 n.4 (4th Cir. 1988). And because the FAD would improperly place a thumb on the scale in favor of affirming the agency finding, admitting the FAD into evidence in order to establish liability would "undermine[] the concept of de novo review by the trier of fact." *See Sulton v. Lahood*, 2009 WL 3815764, at *2 (S.D.N.Y. Nov. 6, 2009); *see also Miller v. Contreras-Sweet*, 2014 WL 5092257, at *5 n.7 (D. Colo. Oct. 10, 2014) (holding that a "Final Agency Decision is not an admission by a party opponent because . . . an employer is not bound by a prior adverse finding by an administrative agency"). Accordingly, pursuant to Federal Rule of Evidence 403, courts have repeatedly excluded FADs and EEOC

---

[14] Indeed, although the specific issue was not before it in *Laber*, the *en banc* Fourth Circuit went out of its way to observe that "the logic of *Chandler* leads inexorably to the conclusion" that a federal-employee plaintiff may *not* "require the district court to make a finding of liability based on the [EEOC's] finding of discrimination." *See Laber*, 438 F.3d at 424 n.20.

decisions from jury trials due to their minimal probative value and the significant danger of causing unfair prejudice, juror confusion, and a waste of time. *See, e.g.*, *Price v. Grasonville Volunteer Fire Dep't*, 2016 WL 6277666, at *4-5 (D. Md. Oct. 26, 2016); *Rhinehart v. City of Gastonia*, 2010 WL 1926444, at *1 (W.D.N.C. May 11, 2010); *Roberts v. Wal-Mart Stores, Inc.*, 1997 WL 38138, at *1-2 (W.D. Va. Jan. 28, 1997). And, if the FAD is not admissible at trial, it logically follows that the FAD alone cannot create a genuine dispute of material fact to defeat summary judgment. *See, e.g.*, *Goldberg*, 836 F.2d at 848 & n.4; *Holley v. N.C. Dep't of Admin.*, 846 F. Supp. 2d 416, 441 (E.D.N.C. 2012).

Here, the FAD is especially lacking in probative value because it only cursorily cites legal authorities on retaliation, DEX 6, at 50, and discovery in the instant litigation has revealed that the FAD is "erroneous in several factual respects regarding plaintiff's … claim." *Roberts*, 1997 WL 38138, at *1. For example, the FAD expressly found that Plaintiff's allegedly lower 2013 performance review "supports [her] claim that she was subjected to harassment on the basis of EEO activity," and it expressly relied on the "lowered performance appraisal" as the first piece of evidence supporting the conclusion that Plaintiff "was subjected to severe and pervasive conduct." DEX 6, at 54, 56. However, *Plaintiff does not dispute that Bauer, who provided her 2013 performance rating, was unaware of her EEO activity at the time he reviewed her*, DEX 14, at 9, and thus his review could not have been in retaliation for protected activity. *See Dowe*, 145 F.3d at 657. This kind of administrative factual error confirms why Title VII cases are determined *de novo* based on the more fulsome and carefully created trial court record.

In sum, Plaintiff cannot meet her evidentiary burden merely by pointing to the FAD, and without more, summary judgment for Defendant is justified.

## CONCLUSION

For the foregoing reasons, and the reasons previously stated in Defendant's opening brief, Defendant respectfully requests that the Court enter summary judgment for Defendant.

Dated:  October 12, 2017

Respectfully submitted,

DANA J. BOENTE
UNITED STATES ATTORNEY

By: _____ /s/ _____
ANDREW S. HAN
Assistant United States Attorney
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:     (703) 299-3970
Fax:     (703) 299-3983
Email:  andrew.han@usdoj.gov
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of electronic filing (NEF) to the following counsel of record:

Jacob M. Small
J. Madison PLC
1750 Tysons Boulevard
Suite 1500
McLean, Virginia 22102
T: (703) 910-5062
F: (703) 910-5107
E: jmsmall@jmadisonplc.com

_____/s/_____
Andrew S. Han
Assistant United States Attorney
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:    (703) 299-3970
Fax:    (703) 299-3983
Email:  andrew.han@usdoj.gov