**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

PATRICIA BURKE,                          )
                                         )
              Plaintiff,                  )
                                         )
       v.                                )          Case No. 1:16cv1256 (LO/JFA)
                                         )
JAMES MATTIS, Secretary, United States   )
Department of Defense,                    )
                                         )
              Defendant.                 )
_____  )

**<u>DEFENDANT'S OPPOSITION
TO PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF</u>**

DANA J. BOENTE
United States Attorney

ANDREW S. HAN
KIMERE J. KIMBALL
Assistant United States Attorneys
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:     (703) 299-3970/3763
Fax:     (703) 299-3983
Email:  andrew.han@usdoj.gov
        kimere.kimball@usdoj.gov
*Counsel for Defendant*

## INTRODUCTION & BACKGROUND

In this civil action, Plaintiff Patricia Burke brought an individual claim of a retaliatory hostile work environment pursuant to Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973. From November 6 through November 13, 2017, this case was tried before a jury, which returned a general verdict in favor of Plaintiff and awarded her nominal damages in the amount of $1.00. On November 29, 2017, Plaintiff filed a motion for equitable relief, which requests that this Court issue six specific permanent injunctions. (Dkt. No. 116.)[1] For the first time since Plaintiff filed this lawsuit on October 3, 2016, she requests the following injunctive relief:

1. An order that the DSS EEO Director report directly to the DSS's agency head;
2. An order prohibiting DSS and any and all agents of DSS from interfering with EEO Staff related to EEO complaints;
3. An order that William Stephens, Franklin Malafarina, Michael Buckley and all other managers within CI be required to take additional EEO training;
4. An order directing DSS to formulate a Retaliation Prevention Plan to prevent retaliation against any DSS employees that make or maintain EEO complaints and to submit that plan to the Court for approval;
5. An order directing DSS to submit to the Court proposed personnel realignments that permanently separate Ms. Burke from harassers William Stephens, Franklin Malafarina, and Michael Buckley while preserving Ms. Burke's pay grade and rate and ensuring that she has work commensurate with her skills and pay grade;
6. An order prohibiting DSS or any and all agents of DSS from retaliating against Ms. Burke for making and prosecuting her EEO complaints.

Pl. Mot. 8-9.

---

[1] Also on November 29, 2017, Plaintiff filed a motion for entry of judgment. (Dkt. No. 114.) The next day, on November 30, 2017, the Clerk of this Court entered judgment in accordance with the jury verdict. (Dkt. No. 118.) Plaintiff and Defendant agree that Plaintiff's motion for injunctive relief is properly construed as a motion pursuant to Federal Rule of Civil Procedure 59, thus tolling the entry of judgment for purposes of appellate review of the jury verdict. *See* Fed. R. Civ. P. 59 Advisory Committee Notes (1995 amdt.) (observing that "post-judgment motions . . . sometimes are filed before actual entry of the judgment by the clerk"); *cf. Apple, Inc. v. Samsung Elecs. Co.*, 2014 WL 6687122, at *5 (N.D. Cal. Nov. 25, 2014) (treating the plaintiff's motion for ongoing royalties filed prior to the entry of final judgment as one for equitable relief, and accepting the plaintiff's characterization of its motion as a Rule 59(e) motion to alter or amend a judgment).

Plaintiff's request for injunctive relief should be denied in its entirety. Contrary to Plaintiff's arguments, and pursuant to established case law, an award of injunctive relief in a Title VII action is not mandatory. This is especially true in a case like this one, where an individual claim is asserted and a jury determines that only nominal damages are warranted to compensate the plaintiff for her injuries. This is also especially true in a case like this one, where the plaintiff failed to ask for particular relief in her complaint and that omission unjustly prejudiced the defendant. Here, prior to the filing of her motion for injunctive relief, Plaintiff had never requested or otherwise notified Defendant of her intent to seek the broad sort of injunctive relief set forth in the motion. In fact, at the close of discovery, Plaintiff elected to clarify the scope of relief sought in her complaint, but she still gave no indication that she would seek such far-reaching equitable relief. *Compare* Compl. ¶¶ 1-2, 50-53 (Dkt. No. 1), *with* First Am. Compl. ¶¶ 2-3, 35-37 (Dkt. No. 41).

As to Plaintiff's specific requests, this Court should exercise its discretion to deny relief because they are all overbroad and not at all tailored to make Plaintiff whole. "[A]n injunction should be no broader than necessary to achieve its desired goals." *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 766 (4th Cir. 1998), *vacated on other grands*, 527 U.S. 1031 (1999). And an injunction under Title VII must "eliminat[e] the effects of past discrimination and prevent[] future discrimination," *Spencer v. Gen. Elec. Co.*, 703 F. Supp. 466, 469 (E.D. Va. 1989), *aff'd*, 894 F.2d 651 (4th Cir. 1990), *abrogated on other grounds*, *Farrar v. Hobby*, 506 U.S. 103 (1992). However, none of Plaintiff's requested relief satisfies any of these threshold requirements. Among other things, several requests lack any evidence that they would return Plaintiff to a position where she would have been absent a violation, several requests improperly intrude on the separation-of-powers between the judiciary and the executive, and several requests are unnecessary because they amount to nothing more than an impermissible order to "obey the law."

Accordingly, because Plaintiff cannot show that her requests for permanent injunctive relief would effectuate any purpose behind Title VII, her motion for injunctive relief should be denied.

## ARGUMENT

One of the purposes of Title VII is "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975). As such, a district court has the discretion to order equitable relief to place the plaintiff "as near as may be, in the situation he would have occupied if the wrong had not been committed." *Id.* at 418-19; *see also Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 766 (4th Cir. 1998) ("[T]he standard to be applied . . . in determining the appropriate remedy for [a violation of Title VII] is that the plaintiff should be placed in as near as a position as possible to where he/she would have been now had the [violation] not occurred."), *vacated on other grounds*, 527 U.S. 1031 (1999). "Being equitable relief, an injunction should be no broader than necessary to achieve its desired goals." *Lowery*, 158 F.3d at 766 (citing *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)). Moreover, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief" to the plaintiff. *Id.* (quoting *Madsen*, 512 U.S. at 765); *accord PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 128 (4th Cir. 2011). Thus, "[a]n injunction should be tailored to restrain no more than what is reasonably required to accomplish its ends," and "it should not go beyond the extent of the established violation." *Hayes v. N. State Law Enf't Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993).

In a Title VII case, "injunctions are by no means mandatory." *Spencer v. Gen. Elec. Co.*, 894 F.2d 651, 660 (4th Cir. 1990), *aff'g* 703 F. Supp. 466 (E.D. Va. 1989), *abrogated on other grounds*, *Farrar v. Hobby*, 506 U.S. 103 (1992). Plaintiff erroneously maintains that because she prevailed at trial in establishing DSS's liability under Title VII, "there is no discretion to deny injunctive relief completely." Pl. Mot. 1 (quoting *United States v. Gregory*, 871 F.2d 1239, 1246 (4th Cir. 1989)). Plaintiff is incorrect. Rather, "equitable relief is not automatic and the Court must assess the

appropriateness of the equitable relief sought in light of the injuries found." *Hayes v. Shalala*, 933 F. Supp. 21, 27 (D.D.C. 1996).

Plaintiff's cited authority in support of the erroneous proposition that this Court has "no discretion" to deny injunctive relief is readily distinguishable because, in general, those cases concerned either "pattern or practice" claims or class-action claims, not the type of single-plaintiff claim that Plaintiff pursued here. *See Gregory*, 871 F.2d at 1241 n.6 (pattern-or-practice); *United States v. Cnty. of Fairfax, Va.*, 629 F.2d 932, 936 (4th Cir. 1980) (pattern-or-practice); *EEOC v. KarenKim, Inc.*, 698 F.3d 92, 94 (2d Cir. 2012) (class action); *Berkman v. City of New York*, 705 F.2d 584, 586 (2d Cir. 1983) (class action).[2] Pattern-or-practice claims fundamentally differ from a claim brought by an individual party, like Plaintiff. For example, "[m]ost 'pattern or practice' cases are proved through the use of statistics." *Gregory*, 871 F.2d at 1243 n.12. More significantly, "[o]nce the pattern or practice has been proved, an inference is raised that *all* employment decisions, during the period in which the discriminatory practice has been in force, were made in pursuit of the policy." *Id.* at 1241 n.6 (emphasis added). For these and other reasons, the Supreme Court has held that "a finding of a pattern or practice of discrimination *itself* justifies an award of prospective relief." *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984) (emphasis added). And for these very same reasons, courts have unequivocally held that an individual plaintiff may not bring a private, non-class suit asserting a pattern-or-practice claim. *See, e.g.*, *Lowery*, 158 F.3d at 760-61; *see also Gilyard v. Northlake Foods, Inc.*, 367 F. Supp. 2d 1008, 1015 (E.D. Va. 2005) (observing that a pattern-or-practice claim relies on an "analytical framework" of proof that differs from the framework for proving an individual Title VII claim). Therefore, contrary to Plaintiff's assertions, because her claim

---

[2] Plaintiff also cites *King v. McMillan*, 594 F.3d 301 (4th Cir. 2010), for this proposition. Although *King* did not consider a pattern-or-practice or a class-action claim, it is even more inapposite because the court in that case only discussed injunctive relief in the context of explaining why substitution of the party-defendant was appropriate under Federal Rule of Civil Procedure 25. *See id.* at 310.

is only an individual one under Title VII, the fact that the jury returned a verdict in her favor on liability does not *itself* necessitate granting her request for injunctive relief, whether in whole or in part.

Rather, in an individual Title VII suit like this one, a district court is only required to "exercise its discretion in light of the prophylactic purposes of the Act to ensure that discrimination does not recur." *Spencer*, 894 F.2d at 660. To that end, there are essentially two purposes: "eliminating the effects of past discrimination and preventing future discrimination." *See Spencer*, 703 F. Supp. at 469 (quoting *Pitre v. W. Elec. Co.*, 843 F.2d 1262, 1274 (10th Cir. 1988)). As to the former, the district court should look to whether any "specific actions have already been taken to alleviate the effects of the past" violations. *See id.* As to the latter, the district court *must* "carefully examine the circumstances of each case" and "conclude that a 'cognizable danger of recurrent violation' exists" before it grants any injunctive relief. *See id.* (quoting *United States v. Hunter*, 459 F.2d 205, 210 (4th Cir. 1972)). And although the defendant has the burden "to produce evidence that. . . harassment will not recur," "the ultimate burden of proof that an injunction is necessary always remains with the plaintiff." *See Spencer*, 894 F.2d at 660 n.13.[3]

---

[3] At least one district court has suggested that a Title VII plaintiff seeking a permanent injunction must meet the four-factor test articulated by the Supreme Court for the issuance of a permanent injunction; the plaintiff must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that the remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Yarnall v. Phil. Sch. Dist.*, 180 F. Supp. 3d 366, 370 (E.D. Pa. 2016) (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). Courts within the Fourth Circuit do not appear to strictly apply these factors in analyzing motions for injunctive relief in the Title VII context; however, the thrust of *Yarnall* is nonetheless consistent with the Fourth Circuit's rule "reject[ing] the notion that a prevailing plaintiff in a Title VII action is automatically entitled to injunctive relief." *Id.* at 372; *accord Spencer*, 894 F.2d at 660. The plaintiff still has the significant burden to show that a permanent

Here, Plaintiff requests that this Court issue six separate injunctions, but all of her requests should be denied because they are alternately vague, overbroad, and divorced from any reasonable expectation of making herself whole.

## I.   THE INJUNCTIVE RELIEF REQUESTED PREJUDICIALLY EXCEEDS THE SCOPE OF RELIEF REQUESTED IN HER COMPLAINT

To begin, Plaintiff's motion should be denied because the injunctive relief requested is well beyond the bounds of the type or scope of relief that Plaintiff has sought since this case was first filed over one year ago in October 2016. Indeed, Plaintiff's original complaint obliquely refers only twice to "equitable relief," Compl. ¶¶ 1-2 (Dkt. No. 1), and in that vein requests only that the Court "order Defendant to refrain from all further violations of *her* federally-protected rights," *id.* ¶ 53 (emphasis added). Otherwise, Plaintiff sought only compensatory damages for "financial losses" and "emotional distress," and attorney's fees. *Id.* ¶¶ 50-52. Later, at the close of discovery, Plaintiff filed an amended complaint, which *withdrew* her request for compensatory damages for "financial losses," but left all other requested relief identically intact. Am. Compl. ¶¶ 35-37 (Dkt. No. 41). In other words, after fully litigating this case through discovery, Plaintiff took the opportunity to amend and clarify the scope of her relief sought, but she elected *not* to give notice that she intended to seek the sort of far-reaching equitable relief contained in her instant motion.

Although a party's entitlement to relief is not strictly limited to that which is specifically set forth in her pleadings, *see* Fed. R. Civ. P. 54(c), this rule is not without its own limitations. *See Atl. Purchasers, Inc. v. Aircraft Sales, Inc.*, 705 F.2d 712, 716 (4th Cir. 1983) ("A party will not be given relief not specified in its complaint where the failure to ask for particular relief so prejudiced the opposing party that it would be unjust to grant such relief."); *see also Santiago v. S. Health Partners*, 2015 WL

---

injunction should issue against her employer, otherwise "the standard for obtaining injunctive relief would be eviscerated." *Yarnall*, 180 F. Supp. 3d at 372.

8179617, at *1 (M.D.N.C. Dec. 7, 2015) (denying motion for injunctive relief "[t]o the extent [it] . . . exceed[s] the scope of Plaintiff's Complaint" (citing *Church of Holy Light of Queen v. Holder*, 443 F. App'x 302, 303 (9th Cir. 2011))). Here, Plaintiff was under no obligation to clarify the scope of her relief sought in her complaint. She nevertheless opted to do so, and at a critical juncture in the litigation: after the facts, issues, and potential risks for the parties were fully developed, but before filing dispositive motions, participating in mediation, and proceeding to trial. Had Defendant been aware that Plaintiff intended to seek not just compensatory damages and possible equitable relief for herself, but also equitable relief that could affect the very structure of DSS as well as individuals within DSS nationwide who had nothing to do with Plaintiff's circumstances, Defendant's calculus and strategy for settlement and trial may have been different.

Accordingly, this is not simply a situation in which Plaintiff seeks reasonable equitable relief to return her to "as near as a position as possible to where []she would have been now had the [violation] not occurred." *See Lowery*, 158 F.3d at 766. Rather, having been awarded only nominal damages by the jury, Plaintiff now attempts to inject new requests for relief into this case that have virtually no connection to her claim for compensatory damages for emotional distress. Plaintiff's prejudicial and transparent attempt to change the terms of her case should be rejected, and her motion for injunctive relief should be denied.

## II. THE INJUNCTIVE RELIEF REQUESTED IS OVERBROAD, OVERLY BURDENSOME, AND WOULD NOT MAKE PLAINTIFF WHOLE

All of the injunctive relief requested by Plaintiff should be denied because it is overbroad, overly burdensome, and is not tailored to make her whole again. As previously explained, Plaintiff bears "the ultimate burden of proof that an injunction is necessary," *Spencer*, 894 F.2d at 660 n.13, by demonstrating that its issuance would "eliminat[e] the effects of past discrimination and prevent[] future discrimination," *Spencer*, 703 F. Supp. at 469. This she cannot do.

With respect to "alleviat[ing] the effects of the past harassment," *id.*, the jury's award of nominal damages is probative. As Judge Ellis of this district concluded, a court's award of damages—even nominal damages—serves to remedy past harassment. *See id.* (Ellis, J.) (holding that because "the Court awarded plaintiff nominal damages for her success in proving that [the defendant] maintained a hostile work environment," the "effects of the proven . . . harassment" were in part remedied). Moreover, as of November 2015, Plaintiff was formally realigned out of the Operations Division (and out of Franklin Malafarina's supervision) and into the Plans, Policy, and Programs ("P3") Division (and under Nelson Bishop's supervision). Trial Tr. at 167:18, 266:1-5 (trial transcript excerpts are attached hereto as Defendant's Exhibit ("DEX") 1). Plaintiff's first- and second-level supervisors who were primarily implicated in her claim are no longer at DSS: Carl Taylor retired in August 2015, Trial Tr. at 785:11-13; and Malafarina left his former position as the Assistant Director of the Operations Division in July 2017 to participate in the National Security Fellowship Program ("NSFP") at Harvard University in Massachusetts, Trial Tr. at 933:5-8; DEX 2 ¶ 5 (Decl. of J. McGovern).[4] And Michael Buckley was not, and has never been, in Plaintiff's chain-of-command. Trial Tr. at 336:22-337:1.[5] These sorts of personnel changes and arrangements further "alleviate the effects of the past harassment." *See Spencer*, 703 F. Supp. at 469.

---

[4] Following the completion of his participation in the NSFP, Malafarina, like all participants in the program, is required to complete a two-year Joint Duty Rotation with the Department of Defense Office of the Under Secretary of Defense for Intelligence. DEX 2 ¶ 5. The Assistant Director of Operations position that Malafarina previously held has been officially backfilled by a competitive selection. *Id.* ¶ 6. Although Malafarina has the option, there are currently no specific plans for him to return to DSS following the completion of his Joint Duty Rotation. *Id.* ¶ 7.

[5] Although Plaintiff's new position within P3 still falls under Stephens's authority, there was no evidence adduced at trial that the retaliatory hostile work environment continued after November 2015. In fact, Plaintiff herself testified that her alleged stress caused by the retaliatory hostile work environment diminished when she transferred to P3, Trial Tr. at 266:1-22, and she testified that as recently as a few months before trial, her working relationship with Stephens (and Buckley) was fine, which Stephens corroborated, Trial Tr. at 375:9-376:6, 743:6-744:5.

With respect to "preventing future illegal discrimination," *id.*, this Court must, again, "conclude that a 'cognizable danger of recurrent violation' exists" before it grants any injunctive relief, *see id.* And even then, any such injunction should be "no more burdensome to the defendant than necessary to provide complete relief" to the plaintiff. *See Lowery*, 158 F.3d at 766. As will be discussed next, each of Plaintiff's six requests for injunctive relief are overbroad and not at all tailored to redressing her established injuries, and should thus be denied.

### A.    The DSS Director Properly Delegated Immediate Supervisory Authority Over the DSS EEO Director to the DSS Chief of Staff

Plaintiff first requests an injunction that would reorganize DSS such that the DSS EEO Director reports directly to the DSS Director, which Plaintiff argues is mandated by 29 C.F.R. § 1614.102(b)(4) and EEOC Management Directive 110 ("MD-110").[6] Pl. Mot. 2-3, 8. Plaintiff apparently takes issue with the fact that under DSS's organizational structure, the immediate supervisor of the DSS EEO Director is the Chief of Staff of DSS, as opposed to the DSS Director himself. *See* Trial Tr. at 688:17-23 (testimony of former DSS EEO Director Carolyn Lyle). Plaintiff contends that this injunctive relief is necessary to "remedy a lawless election by DSS to de-prioritize the elimination of workplace discrimination." Pl. Mot. 3. However, notwithstanding Plaintiff's hyperbolic characterization, it is simply untrue that DSS's organizational structure is inconsistent with federal regulations or that a reorganization is necessary to make Plaintiff whole.

Although § 1614.102(b)(4) states that the "EEO Director shall be under the immediate supervision of the agency head," the federal EEO regulations also expressly provide that "[a]n agency head may delegate authority under this part [i.e., part 1614], to one or more designees," 29

---

[6] MD-110 is itself not a federal regulation; rather, it is "a document issued by the EEOC to provide federal agencies with EEOC policies, procedures, and guidance relating to the processing of employment discrimination complaints governed by part 1614 of EEOC regulations." *Dep't of Air Force, 436th Airlift Wing, Dover Air Force Base v. Fed. Labor Relations Auth.*, 316 F.3d 280, 282 (D.C. Cir. 2003). It is available online at https://www.eeoc.gov/federal/directives/md110.cfm.

C.F.R. § 1614.607. In other words, an agency head may delegate immediate supervisory authority over an EEO director to his designee. Indeed, when § 1614.102(b)(4) was first promulgated, the commentary to the final rule addressed "object[ions] to the provision in the regulation that the EEO Director be under the immediate supervision of the head of the agency" by noting that "section 1614.607 permits that individual to delegate that authority." *See* Federal Sector Equal Employment Opportunity, 57 Fed. Reg. 12,634, 12642 (Apr. 10, 1992) (final rule).[7] Here, the DSS Director has properly exercised his authority by delegating immediate supervision over the DSS EEO Director to the DSS Chief of Staff, who in turn reports directly back to the DSS Director.[8]

Plaintiff objects to this delegation of authority to the DSS Chief of Staff in part because the DSS Chief of Staff "also oversees the Human Capital Management Office." Pl. Mot. 3. Presumably, Plaintiff is concerned with the MD-110's admonition against an EEO director being "placed under the supervision of the agency's Chief Human Capital Officer." *Id.* But the DSS Chief of Staff is not DSS's "Chief Human Capital Officer"—at best, the DSS Chief of Staff "oversees" DSS's Human Capital Management Office in the same way that the DSS Chief of Staff "oversees" DSS's EEO Office. Significantly, Plaintiff herself was well aware of this during the relevant time period of this case. Indeed, at trial, Plaintiff accurately explained that then-DSS Chief of Staff Rebecca Allen was part of the DSS "front office," which is "the office that's in charge of the DSS" (i.e., the entire agency). Trial Tr. at 304:22-305:1. By comparison, in other testimony, Plaintiff accurately referred to meetings she had with the DSS "HR Office" and the "HR Director," La Shawn Kelley. Trial Tr. at 344:18-23. It is thus disingenuous for Plaintiff to suggest that the DSS Chief of Staff "oversees the

---

[7] Section 1614.102(b)(4) was originally codified at § 1614.102(b)(3). It was re-codified at § 1614.102(b)(4) in 1999 as part of amendments to the federal-sector EEO regulations. *See* Federal Sector Equal Employment Opportunity, 64 Fed. Reg. 37,644, 37,655 (July 12, 1999) (final rule).

[8] Notably, at trial, Plaintiff's counsel acknowledged that the DSS Chief of Staff reports directly to the DSS Director. Trial Tr. at 246:20-23.

Human Capital Management Office" in a manner such that the Chief of Staff's immediate supervision over the DSS EEO Director would contravene the MD-110.

Nevertheless, Plaintiff insists that the DSS Chief of Staff's immediate supervision over the DSS EEO Director "played a role in the creation of the retaliatory hostile work environment that the jury found Ms. Burke was subjected to." Pl. Mot. 3. To that end, Plaintiff notes only her own rebuttal testimony at trial that "Lyle did not believe that her office had the independence to conduct its business without interference by Counterintelligence Directorate ('CI') Director William Stephens." *Id.* But just because the jury returned a general verdict in this case, it cannot be said that the jury credited this particular testimony by Plaintiff in finding a hostile work environment, especially given that Lyle herself testified to the contrary. *See Hayes*, 933 F. Supp. at 27 ("Where the jury has not actually decided an issue or where the basis for the jury's decision cannot be determined, the court is not bound." (citing *Blake v. Hall*, 668 F.2d 52, 54 (1st Cir. 1981))). As Lyle explained, an entirely different office—i.e., the Investigation Resolutions Division—actually performed the investigation of Plaintiff's EEO claim, and Lyle's office served only to ensure that all document requests were properly submitted to the EEO investigator, which it did. Trial Tr. at 696:4-697:7 (". . . I would have made sure that it was submitted according to the document requests. I am confident that most of those documents, if not all, were submitted."). And Lyle further explained that, in any event, then-DSS Chief of Staff Rebecca Allen (i.e., Lyle's supervisor) did not report to Stephens, and Stephens was not in a position to sign Lyle's performance appraisal. Trial Tr. at 699:1-11. As such, Plaintiff's characterization of what Lyle "believe[d]" is belied by Lyle's own actual testimony. On this very tenuous record,[9] injunctive relief is not warranted.

---

[9] Plaintiff additionally argues that Lyle's "belie[f]" that Stephens would interfere with the independence of the EEO Office led Lyle to recommend that an "outside entity" draft the Final Agency Decision ("FAD"). Pl. Mot. 3. Importantly, there was no testimony to this effect at trial. Plaintiff's counsel only proffered this evidence at side-bar outside the presence of the jury, but this Court excluded it. Trial Tr. at 1031:25-1034:23. At the same time, it is worth pointing out that

B.    **There is No Cognizable Danger of Recurrent Violation Concerning Alleged
Interference with the EEO Office**

Plaintiff next requests an injunction that would "prohibit DSS from interfering with EEO

office staff as a means of retaliating against complainants like Ms. Burke." Pl. Mot. 4-5, 8. For a

number of reasons, however, this request falls short of satisfying the standard under Title VII

necessary for an injunction to issue. As an initial matter, by seeking an injunction to protect

"complainants like Ms. Burke," Plaintiff's request itself acknowledges that the requested injunction

is not intended to make *Plaintiff* whole. But "the standard to be applied . . . in determining the

appropriate remedy for [a violation of Title VII] is that *the plaintiff* should be placed in as near as a

position as possible to where he/she would have been now had the [violation] not occurred."

*Lowery*, 158 F.3d at 766 (emphasis added). Plaintiff instead appears to seek to vindicate the rights of

others—relief that might sometimes be appropriate in a pattern-or-practice or class action case, but

is not appropriate to this individual-plaintiff case. The Fourth Circuit has expressly limited the scope

of equitable relief to be "no broader than necessary to achieve its desired goals," *id.*, and "tailored to

restrain no more than what is reasonably required to accomplish its ends," *Hayes*, 10 F.3d at 217. On

its face, Plaintiff's request is contrary to the dictates of the Fourth Circuit.

As to the evidentiary basis for this request, Plaintiff identifies only Michelle Labov and

Carolyn Lyle as the individuals within DSS's EEO Office who processed her EEO claim and whose

work was allegedly interfered with by DSS management. But neither Labov nor Lyle work for DSS

anymore—Labov having departed in April 2014, and Lyle having departed in April 2016. Trial Tr. at

623:10-12, 687:16-20. Because this Court must consider whether a "cognizable danger of recurrent

---

Plaintiff cannot lay claim to being prejudiced by the fact that an outside entity drafted the FAD since
the FAD also concluded that Plaintiff was subjected to a retaliatory hostile work environment. *See*
Def.'s Mot. in Limine to Exclude the FAD, DEX 1 (Dkt. No. 55-1).

violation" exists, *see Spencer*, 703 F. Supp. at 469, the fact that neither Labov nor Lyle are employed by DSS necessarily means that putative interference with *their* work at DSS will not recur.

On that note, because the jury returned a general verdict, it cannot be said that the jury even credited Plaintiff's theory that DSS management actually interfered with Labov's and Lyle's work on her case in the precise manner that she alleges. *See Hayes*, 933 F. Supp. at 27. Indeed, the evidence adduced at trial is not even consistent with Plaintiff's contentions. With respect to Labov, Plaintiff *only* points out that Labov "testified that her employment was threatened as a result of her involvement in the Burke case." Pl. Mot. 4. Crucially, Labov testified that she only heard about the putative threat to her job from Lyle, Trial Tr. at 613:23-614:7, but Lyle refuted that this ever occurred, Trial Tr. at 692:4-20 ("Q. Do you believe that anyone did threaten Ms. Benitez[10] with termination? A. I do not believe anyone threatened her with termination. I certainly didn't, I was her supervisor. Q. And you don't [re]call telling her that anybody threatened her with termination? A. I do not recall telling her that anyone threatened her with termination."). And Labov conceded that she ultimately left DSS of her own accord several months after the putative threat to her job. Trial Tr. at 662:10-19. With respect to Lyle, Plaintiff *only* points out that Lyle "testified that her performance evaluation was lowered because of her involvement in Ms. Burke's case." Pl. Mot. 4. However, this is a misleading characterization of Lyle's actual testimony at trial. Lyle explained that although she understood her lowered performance evaluation to stem from Plaintiff's case, the specific criticism had to do with the fact that Lyle's office was perceived to be inappropriately advocating for the complainant in contravention of the neutral role it was supposed to adhere to. Trial Tr. at 698:9-699:11.

---

[10] Benitez is Michelle Labov's maiden-name, by which she was primarily known when she worked at DSS.

Based on just these two allegations of interference, Plaintiff inaccurately presumes that the trial established a "*practice* of interfering with EEO staff," and that this Court should "take this opportunity to order DSS to correct a *practice* that appears designed to interfere with the sound administration of Title VII." Pl. Mot. 4 (emphasis added). Plaintiff's sleight-of-hand in suggesting that a "practice" of interference has been conclusively demonstrated should be rejected, as that term carries a very specific meaning within Title VII jurisprudence. As noted earlier, among other things, the means of proving a pattern-or-practice claim, *see Gregory*, 871 F.2d at 1241 n.6, and the presumptions and consequences that may flow from proving a pattern-or-practice claim, *see id.* at 1243 n.12, are fundamentally different from an individual claim like Plaintiff's in this case. Thus, it is legally untenable for Plaintiff to extrapolate from just two contested pieces of evidence that a broad injunction should issue.

And to the extent that Plaintiff seeks more generalized injunctive relief prohibiting DSS from "interfering" with the EEO Office, Plaintiff's request reduces to a basic request that DSS "obey the law." However, as discussed more fully below, *see infra* Parts **II.D, II.F**, such injunctions are both overbroad and unnecessary and thus should not be granted.

**C.**     **Additional EEO Training Is Not Warranted Under These Circumstances**

Plaintiff requests an injunction directing "William Stephens, Franklin Malafarina, Michael Buckley and all other managers within CI" to take additional EEO training, specifically "40 hours of live, in-person EEO training" each. Pl. Mot. 5, 8. But this request is not only unacceptably burdensome, it is also completely untethered to any evidentiary basis to suggest that granting it would assist in making Plaintiff whole or in addressing any established wrong that contributed to the retaliatory hostile work environment. At bottom, an injunction must be "necessary to achieve its desired goals," *Lowery*, 158 F.3d at 766; however, Plaintiff identifies no reason beyond the jury's general verdict at trial to support her argument that a far-reaching training injunction is needed.

Indeed, there was no evidence at trial to suggest that DSS's violation of Title VII was a result of a failure in training—as Plaintiff has never made allegations, let alone proffered evidence, regarding any lack of training given to her supervisors or demonstrating that if her managers had been properly trained, she would not have been subjected to retaliatory harassment. Without more, this Court's equitable powers should not be so lightly invoked. *See Figueroa v. City of Chicago*, 2000 WL 1047316, at *4-5 & n.1 (N.D. Ill. July 27, 2000) (denying injunctive relief for additional harassment training because there was "no basis for finding [existing] mandatory programs to be deficient in preventing . . . harassment" and because the plaintiff "cite[d] to no trial evidence supporting her request for relief"); *see also Hayes*, 10 F.3d at 217 ("[I]njunctive relief . . . should not go beyond the extent of the *established* violation." (emphasis added)).

Additionally, Plaintiff's request is not tailored to accomplish any real goal. First, forty-hours of training, whether in-person or not, is a breathtaking and resource-consuming amount of training for *any* purpose. Second, Plaintiff requests that "*all* other managers within CI" be directed to undergo additional training. Pl. Mot. 8 (emphasis added). But despite the fact that hers was an individual claim that implicated a discrete number of managers within the Quantico, Virginia headquarters of DSS, Plaintiff would have this Court order managers within CI—which has personnel in approximately forty other geographic locations across the country, Trial Tr. at 934:22-935:1—to undergo additional EEO training, regardless of whether those managers had any involvement or awareness of Plaintiff's case. Third, Plaintiff requests that all managers within CI undergo additional training irrespective of the *degree* of their alleged involvement. For example, the only evidence at trial that Buckley had anything to do with Plaintiff's hostile work environment claim was that he called a single meeting with her and her supervisors in June 2015 to address concerns over her discussing confidential personnel information, Trial Tr. at 143:1-144:16, 165:10-166:1, yet Plaintiff requests that he undergo the same amount of training as Malafarina, who was her

actual first- and second-level supervisor during the relevant time period, Trial Tr. at 937:2-10. All told, the lack of even the slightest bit of nuance in Plaintiff's request shows that granting it has virtually nothing to do with making her whole, particularly when Malafarina is no longer her supervisor.

In fact, Plaintiff *admits* that her request that this Court order additional EEO training for managers at CI is completely irrelevant to redressing her claimed injuries. As part of her request that this Court order a personnel realignment within CI, *see infra* **Part II.E**, Plaintiff states: "[T]he years-long nature of the harassment shows that these individuals cannot be trusted to refrain from continuing to retaliate against Ms. Burke, *regardless of whether they receive future training*." Pl. Mot. 6 (emphasis added). As such, Plaintiff unequivocally concedes that an injunction requiring additional EEO training would serve no purpose. For this reason alone, this request should be denied.

In any event, it must be emphasized that managers within DSS, like all employees within DSS, already undergo significant EEO training on a regular basis. For example, new employees must undergo EEO/Diversity training as part of the New Employee Orientation and separate EEO training within the first ninety days of employment, and current employees must undergo additional EEO training on a bi-annual basis. DEX 3 ¶ 5 (Decl. of R. Campbell). The DSS EEO Office also provides regular and ongoing training in the areas of EEO, diversity and inclusion, disability/reasonable accommodations, and mediations, including: Civil Treatment for Supervisors through ELI, Inc.; Civil Treatment for Employees through ELI, Inc.; Work-life Diversity; Myers Briggs Type Indicator; John Maxwell Certified Courses on communication/leadership; Unconscious

16

Bias, for senior leaders and GG-15s and above; New Inclusive Quotient, for GG-15s and above; and Reasonable Accommodations/Disability Awareness. *Id.* ¶ 4.[11]

Moreover, upon request, the DSS EEO office will provide additional, targeted training, sometimes in conjunction with other diversity or special emphasis programs. *Id.* ¶ 8. For example, in January 2017, the DSS EEO office facilitated the administration of the DEOMI Employee Climate Assessment Survey ("DEOMI survey"), which sought feedback from all DSS employees concerning the workplace climate. *Id.*[12] Starting in March 2017, over the course of several months, the DSS EEO office coordinated "outbriefs" with senior leaders regarding the results of the DEOMI survey. *Id.* At least four outbriefs were conducted specifically for CI. *Id.* Upon receiving the initial results/outbriefs in March 2017, CI and several other Directorates within DSS affirmatively reached out to the EEO office to start addressing the concerns and challenges raised by employees in the DEOMI survey. *Id.* ¶ 9. Specifically, Stephens and Mark Allen reached out to EEO Director Campbell and requested additional training for CI leadership. *Id.* ¶ 10. Accordingly, in October 2017, Campbell conducted a communication/leadership course for CI leadership, in which both Stephens and Mark Allen participated. *Id.* What is more, the DSS EEO office has indicated that, at a minimum, it will be facilitating the administration of the DEOMI survey again in FY 2018 and FY 2019, and will continue to work with Directorates and groups within DSS to identify plans and strategies to address the concerns within their particular teams. *Id.* ¶ 11.

In light of these specific, concrete steps that DSS already has in place—or has *added* since Plaintiff instituted her suit—there is no "cognizable danger of recurrent violation" to be addressed

---

[11] A comprehensive listing of EEO-related trainings that were provided to DSS in FY 2017 and that will be, at a minimum, provided to DSS in FY 2018 is also set forth in the attached Declaration of Raymond Campbell, the Director of DSS's EEO office. DEX 3 ¶¶ 6-7.

[12] This is the same "DEOMI survey" that this Court excluded from evidence at trial in response to Defendant's motion in limine. *See* 11/2/17 Order (Dkt. No. 94); Def.'s Mot. in Limine to Exclude the DEOMI Survey Summary, DEX 1 (Dkt. No. 57-1).

by the issuance of an injunction. *See, e.g.*, *McClintick v. Leavitt*, 2008 WL 11363283, at *3 (D. Md. July 31, 2008) (denying injunctive relief seeking additional EEO training, in part, because the federal "defendant already requires mandatory training sessions for employees and supervisors regarding employment discrimination and retaliation"); *Spencer*, 894 F.2d at 660 (crediting the defendant's institution of a new anti-sexual harassment policy as evidence of no "cognizable danger of recurrent violation"). Accordingly, Plaintiff's requested injunctive relief that all of CI's managers undergo and additional forty-hours of EEO training should be denied.

### D.   Creation of a Plan to Prevent Future Retaliation Is Unwarranted

Plaintiff requests an injunction that would require DSS "to create a plan to prevent future retaliation." Pl. Mot. 5-6, 9. Specifically, Plaintiff requests that DSS "develop a plan" that:

> (1) acknowledges the problems of the past,
> (2) identifies organizational weaknesses that permitted those problems,
> (3) identifies resources it has at its disposal to prevent future retaliation,
> (4) identifies resources it does not have but needs to prevent retaliation,
> (5) provides for concrete steps that will adequately prevent retaliation from occurring in the future, and
> (6) provides for accountability when staff are found to have engaged in retaliation.

*Id.* at 5-6. Plaintiff then requests that DSS be required to submit this plan to the Court for approval, *id.* at 6, presumably in an effort for this Court to retain jurisdiction over this matter. However, this request is impermissible for several reasons.

First, this request is vague, overbroad, and not tailored to redressing *Plaintiff's* injuries. As noted earlier, "the standard to be applied . . . in determining the appropriate remedy for [a violation of Title VII] is that *the plaintiff* should be placed in as near as a position as possible to where he/she would have been now had the [violation] not occurred." *Lowery*, 158 F.3d at 766 (emphasis added). And, again, the scope of equitable relief is to be "no broader than necessary to achieve its desired goals," *id.*, and "tailored to restrain no more than what is reasonably required to accomplish its

ends," *Hayes*, 10 F.3d at 217. Yet Plaintiff's request refers to no specific allegation or injury associated with *her* claim.

Rather, Plaintiff attempts to import *unproven* claims by *other* individuals to support her request that DSS "develop a plan." Pl. Mot. 5 (alleging that "[t]he evidence in this case shows that CI's management engaged in retaliation related to at least three different complaints"). However, the evidence at trial simply does not support Plaintiff's argument. The "three different complaints" appear to refer to Plaintiff's own complaint—which was *not* brought as a class action—and the individual complaints of Jennifer Gabeler and Connie Vitiello concerning alleged retaliation. As to Gabeler's complaint, Gabeler herself testified that there was no finding or admission of liability on DSS's part. Trial Tr. at 549:17-20, 550:8-11. As to Vitiello's complaint, Plaintiff is well aware that this Court excluded any testimony from Vitiello regarding her own experiences at DSS. Trial Tr. at 240:12-18. Accordingly, the evidence at trial did not establish liability by DSS as to anyone other than Plaintiff, and thus the necessity of ordering DSS to create a broad plan of action to address supposedly widespread retaliation is unfounded. *See Hayes*, 10 F.3d at 217 (holding that an injunction "should not go beyond the extent of the *established* violation" (emphasis added)).

Second, the "plan" that Plaintiff requests for DSS to develop would implicate basic separation-of-power issues that this Court need not—and should not—wade into. By this request for injunctive relief, Plaintiff seeks to have this Court retain oversight over DSS's "organizational weaknesses," "resources it has at its disposal," and "resources it does not have but needs." Pl. Mot. 5-6. But a core element of the separation of powers is the judicial deference afforded to a federal agency's determination of its own operations or allocation of resources. An "agency's decision about how to allocate its scarce resources to accomplish its complex mission traditionally has been free from judicial supervision. This tradition of deference is rooted in the separation of powers, and the respect of the judiciary for the functions of a coordinate branch of government." *Ngure v. Ashcroft*,

367 F.3d 975, 983 (8th Cir. 2004). Even where an agency has been found to violate a statutory mandate, "[e]quitable relief . . . does not necessarily follow a finding of a violation: respect for the autonomy and comparative institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities." *In re Barr Labs., Inc.*, 930 F.2d 72, 74 (D.C. Cir. 1991); *see also E. Bay Recycling, Inc. v. Cahill*, 2007 WL 2728421, at *9 (S.D.N.Y. Sept. 14, 2007) ("[T]he executive branch and its agencies are afforded considerable deference at both the federal and state levels when it comes to setting policy priorities and allocating resources.").

Deference to an agency's allocation of resources and ordering of priorities is especially warranted here because of DSS's national security function as part of the United States Department of Defense. *E.g.*, Trial Tr. at 707:24-708:4 (testimony of W. Stephens) (explaining that DSS is "charged with protecting classified technology in cleared industry," which are "firms that work on classified projects for the United States government, most specifically Department of Defense"). The Fourth Circuit has long required deference to the executive branch in the realm of national security, including in cases that implicate constitutional and civil rights. *See, e.g., Hegab v. Long*, 716 F.3d 790, 794 (4th Cir. 2013) ("[C]ourts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." (quoting *Dep't of the Navy v. Egan*, 484 U.S. 518, 530 (1988))); *Hamdi v. Rumsfeld (Hamdi II)*, 296 F.3d 278, 281 (4th Cir. 2002) ("[T]he Supreme Court has shown great deference to the political branches when called upon to decide cases implicating sensitive matters of foreign policy, national security, or military affairs."); *Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir. 1991) ("Of the legion of governmental endeavors, perhaps the most clearly marked for judicial deference are provisions for national security and defense.").[13]

---

[13] Other circuits are well in accord with the Fourth Circuit's view in this regard. *See, e.g., Bassiouni v. Fed. Bureau of Investigation*, 436 F.3d 712, 724 (7th Cir. 2006) ("We note at the outset that the realm of national security belongs to the executive branch, and we owe considerable deference to that branch's assessment in matters of national security."); *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003) ("It is equally well-established that the judiciary owes some

In light of such deference, and particularly in light of the fact that the evidence at trial did not demonstrate any far-reaching pattern-or-practice of retaliation at DSS, this Court should not needlessly entangle itself with DSS's business operations.

Third, the "plan" that Plaintiff requests for DSS to develop would amount to little more than an order that DSS and its agents "obey the law." But, "[t]ypically, an injunction that simply orders the defendant to obey the law and not discriminate is impermissible." *Miller v. Pilgrim's Pride Corp.*, 2007 WL 2570219, at *4 (W.D. Va. Aug. 31, 2007) (citing *NLRB v. U.S. Postal Serv.*, 486 F.3d 683, 691 (10th Cir. 2007)). "The jury verdict is sufficient in and of itself to protect plaintiff against future acts of discrimination and retaliation." *Hayes*, 933 F. Supp. at 27; *see also EEOC v. Fed. Exp. Corp.*, 2006 WL 1134208, at *2 (D. Md. Apr. 25, 2006) ("[I]t is inappropriate to enjoin [the defendant] to obey the law. The [employment discrimination statutes] remain[] in effect, and an injunction to obey that law would add nothing."), *aff'd*, 513 F.3d 360 (4th Cir. 2008). And this Court should "not presume that [DSS] and [its] employees will not follow the law." *See Hayes*, 933 F. Supp. at 27.

And finally, the vagueness and overbreadth of Plaintiff's requested "plan" stands in sharp contrast to the fact that the jury here determined that, although DSS violated Title VII, only nominal damages were justified to compensate Plaintiff for her claimed injuries resulting from that violation. In other words, the jury made it clear that this is not a situation needing broad relief, let alone overbroad relief, to make Plaintiff whole. Granting this request for an injunction that would direct DSS to create a comprehensive and far-reaching plan, divorced from the evidence at trial, to address alleged retaliation, would be inconsistent with the clear message of the jury's verdict. As such, this request should be denied.

---

measure of deference to the executive in cases implicating national security, a uniquely executive purview.").

### E.   There is No Cognizable Danger of Recurrent Violation to Warrant a Personnel Realignment

Plaintiff requests an injunction that would require DSS "to make personnel realignments that separate Ms. Burke from harassers William Stephens, Michael Buckley, and Franklin Malafarina, and to maintain that separation indefinitely." Pl. Mot. 6-7, 9. However, this request is not only overbroad on its face, granting it would also implicate the same basic separation-of-power issues discussed previously with respect to Plaintiff's request for DSS to create a plan to prevent future retaliation. *See supra* **Part II.D**. It should thus be rejected.

Indeed, on top of the judicial deference that should be afforded to a federal agency's determination of its own operations or allocation of resources, especially given the uniquely governmental concerns over national security, the Fourth Circuit has admonished that even within the private sector, a district court should not entangle itself in business operations like personnel assignments when fashioning equitable relief in the wake of a finding of employment discrimination. For example, in *Spagnuolo v. Whirlpool Corp.*, 717 F.2d 114 (4th Cir. 1983), the Fourth Circuit held that although a jury found that the plaintiff had been the victim of age discrimination when his position was eliminated, the district court could not order the defendant to "bump" other current employees in favor of reinstating the plaintiff to his former (or an equivalent) position. *See id.* at 120 ("[W]holesale bumping orders would disrupt the business's operations and would excessively entangle the district court in the operations of the business."). What is more, the *Spagnuolo* court was especially loath to order injunctive relief that would reorganize the defendant's personnel because monetary relief could effectively serve as an alternative remedy. *See id.*

In this case, the evidence at trial demonstrated that DSS's national-security-focused mission informed—and continues to inform—all of its personnel decisions, including those within the CI Directorate. *E.g.*, Trial Tr. at 936:13-937:1 (testimony of F. Malafarina) (describing the evolution of DSS's CI operations to adapt to threats to national security), 941:18-942:1 (testimony of F.

Malafarina) (explaining that alternative work schedules were a privilege that could be granted only if the accomplishment of DSS's "mission" were guaranteed). Personnel decisions as fundamental as where CI employees physically worked were dictated by DSS's mission, largely due to its regular handling of classified material. *E.g.*, Trial Tr. at 884:2-5 (testimony of E. Blackmon) (explaining that "security concerns regarding classified information" prohibited employees from teleworking); 935:2-5 (testimony of F. Malafarina) (testifying that CI personnel "sit in the SCIF, . . . a sensitive compartmented information facility, where you process classified information"). Consequently, this Court should be vigilant not to intrude into sensitive decisionmaking over how best to assign personnel within DSS to achieve the agency's national-security objectives.

Ordering a realignment of personnel here is particularly unwarranted because this is not a situation in which Plaintiff was discharged, passed over for a promotion, or denied a reassignment to a new position.[14] As such, there is no realignment that would make Plaintiff whole by putting her back "in as near as a position as possible to where []she would have been" absent the hostile work environment. *See Lowery*, 158 F.3d at 766. Moreover, as discussed earlier, in November 2015, consistent with her wishes, Plaintiff was formally realigned out of the Operations Division (and out of Malafarina's supervision) and into the P3 Division (and under Bishop's supervision). Trial Tr. at 167:18; 266:1-5. Buckley was not, and has never been, in Plaintiff's chain-of-command. Trial Tr. at 336:22-337:1. And although Plaintiff's new position within P3 still fell under Stephens's authority, there was no evidence adduced at trial that the retaliatory hostile work environment continued after November 2015. In fact, Plaintiff herself testified that as recently as a few months before trial, her

---

[14] At most, Plaintiff alleged as part of her retaliatory hostile work environment claim that her request to be geographically relocated to a different office in order to ease her commute was improperly denied. Trial Tr. at 257:11-24. However, the undisputed evidence at trial showed that none of the individuals whom she seeks realignment of (i.e., Stephens, Malafarina, and Buckley) made the ultimate decision to deny her relocation request. Trial Tr. at 742:16-20.

working relationship with both Stephens (and Buckley) was fine, which Stephens corroborated. Trial Tr. at 375:9-376:6, 743:6-744:5.

Nonetheless, Plaintiff speculates that Stephens, Malafarina, and Buckley "cannot be trusted to refrain from continuing to retaliate against [her]." Pl. Mot. 6. She suggests that this is so because Stephens "led in that endeavor" of retaliation and because she "still works under Mr. Stephens." *Id.* The evidence on which Plaintiff would undoubtedly rely for this claim is the testimony of Bishop— who was not in Plaintiff's chain-of-command during the relevant time period, Trial Tr. at 167:16-21—that he participated in a single meeting with Stephens in which Stephens raised concerns over leaking of confidential personnel information by Jessica Horvath, one of Bishop's actual subordinates. Trial Tr. at 120:18-121:11. Bishop testified that the "main purpose" of the meeting was to address the leaking of personnel information. Trial Tr. at 158:16-19. Bishop further testified that during this meeting, Stephens mentioned a tactic he used prior to DSS whereby he would "isolate people, and take away their job duties." Trial Tr. at 121:12-15. Crucially, Bishop testified that Stephens had raised the notion of "taking away . . . duties" as a means of stopping the leaking of personnel information by Horvath. Trial Tr. at 165:2-8. In any event, Bishop also explicitly testified that Stephens never directed him to actually use such tactics on *Horvath*, much less Plaintiff. Trial Tr. at 121:16-22. And with respect to Plaintiff, Bishop's testimony made no mention whatsoever that Stephens ever directed him to use similar tactics, or that he ever observed Stephens directing anyone else to use similar tactics. Indeed, Taylor and Malafarina testified that no one ever directed them to retaliate against her, Trial Tr. at 832:16-18, 973:18-20, and Stephens denied ever having done so, Trial Tr. at 742:21-743:5.

In support of her realignment request, Plaintiff proffers two pieces of new evidence to show that retaliatory harassment has already begun to recur, but neither piece is probative of a hostile work environment. First, Plaintiff has submitted a copy of the online version of a Washington Post

article that was written about the trial, and which includes anonymous, online comments that Plaintiff characterizes as ongoing harassment by DSS. Pl. Mot. 6-7 (citing PEX 2). Without a shred of evidence beyond her own pure speculation, Plaintiff urges that because "[t]here are no persons known to Plaintiff with both the knowledge of this case demonstrated by these posters and the incentive to make these defamatory public comments," this Court "should infer that these posts were made by one or more of the managers whom the jury found harassed Ms. Burke." *Id.* Plaintiff jumps to this conclusion despite the fact that she filed a public complaint over one year ago culminating in a *five-day public trial* in federal court. As such, any number of individuals inside, or outside, DSS could have posted the comments on this public, online article of the Washington Post—a major national newspaper.

Furthermore, it is unknown *what time* or *from where* these comments were posted; therefore, even assuming that it was one or more current DSS employees (or any federal employee) who posted on the news article comments board, it could well have been done in their personal, as opposed to official, capacities. But it is well-settled that federal employees generally do not give up their First Amendment rights simply by virtue of their status as federal employees. *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 465 (1995) ("Even though respondents work for the Government, they have not relinquished the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest."); *accord Kirby v. City of Elizabeth City, N.C.*, 388 F.3d 440, 445 (4th Cir. 2004). As a result, separate and apart from whether these comments constitute a "cognizable danger of recurrent violation" to justify injunctive relief within the context of Title VII, it is at best a dubious proposition that these public, online comments—posted on a press website—concerning a public trial could appropriately serve as the basis for the broad, untailored, and unrelated injunctive personnel realignment requested by Plaintiff. Without more, Plaintiff's request should be denied.

Second, Plaintiff has submitted a declaration averring that shortly following the close of the trial in November, her current direct supervisor Dana Richard "singled [her] out and directed [her] to start signing-in and -out again." Pl. Mot. 6 (citing PEX 1). However, this is both misleading and inadequate to demonstrate that a "cognizable danger of recurrent violation" exists for several reasons. To begin, Richard only became the Acting Assistant Director of P3 and Plaintiff's immediate supervisor after Bishop retired from DSS in April 2017. DEX 4 ¶¶ 1-3 (Decl. of D. Richard). Prior to becoming the Acting Assistant Director of P3, Richard had never been in Plaintiff's supervisory chain. *Id.* ¶ 3. Plaintiff has never alleged that he was involved in the events underlying her retaliatory hostile work environment claim, and, indeed, there was no testimony whatsoever at trial about Richard acting in a retaliatory manner toward Plaintiff.[15] In fact, even today Richard does not know what the specific factual allegations underlying Plaintiff's claims are. *Id.* ¶ 10. Thus, any new allegations with respect to Richard are wholly irrelevant to whether this is a "cognizable danger of *recurrent* violation." *See Spencer*, 703 F. Supp. at 469 (emphasis added).

Also, as Plaintiff's own declaration makes clear, it was *Plaintiff who initiated the conversation* with Richard shortly after the end of the trial. PEX 1, at 1. This was not an instance in which DSS management affirmatively sought to retaliate against her. Rather, on November 16, 2017, Plaintiff and Richard (her current supervisor) had a one-on-one discussion concerning her 2017 annual performance review, and providing feedback is part of the annual performance evaluation process. DEX 4 ¶ 5. Among other things, Richard related to Plaintiff that soon after he became the Acting Assistant Director of P3, some concerns had been expressed to him regarding when she reports for work each day, so he advised her that the question had been raised. *Id.* ¶ 6. Plaintiff typically arrives

---

[15] The *only* time Richard's name was even mentioned at trial was when Stephens gave background testimony describing the current organizational chain-of-command in P3 and CI. Trial Tr. at 712:4-13.

at 6:00 a.m. each day,[16] and Richard assumes that she comes to work when she says she does because he typically does not arrive at work until 7:30 a.m. each day (and thus does not personally observe when she arrives on a normal duty day). *Id.* ¶ 7. As such, Richard suggested that it might be a good idea to make sure that Plaintiff is seen arriving each day, or, if she wanted, she could call or e-mail him when she got in to avoid any questions about this issue. *Id.* ¶ 6.

Notably, it was solely Richard's own independent suggestion that Plaintiff take steps to confirm her arrival time each day; he was not directed to suggest this to her or to require her to do this. *Id.* ¶ 8. In fact, Richard has also mentioned to his other direct-reports that P3 is a small division and that people within DSS frequently need to find one of them for work, and thus they should all make sure others are aware of their arrivals and departures each day. *Id.* Richard simply raised this timekeeping issue with Plaintiff when he did because they were already in the middle of discussing her work performance as part of the annual performance evaluation process. *Id.* ¶ 10.[17] Furthermore, when Stephens and Mark Allen became aware that Richard had made this suggestion to Plaintiff, Mark Allen directed Richard to stop this and advise Plaintiff that she was not required to "sign in." *Id.* ¶ 9. Richard so advised Plaintiff right away. *Id.*

In sum, as a supervisor and timecard approver, including for Plaintiff, it is Richard's obligation to make sure that employees are putting in the time that they are claiming they are working. *Id.* ¶ 7. His suggestion to Plaintiff had nothing to do with her court case, let alone her EEO complaint. It is insufficient for Plaintiff to select an isolated, undesirable decision by her new

---

[16] As Plaintiff attested to at trial, Trial Tr. at 403:22-404:1, and as Richard confirms, Plaintiff is currently on a Maxiflex work schedule, which allows her to vary the times that she reports and departs for work each day as long as she performs or accounts for (by taking approved leave) 80 duty hours per two-week pay period, DEX 4 ¶ 6.

[17] Moreover, because Richard and Plaintiff were discussing Plaintiff's annual performance evaluation for 2017, it is unsurprising that this conversation took place in November—irrespective of the fact that the trial in this case took place then as well.

supervisor, who had nothing to do with the events underlying this litigation, and which she herself prompted, in order to support a far-reaching injunction like this requested realignment.[18] This is not the standard for granting such injunctive relief and should be rejected.

**F.    A Blanket Injunction Requiring DSS to "Obey the Law" Is Improper and Unnecessary**

Finally, although Plaintiff concedes that "broad prohibitions are generally disfavored in equity," she nonetheless requests an injunction "prohibiting DSS or any and all agents of DSS from retaliating against Ms. Burke for making and prosecuting her EEO complaints." Pl. Mot. 7-9. Much like Plaintiff's request that this Court direct DSS to create a plan to prevent future retaliation, *see supra* **Part II.D**, Plaintiff in effect seeks an order from this Court directing DSS and its agents to "obey the law." But, again, "an injunction that simply orders the defendant to obey the law and not discriminate is impermissible." *Miller*, 2007 WL 2570219, at *4 .

In *Davis v. Richmond, Fredericksburg & Potomac R. Co.*, 803 F.2d 1322 (4th Cir. 1986), the Fourth Circuit vacated the district court's injunction directing the defendant-company to "refrain from 'committing further violations of Title VII'" because it "swept too broadly." *See id.* at 1328. "Such an injunction impermissibly subjects a defendant to contempt proceedings for conduct 'unlike and unrelated to the violation with which it was originally charged.'" *Id.* (quoting *NLRB v. Express Publ'g Co.*, 312 U.S. 426, 436 (1941)). Thus, granting such injunctive relief would "would invite constant court monitoring of the injunction." *Hendrix v. Sterilite Corp.*, 742 F. Supp. 2d 1277, 1285 (N.D. Ala. 2010); *see also Farina v. Ciccone Food Prods., Inc.*, 2005 WL 3483002, at *2 (N.D. Ill. Dec. 15,

---

[18] It is also worth noting that even if this sign-in proposal had continued, it cannot be said that the jury determined that the allegations concerning Taylor's temporary four-week sign in/out requirement contributed to the retaliatory hostile work environment. Because the jury returned a general verdict on liability, there is no way to know for sure what precise events the jury considered violative of Title VII and thus what precise events should even be under consideration as subject to a potential injunction. *See Hayes*, 933 F. Supp. at 27.

2005) (holding that to enjoin the defendant "from violating Title VII" and to order it to establish a sexual harassment policy "would warrant an extended involvement by the court in the affairs and operations of [the defendant]"). Absent "compelling circumstances," the "additional expenditure of court resources for such a purpose" is not merited. *See Farina*, 2005 WL 3483002, at *2.

In this case, such "compelling circumstances" do not exist. To be sure, although the jury found DSS liable for a retaliatory hostile work environment, this is nonetheless an individual claim circumscribed in time involving a discrete number of managers within DSS—several of whom no longer work at the agency. *See Farina*, 2005 WL 3483002, at *2 ("This is not a case where an entire supervisory body in a company engaged in systematic harassment that would require future injunctive relief to fully remedy the problem."); *see also Spencer*, 894 F.2d at 660 (affirming the denial of an injunction because "[t]his is not a case of systematic company-wide discrimination"). And tellingly, Plaintiff herself concedes that it is "difficult to predict the shape and nature of retaliation that DSS managers may impose in the future." Pl. Mot. 8. This concession fatally undermines her request because injunctive relief *must* only be tailored to prevent a "cognizable danger of *recurrent* violation." *See Spencer*, 703 F. Supp. at 469 (emphasis added). That is to say, injunctive relief may be granted if, and only if, there is a likelihood that "*established* violations" will "recur[]." *See Hayes*, 10 F.3d at 217 (emphasis added). As Plaintiff admits, it cannot be predicted whether any specific acts on which the jury may have based its finding of liability will recur, or whether any specific individuals whose actions the jury may have faulted will repeat those actions. Thus, contrary to clear Fourth Circuit precedent, Plaintiff impermissibly seeks to subject DSS to "contempt proceedings for conduct unlike and unrelated to the violation with which it was originally charged." *See Davis*, 803 F.2d at 1328.

Furthermore, Plaintiff's request is untenable as a practical matter in light of the fact that her single claim in this case was one for a retaliatory hostile work environment, and that it cannot be

determined what specific conduct the jury considered to have contributed to a finding of liability. As such, there is no workable baseline on which to adjudicate any future putative violation of an "obey the law" injunction. Yet Plaintiff still reasons that a broad "obey the law" injunction is necessary to "allow [her] the opportunity to appeal *straight to this Court* for a contempt citation if future retaliation occurs." Pl. Mot. 8 (emphasis in original). Plaintiff noticeably neglects to identify when such a hypothetical claim may ripen. For example, given the testimony that was brought forth at trial, if any of her managers fail to inform her about a meeting, or fail to give her a desired work assignment, or even fail to greet her—even just once—then by this request, could Plaintiff immediately invoke this Court's oversight? Such a breathtaking result is simply not what Title VII was intended to provide.

Plaintiff baldly asserts that "[t]he evidence at trial showed that DSS was emboldened in its retaliation due to the *remoteness* of any relief available to Ms. Burke." *Id.* However, Plaintiff does not actually identify any evidence in the record to support this statement. There is none. The mere fact that Plaintiff succeeded in achieving a jury verdict in her favor does not mean that she may forevermore bypass basic exhaustion requirements for hypothetical future claims that lack any "cognizable danger" of recurring. *See Hendrix*, 742 F. Supp. 2d at 1285 (declining to grant a blanket "obey the law" injunction because "[t]o do so would invite constant court monitoring of the injunction, and would invite a series of contempt citations, *without the exhaustion of EEOC remedies*") (emphasis added)). Accordingly, Plaintiff's request for a blanket "obey the law" injunction should likewise be denied.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Injunctive Relief should be denied. Plaintiff has not met her burden to show that she is entitled to any relief beyond the nominal damages awarded by the jury.

Dated: January 3, 2018                    Respectfully submitted,

                                          DANA J. BOENTE
                                          UNITED STATES ATTORNEY

                                    *By*: _____/s/_____
                                          ANDREW S. HAN
                                          KIMERE J. KIMBALL
                                          Assistant United States Attorneys
                                          Office of the United States Attorney
                                          Justin W. Williams U.S. Attorney's Building
                                          2100 Jamieson Avenue
                                          Alexandria, Virginia 22314
                                          Tel:    (703) 299-3970/3763
                                          Fax:    (703) 299-3983
                                          Email:  andrew.han@usdoj.gov
                                                  kimere.kimball@usdoj.gov
                                          *Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2018, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which will send a notification of electronic filing (NEF) to the

following counsel of record:

Jacob M. Small
J. Madison PLC
1750 Tysons Boulevard
Suite 1500
McLean, Virginia 22102
T: (703) 910-5062
F: (703) 910-5107
E: jmsmall@jmadisonplc.com

_____/s/_____
Andrew S. Han
Assistant United States Attorney
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:     (703) 299-3970
Fax:     (703) 299-3983
Email:  andrew.han@usdoj.gov